MEMORANDUM AND ORDER
 

 GILES, District Judge.
 

 TABLE OP CONTENTS
 

 SUBJECT PAGE
 

 I. INTRODUCTION 1392
 

 II. THE COMPLAINTS 1393
 

 III. DISCUSSION 1397
 

 A. Pleading Deficiencies 1397
 

 1. Specificity and Rule 9(b) 1397
 

 2. Immaterial, Impertinent or Scandalous Matter 1400
 

 3. Simplicity and Rule 8 1401
 

 B. Federal Securities Laws 1402
 

 1. Section 10(b) 1402
 

 (a) Scope of Prohibited Conduct 1403
 

 (b) Churning 1405
 

 (c) In Connection With 1407
 

 (d) Causation 1413
 

 2. Section 12(2) 1417
 

 3. Investment Advisers Act of 1940 1418
 

 4. Section 17(a) 1417
 

 5. Vicarious Liability 4449
 

 C. The Rico Claims 1422
 

 1. The Statute 1422
 

 2. Securities Related Issues 1424
 

 3. Organized Crime 1426
 

 4. Injury 1430
 

 (a) Competitive Injury 1431
 

 (b) Racketeer Enterprise Injury 1434
 

 D. State Law Claims 1437
 

 1. Pendent Jurisdiction 1437
 

 2. Causation 1438
 

 3. State Securities Statutes 1438
 

 4. New Jersey Consumer Fraud Act 1441
 

 I. INTRODUCTION
 

 Before the court are motions to' dismiss in five securities fraud cases, consolidated for purposes of pretrial proceedings by the Judicial Panel on Multidistrict Litigation.
 
 [1]
 
 Although the allegations contained in the complaints vary slightly, each involve the conduct of Kenneth G. Catanella (“Catanella”), a securities broker employed by defendant E.F. Hutton and Company, Inc. (“Hutton”). Catanella is accused of a continuing course of fraud in connection with his handling of plaintiffs’ portfolios. The allegations run the gamut from churning to the purchase of unsuitable securities and the failure to disclose the risks inherent in certain transactions. In addition to misrepresentations and omissions directly impinging upon trading decisions, it is also averred that Catanella failed to disclose his role in a prior securities fraud action. Defendants Hutton and Granville are sued for failing to supervise Catanella adequately and under the related doctrine of
 
 respondeat superior.
 
 They are also characterized as “controlling persons” and aiders and abettors. Plaintiffs invoke sections 12(2), 15 and 17(a) of the Securities Act of 1933, 15 U.S.C. §§
 
 m
 
 (2), 77o, 77q(a) (1976), sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a) (1976) and the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-l — 80b-17
 
 *1393
 
 (1976) . Claims are also made pursuant to the Racketeer Influenced and Corrupt Organizations Act of 1970, (“RICO”), 18 U.S.C. §§ 1961-1968 (1976). Various counts based upon state law have been appended to the federal claims. In their motions to dismiss, defendants have assailed the legal sufficiency of virtually every cause of action. For the reasons which follow, the motions shall be granted in part and denied in part.
 

 II. THE COMPLAINTS
 

 When deciding a motion to dismiss, the court must take as true all well pled allegations and resolve all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.
 
 See e.g., Miree v. DeKalb County,
 
 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977) ;
 
 Rogin v. Bensalem Township,
 
 616 F.2d 680, 685 (3d Cir.1980);
 
 Bogosian v. Gulf Oil Corp.,
 
 561 F.2d 434, 444 (3d Cir. 1977).
 
 [2]
 
 Mindful of this standard, I shall summarize the rather complex allegations contained in the complaints. In the interest of brevity, I shall address issues jointly where possible.
 

 Each complaint begins by tracing the progress of Catanella’s brokerage career. After spending eight months as a trainee, he embarked on that career at Paine, Webber, Jackson & Curtis, Inc. (“Paine, Webber”) in 1969. Then, from December, 1972 until November, 1973, he was a registered representative and sales manager for Shearson, Hayden, Stone, Inc. (“Shear-son”). Taraborelli Complaint at ¶ 16; Shulik Complaint at ¶ 8.
 
 [3]
 
 In April of 1974, Catanella’s former customers from Paine, Webber and Shearson instituted suit against him and his former employers, claiming violations of a variety of federal and state securities laws.
 
 [4]
 
 After a bench trial, Catanella was found to have violated sections 10(b) and 15(c) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78o (c) (1976), various regulations and stock exchange rules. The trial court determined that Catanella had intentionally mishandled those plaintiffs’ accounts, making unauthorized and unsuitable purchases, failing to disclose the risks inherent in short term trading and recommending securities without justification or investigation. Catanella also churned the accounts, disregarded specific instructions and breached a variety of fiduciary duties. Taraborelli Complaint at ¶ 19. Paine, Webber and Shearson were held liable for,
 
 inter alia,
 
 failing to supervise Catanella.
 
 Id.
 
 Judgment was entered against the defendants for eight hundred and thirteen thousand dollars ($813,000.00) and the case was later settled for an amount very close to that figure.
 
 Id.
 
 at 1120.
 

 The instant complaints also allege that Catanella had been terminated by Paine, Webber and Shearson, had been the subject of customer complaints and disciplinary proceedings, and had been previously fined for unauthorized trading. Catanella’s commission record had been quite high, a potential indicia of churning.
 
 Id.
 
 at 1121. Despite this dubious employment history, Hutton hired Catanella as a registered representative. It is averred that Hutton either knew all of these facts before hiring him or was reckless in its failure to so learn. Not only was Catanella hired, but he was also named Portfolio Manager, made a member of Hutton’s Director’s Advisory Council and elected Vice-President. These titles added to Catanella’s credibility, but were allegedly undeserved and misrepresented the level of his expertise.
 
 Id.
 
 at
 
 *1394
 
 11¶ 23-24. In an attempt to launch Catanella’s career at Hutton, a series of widely publicized seminars and lectures were sponsored by the firm. Famous market prognosticator, Joseph Granville was spotlighted at these lectures and Catanella was presented as a follower of the Granville method of investing. Gaugler Amended Complaint at H 8. These seminars were directly or indirectly responsible for bringing plaintiffs and Catanella together.
 

 A.
 
 The Gaugler Complaint
 

 Edward Gaugler, a sixty two year old retired scientist, attended a Hutton seminar in Atlantic City. Both Granville and Catanella were in attendance, and the latter was dubbed the “Granville Oriented Broker in the Tri-State Area.”
 
 Id.
 
 at H 9. During the seminar, Gaugler was given an informational card, which he filled out, entitling him to a free Granville Newsletter. This card also provided Catanella with the ability to contact and solicit him as a potential customer, which he did. Gaugler explained that his investments to date had been conservative,
 
 id.
 
 at II11, and that he desired only a “businessman’s risk.”
 
 Id.
 
 at 22. It is alleged that Gaugler was unsophisticated in investments and this fact should have been clear to Catanella.
 
 Id.
 
 at 11¶ 3, 11. Catanella attempted to convince Gaugler to follow the Granville market approach, making it appear that he was in constant contact with Granville and that Granville approved of his trading decisions. He also represented that Hutton’s research facilities were utilized in reaching all trading decisions.
 
 Id.
 
 at HH 11-14.
 

 The complaint avers numerous wrongdoings by Catanella and Hutton, including their failure to disclose the cash position in Gaugler's account thereby enabling Hutton to use the idle cash for its own benefit,
 
 id.
 
 at ¶ 17; failure to disclose that certain transactions were contrary to Granville’s advice,
 
 id.
 
 at ¶ 18; failure to disclose that Gaugler had not “gotten in” at the beginning of Granville’s strategy for a certain period,
 
 id
 
 at ¶ 23, and failure to disclose that Hutton’s research resources were rarely utilized in making trading decisions,
 
 id.
 
 at H 24. Defendants made unauthorized trades, purchasing securities that were far riskier than those desired by Gaugler. Catanella induced Gaugler to purchase options, representing himself to be experienced in that area. Gaugler was never apprised of the significant risks involved and after losing almost all of the capital invested, was told that Catanella had never before traded in options.
 
 Id.
 
 at MI 21-22. Contrary to their representations, when warranted by the situation, defendants did not place firm stop orders on behalf of Gaugler’s account.
 
 Id.
 
 at H 25. Gaugler claims that Catanella engaged in churning, yielding a turnover ratio in excess of seven to one,
 
 id.
 
 at ¶ 16, and failed to disclose that he was a defendant in the
 
 Brown
 
 suit. Hutton and Granville were aware of Catanella’s complicity or were reckless in their failure to so learn.
 
 Id.
 
 at MI 25F, 25H. Finally, Granville is accused of reassuring Gaugler that all was going well while the other defendants were raping his portfolio.
 
 Id.
 
 at H 19.
 

 Gaugler sues under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a) (1976); section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (1976); section 206 of the Investment Advisers Act, 15 U.S.C. § 80b-6 (1976) and RICO. The complaint also contains state claims for breach of contract, breach of fiduciary duty, conversion, fraud, negligence, violation of the New Jersey Consumer Fraud Act, N.J.Stat. Ann. tit. 56 § 8-1 — 8-20 (West Supp.1983-1984), and the New Jersey Uniform Securities Law, N.J.Stat.Ann. tit. 49 § 3-47 — 3-76 (West Supp.1983-1984). The liability of Granville and Hutton is premised upon the “controlling persons” provision,
 
 id.
 
 at 117;
 
 respondeat superior, id.
 
 at II 28; failure to adequately supervise Catanella,
 
 id.
 
 at H 20 and aiding and abetting.
 
 Id.
 
 at 27.
 

 Catanella and Hutton seek dismissal, assailing the complaint for not pleading fraud with sufficient specificity to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. Alternatively, they seek a more definite statement under Rule 12(e). Defend
 
 *1395
 
 ants contend that Gaugler has failed to state a claim under section 10(b), arguing that the complaint is devoid of any allegations of material misrepresentations or omissions in connection with the purchase or sale of securities. Further, they insist that the complaint fails to state a cause of action under RICO and both New Jersey statutes. Defendants assert that count eleven, which contains details of the
 
 Brown
 
 action, including excerpts from the court’s findings, should be striken as “immaterial, impertinent or scandalous matter,” under Rules 11 and 12(f). Defendants also claim that certain portions of the complaint are violative of Rule 8. Finally, if the federal causes of action fail, Catanella and Hutton argue for dismissal of the pendent state claims.
 

 In a separate motion, Granville moves to dismiss or for a more definite statement under Fed.R.Civ.P. 12(e). In addition to expressly joining the motion of Catanella and Hutton, Granville argues that the complaint does not support liability against him either as a controlling person or an aider and abettor.
 

 B.
 
 The Taraborelli Complaint
 

 David Taraborelli brings suit on behalf of himself and all other persons who purchased from or sold securities to, Catanella from April 1, 1979 to the present. Taraborelli Complaint at ¶ 9.
 
 [5]
 
 Like the Gaugler complaint, it traces Catanella’s employment history and involvement in
 
 Brown.
 
 Again, Catanella is charged with churning, failing to disclose the risks of option and margin trading and engaging in unauthorized transactions, unsuited to the customer’s needs or desires. It is generally averred that he disseminated material false or misleading information to his customers.
 
 Id.
 
 at 1111 25, 26. Catanella and Hutton
 
 [6]
 
 are sued under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, RICO, common law fraud, misrepresentation, negligence and both the Pennsylvania and New Jersey securities statutes. In their motion to dismiss, defendants raise arguments similar to those made in Gaugler. With respect to section 10(b), defendants argue that the requisite material misrepresentations or omissions are absent, that their actions did not cause plaintiffs’ losses, and were not “in connection with” the purchase or sale of a security. It is asserted that the fraud allegations were not pled with sufficient specificity and that the complaint fails to state a cause of action under RICO. Portions of the complaint are labeled scandalous and impertinent and defendants maintain that the failure of the section 10(b) claim would prove fatal to the section 20(a) claim. Finally, defendants contend that the complaint fails to state a cause of action under either the Pennsylvania or New Jersey statute, that causation is lacking and that all pendent claims should be dismissed if the federal claims are found wanting.
 

 C.
 
 The Shulik Complaint
 

 Saul and Teresa Shulik met Catanella at one of the Hutton-Granville seminars. They were also unsophisticated investors and specifically advised him of their interest in safe and conservative investments. Shulik complaint at ¶ 18. Although Catanella agreed to abide by their wishes, he indicated that as amateurs, they ought to rely upon him to handle their portfolio. Initially, Catanella did purchase blue chip quality stocks as requested.
 
 Id.
 
 at 1122. However, a variety of circumstances led to the sale of most, if not all, of this high quality stock. First, Catanella convinced the Shuliks to open a margin account to allow them greater purchasing power. In response to plaintiffs’ inquiries about the high interest, risks involved and frequent transactions, Catanella assured the Shuliks that he was proceeding along the appropriate course.
 
 Id.
 
 at 1125. However, a large portion of the blue chip stock in the Shu
 
 *1396
 
 liks’ portfolio was sold in order to effectuate Granville’s advice to “go short,”
 
 id.
 
 at ¶ 27, a decision which resulted in substantial losses. In an attempt to recoup some of these losses, Catanella began to purchase a large volume of shares in a company called Texas International. All blue chip securities, except holdings in Exxon and Smith, Kline were sold to purchase blocks of Texas International stock.
 
 Id.
 
 at H 30. When the price began to decline, the Shuliks requested that Catanella sell while they could still profit, but once again Catanella reminded them that they had no experience in the field and should “leave everything to him.”
 
 Id.
 
 at ¶ 32. Ultimately, the price dropped so low that virtually the entire portfolio was sold to satisfy margin calls.
 
 Id.
 
 at 33-35. In addition to losing their initial investment of seventy-two thousand dollars ($72,000), they paid eleven thousand dollars ($11,000) in brokerage commissions and over thirteen thousand dollars ($13,000) in interest on their margin account.
 
 Id.
 
 at ¶ 36.
 

 The Shuliks accuse defendants of churning, manipulating their margin account to generate interest, failing to disclose the risks involved in margin trading and purchasing securities without reasonable investigation or justification, considering their stated investment goals. The Shuliks point out that they relied upon Hutton’s reputation and Catanella’s representations about his experience. Given their lack of sophistication, they followed Catanella’s advice according him
 
 de facto
 
 control over their account.
 
 Id.
 
 at ¶ 45. In deciding to trust and rely upon Catanella, plaintiffs did not know of his role in
 
 Brown.
 
 The complaint alleges violations of sections 10(b) and 20(a), RICO, the Investment Advisers Act and the Pennsylvania and New Jersey securities statutes. Claims are also included for fraud, conversion, negligence and breach of contract. The motion to dismiss in this case raises virtually identical arguments, contending that the complaint fails to state a claim under section 10(b), RICO, the Investment Advisers Act and the Pennsylvania and New Jersey securities statutes.
 

 D.
 
 The Singer Complaint
 

 Although Ronald Singer did not attend a Hutton-Granville lecture, he responded by telephone to a promotional advertisement and was subsequently contacted by Catanella. Singer Complaint at MI 16-17. He explicitly informed Catanella of his interest in only safe investments. Catanella promised to invest ninety percent (90%) of his money in conservative high quality securities, using only ten percent (10%) for more speculative ventures.
 
 Id.
 
 at ¶ 20. Catanella made a variety of representations about his experience and informational links, inducing Singer to open an account with him. Singer stated that he was investing the bulk of his assets, was unsophisticated, and was therefore relying on Catanella. He accorded the broker broad discretionary powers.
 
 Id.
 
 at ¶ 21. Contrary to the investor’s expectations, Catanella engaged in highly speculative maneuvering, selling short, on margin and purchasing options. He misrepresented the risks, failing to disclose,
 
 inter alia,
 
 that by trading on margin, Singer was actually gambling with more money on the table. He failed to explain how interest was computed, the extent to which Hutton benefitted from the margin account and the eventuality of margin calls. He also indicated that trading on margin was suitable for someone with Singer’s investment objectives.
 
 Id.
 
 at ¶ 26. However, the margin account was allegedly opened primarily to generate interest income for Hutton.
 
 Id.
 
 at H 27. Defendants also are accused of churning.
 
 Id.
 
 at II37. When the value of Singer’s portfolio began to decline, Catanella reassured him that he would handle everything and would “turn things around.”
 
 Id.
 
 at II30. To recoup, Catanella began purchasing only Texas International, an allegedly undervalued stock. The suitability of this volatile stock was misrepresented and, as mentioned above, its market price began to plummet. Margin calls led Singer to owe Hutton approximately twelve thousand dollars ($12,-000).
 
 Id.
 
 at 35. Allegations with respect to
 
 Brown
 
 also find themselves in this complaint. Singer invokes sections 10(b), 12(2),
 
 *1397
 
 15 and 20(a); RICO and the Pennsylvania and New Jersey securities statutes. The full panoply of state common law claims are also included.
 

 Once again, the motions to dismiss attack the legal sufficiency of the securities and RICO claims. Defendants also contend that the churning allegations lack the specificity required under Fed.R.Civ.P. 9(b). Finally, defendants incorporate all arguments raised in the Taraborelli motion.
 

 E.
 
 The Rastelli Complaint
 

 The Rastelli complaint is a virtual carbon copy of Singer. Consequently, the motion to dismiss asserts the same arguments raised in the Singer motion.
 

 III. DISCUSSION
 

 A.
 
 Pleading Deficiencies
 

 In addition to more substantive attacks, defendants argue that all of the complaints suffer from fatal pleading flaws. The allegations are assailed under Rules 8 and 9(b) of the Federal Rules of Civil Procedure. Moreover, portions of the complaints are characterized as “immaterial, impertinent or scandalous,” worthy of being stricken under Rules 11 and 12(f). I shall address these contentions
 
 seriatim.
 

 1.
 
 Specificity and Rule 9(b)
 

 Rule 9(b) of the Federal Rules of Civil Procedure requires allegations of fraud to be pled with particularity.
 
 [7]
 
 Defendants argue that plaintiffs’ averments are conclusory, lacking the factual specificity necessary to formulate an intelligent response. They cite plaintiffs’ failure to furnish the details typically required of newspaper reporters — the who, what, where, when and how of the misrepresentations and omissions. The allegations of scienter are condemned as faulty as are the charges of churning. Defendants contend that the RICO counts are predicated upon vacuous and deficient allegations of securities fraud. As an alternative to dismissal, defendants seek a more definite statement under Fed.R.Civ.P. 12(e).
 

 Rule 9(b)’s particularity requirements prohibits reliance upon “unsubstantiated conclusory allegations.”
 
 Juster v. Rothschild, Unterberg, Towbin,
 
 554 F.Supp. 331, 332 (S.D.N.Y.1983) (quoting
 
 Vetter v. Shearson Hayden Stone, Inc.,
 
 481 F.Supp. 64, 65 (S.D.N.Y.1979).
 
 Accord Decker v. Massey-Ferguson, Ltd,
 
 681 F.2d 111, 115 (2d Cir.1982);
 
 Segal v. Gordon,
 
 467 F.2d 602, 607 (2d Cir.1972);
 
 Mauriber v. Shearson/American Express, Inc.,
 
 567 F.Supp. 1231, 1236 (S.D.N.Y.1983);
 
 Kimmel v. Peterson,
 
 565 F.Supp. 476, 481, (E.D.Pa.1983);
 
 Merrill Lynch, Pierce, Fenner & Smith v. DelValle,
 
 528 F.Supp. 147, 149 (S.D.Fla.1981);
 
 Goodman v. Moyer,
 
 523 F.Supp. 33, 35 (E.D.Pa.1981). As the Second Circuit stated in
 
 Segal,
 
 “10b-5 violations will not pass scrutiny if they do not allege with some specificity the statements allegedly constituting fraud.” 467 F.2d at 607. The purpose for this rule is two-fold. It protects parties from frivolous allegations of fraud. As Wright and Miller noted; “[I]t is a serious matter to charge a person with fraud and hence no one is permitted to do so unless he is willing to put himself on record as to what the alleged fraud consists of specifically.” 5 C. Wright & A. Miller,
 
 Federal Practice & Procedure,
 
 § 1298 at 413 (1969) (footnotes omitted). It also serves a notice function. To comply with the rule, a complaint must contain sufficient detail to apprise the defendants of the claims against them and allow them to formulate a meaningful response.
 
 See e.g., Gottreich v. San Francisco Investment Corp.,
 
 552 F.2d 866 (9th Cir.1977);
 
 Kimmel,
 
 565 F.Supp. at 481;
 
 Kaufman v. Magid,
 
 539 F.Supp. 1088, 1092-93 (D.Mass.1982);
 
 Baselski v. Paine, Webber, Jackson & Curtis, Inc.,
 
 514 F.Supp. 535, 540 (N.D.Ill.1981);
 
 Zaretsky v. E.F. Hutton & Co., Inc.,
 
 509 F.Supp. 68, 74 n. 27 (S.D.N.Y.1981);
 
 Posner v. Coopers & Lybrand,
 
 92 F.R.D. 765, 768 (S.D.N.Y. 1981) ,
 
 aff'd mem.,
 
 697 F.2d 296 (2d Cir. 1982) . Although it is difficult to describe
 
 *1398
 
 abstractly the quantum of specificity required, the rule is generally deemed satisfied where the complaint details the time, place, substance of the alleged misrepresentations, as well as the identity of the individual perpetrating the fraud.
 
 See e.g., Bennett v. Berg,
 
 685 F.2d 1053, 1062 (8th Cir.1982),
 
 aff'd en banc,
 
 710 F.2d 1361 (8th Cir.1983),
 
 cert. denied,
 
 — U.S. -, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983);
 
 Kaufman,
 
 539 F.Supp. at 1093;
 
 Baselski,
 
 514 F.Supp. at 540;
 
 Troyer v. Karcagi,
 
 476 F.Supp. 1142, 1149 (S.D.N.Y.1979). However, as the
 
 Baselski
 
 court noted; “[t]he sufficiency of a pleading under this rule also varies with the complexity of the transaction. When the transactions are numerous and take place over an extended period of time, less specificity is required.” 514 F.Supp. at 540 (citations omitted). Furthermore, Rule 9(b) must be read in conjunction with Rule 8(a) which requires only a short and plain statement of the cause of action.
 
 [8]
 
 Therefore, the rule should not be applied with such draconian strictness as to undermine the liberal spirit of the Federal Rules of Civil Procedure.
 

 Considering the complaints in light of the standards articulated above, I conclude that dismissal is not warranted. The Gaugler complaint sets out the churning allegations in exacting detail, including the names of the securities allegedly churned, the commissions generated, the frequency of trades and the turnover ratio.
 
 [9]
 
 Gaugler Amended Complaint at ¶ 16i-x. In addition, various misrepresentations and omissions are described, accompanied by the substance of the statements, the identity of the speaker and why they are alleged to be fraudulent. The only thing missing is the exact date on which each incident occurred. However, there is more than sufficient information to apprise defendants of the claims against them and aid in formulating a response. The Gaugler complaint does not offend Rule 9(b) and neither dismissal nor a more definite statement is warranted.
 

 The Shulik, Rastelli and Singer complaints, while not as detailed as the amended complaint in Gaugler, still pass muster under Rule 9(b). They contain much more than the conclusory allegations of fraud that defendants portray. A course of fraudulent activity is chronicled, including a variety of misrepresentations and omissions, the substance of which is described in the complaints. The relative knowledge of the parties is outlined and the perpetrator of the fraud identified. The breadth of the allegations convinces me that the fraud aspects of these complaints are not “vexatious,” brought only to tarnish the defendants’ reputations. Although not paragons of specificity, I conclude that the allegations stated are sufficient to place defendants on notice and allow them to respond. As the court in
 
 Mauriber
 
 noted; “I find no greater merit in defendant’s remaining scattershot contentions that the complaint omits various details ____ The complaint is not deficient for failing to state every detail that might be a proper subject for interrogatories.” 567 F.Supp. at 1236. I recognize, as did the court in
 
 Mauriber,
 
 that the actual shaping of issues in complex cases takes place during the discovery process.
 
 See also Christidis v. First Pennsylvania Mortgage Trust,
 
 717 F.2d 96, 99-100 (3d Cir.1983).
 

 
 *1399
 
 However, I do note that the churning charges in these complaints are somewhat conclusory. The Shulik complaint states the amount of commissions paid to defendants. The Rastelli and Singer complaints assert only that plaintiffs’ portfolios were churned to generate commissions and in direct contradiction to plaintiffs’ investment instructions. Defendants argue that these allegations are insufficient under Rule 9(b) principally because they fail to identify those transactions alleged to be improper. Notwithstanding that some courts might, in their discretion, require more specificity to maintain a churning claim than is present here,
 
 see Russo v. Bache Halsey Stuart Shields, Inc.,
 
 554 F.Supp. 613, 617-18 (N.D.Ill.1982);
 
 Vetter v. Shearson Hayden Stone, Inc.,
 
 481 F.Supp. 64, 66 (S.D.N.Y.1979);
 
 Fein v. Shearson Hayden, Stone, Inc.,
 
 461 F.Supp. 137, 142-43 (S.D.N.Y.1978), I will not dismiss these portions of the complaints.
 
 See e.g., Kaufman v. Magid,
 
 539 F.Supp. 1088, 1095 (D.Mass.1982) (general allegations of churning, tracking definition held sufficient). As the
 
 Baselski
 
 court noted, where the transactions are numerous and stretch over an extended period of time, less specificity is required. 514 F.Supp. at 540. Given the time frame involved in these complaints and the potentially large number of transactions involved, a requirement that plaintiff list each allegedly fraudulent purchase and sale would be unduly burdensome and undermine the liberal notice pleading embodied in the Federal Rules of Civil Procedure.
 
 [10]
 

 Accord Baselski,
 
 514 F.Supp. at 541 n. 2. Moreover, unless they have been diligent record keepers, plaintiffs may lack, pre-discovery, detailed information necessary to list all transactions or calculate turnover ratios. The records containing that information are most likely in the possession of defendants. Although I do not sanction conclusory pleading and would prefer more detail, I decline to impose requirements that may bar otherwise deserving plaintiffs from vindicating their claims. Even assuming that plaintiffs do possess the necessary information, dismissal or requiring a more definite statement would serve little practical utility. Defendants have been accused of churning and have sufficient facts to admit or deny that allegation. Amendments to the complaints would only delay what already appears to be a protracted suit. As this court noted; “[o]nly through discovery will both sides gain the information required to assert their respective claims and defenses.”
 
 Kimmel,
 
 565 F.Supp. at 482.
 

 The Taraborelli complaint is the least specific of the five. Although the pleading sets forth in great detail Catanella’s involvement in
 
 Brown
 
 and the findings in that case, the other allegations of fraud are somewhat conclusory. The factual background is provided, including Hutton’s role in launching Catanella’s career with the aid of the Granville seminars. However, the ultimate allegations of fraud are sparse.
 
 [11]
 
 Plaintiffs’ response concedes that the requisite particularity is lacking, but argues that his claim of fraud is predicated only upon Catanella’s failure to disclose his role in
 
 Brown. See
 
 Plaintiff’s Memorandum of Law in Opposition to Defendant’s Motion to Dismiss the Complaint at 18. The other allegations of fraud, including churning and option and margin trading without dis
 
 *1400
 
 closing the inherent risks, are said to support the claim of fraud, rather than constitute it.
 
 Id.
 
 Frankly, I am perplexed how an allegation of churning relates to the failure to disclose the existence of a previous action. It seems apparent that these are separate and distinct instances of fraudulent conduct. However, I shall accept plaintiffs’ representation that the fraudulent behavior is limited to
 
 Brown.
 
 The averments surrounding
 
 Brown
 
 are pled with sufficient particularity under Rule 9(b). Given plaintiffs’ position, I need not reach the specificity of the other allegations of fraud and shall deny the motion to dismiss. However, this issue may arise again if I am called upon to decide a class certification motion. Should plaintiff desire at that time to include other instances of fraud, he will be required to furnish additional factual allegations.
 
 [12]
 
 Defendants’ motions to dismiss on specificity grounds are therefore denied.
 
 [13]
 

 2.
 
 Immaterial, Impertinent or Scandalous Matter
 

 Defendants move to strike portions of the complaints as “immaterial, impertinent or scandalous” under Fed.R.Civ.P. 12(f). The challenge focuses upon the RICO counts, which set out at length the details of the
 
 Brown
 
 action.
 
 [14]
 
 In particular, defendants attack the quotation of large excerpts from the court’s findings in
 
 Brown.
 
 It is argued that
 
 Brown
 
 has nothing to do with this action, is not material and is extremely prejudicial. In addition, defendants characterize the averments as an attempt to prove that Catanella acted in conformity with his prior conduct, an impermissible inference under Rule 404(b) of the Federal Rules of Evidence.
 

 The standard for striking under Rule 12(f) is strict. One court has stated that “only allegations that are ‘so unrelated to plaintiffs’ claims as to be unworthy of any consideration as a defense’ should be striken.”
 
 EEOC v. Ford Motor Co.,
 
 529 F.Supp. 643, 644 (D.Col.1982) (quoting C. Wright & A. Miller,
 
 Federal Practice and Procedure
 
 § 1380 at 784 (1969)). Similarly, immateriality under this rule has been defined as “any matter having no value in developing the issues of a case.”
 
 Oaks v. City of Fairhope, Ala.,
 
 515 F.Supp. 1004, 1032 (S.D.Ala.1981).
 

 Defendants’ arguments overlook the fact that the
 
 Brown
 
 litigation is highly relevant in two major respects. Catanella’s previous involvement in securities fraud may help establish the “pattern of racket
 
 *1401
 
 eering” prong of RICO.
 
 [15]
 
 More importantly, the failure to disclose Catanella’s role in
 
 Brown
 
 is one of the alleged acts of fraud. The details surrounding the suit become crucial. For example, the more outrageous the fraud in
 
 Brown,
 
 arguably the more material becomes the failure to disclose. The actual resolution of the suit may also be highly probative with respect to Hutton’s level of knowledge. I do not interpret these allegations as an attempt to prove Catanella’s present liability because of the marked similarity between the activities. Quoting
 
 ad nauseum
 
 from the court’s findings might not have been necessary, however, the content of those findings is not “so unrelated to plaintiffs’ claims” as to warrant striking them under Rule 12(f). By so holding, I do not rule on the legal sufficiency of a section 10(b) claim premised upon the failure to disclose
 
 Brown,
 
 an issue which shall be analyzed
 
 infra.
 
 I decide only that, as a matter of pleading, dismissal is not appropriate.
 

 3.
 
 Simplicity and Rule 8
 

 Defendants attack the RICO counts for their verbosity, arguing that Fed.R. Civ.P. 8 is thereby offended. Rule 8(a)(2) requires that a pleading contain “a short and plain statement of the claim showing that the pleader is entitled to relief____” This rule sets the liberal tone of the federal pleading requirements, in sharp contrast to the earlier formalistic code and writ pleading. Indeed, Rule 8(e)(1) states that “[e]ach averment of a pleading shall be simple, concise, and direct.
 
 No technical forms of pleading or motions are required.”
 
 Fed.R.Civ.P. 8(e)(1) (emphasis added). However, the Rule must be applied with some logic and common sense. The length of a pleading will depend upon a number of factors, not the least of which is the complexity of the case.
 
 Accord Kaufman,
 
 539 F.Supp. at 1092.
 

 The RICO counts, detailing the findings in
 
 Brown,
 
 are indeed prolix. However, as determined above, these allegations may be relevant, although very lengthy and redundant in spots. I shall not go through each count and determine which averments ought to remain and which are potentially extraneous. I agree with the sentiments expressed in
 
 Kaufman:
 

 The plaintiffs in this action are alleging the violation of numerous provisions in the federal securities laws, which are complex in their application. This makes “concise” pleading difficult.
 

 What verbosity and repetition appears in the complaint does not, standing alone, justify dismissal under Rule 8.
 

 Kaufman,
 
 539 F.Supp. at 1092 (emphasis added). Accordingly, the RICO counts shall not be dismissed pursuant to Fed.R. Civ.P. 8.
 

 In Gaugler and Shulik defendants also argue that the state law claims lack sufficient factual allegations to pass muster under Rule 8(a)(2). For example, the contract claim in Gaugler is faulted for failing to set forth when the contract was formed and the substance of its terms. Similarly, on the breach of fiduciary duty issue, plaintiffs allegedly fail to spell out the nature of the claimed duty. This argument misperceives the purpose of Rule 8. Striking complaints that fall short of perfection is the very practice which the Federal Rules sought to end. All that is required is a sufficient
 
 factual
 
 basis to place defendants on notice and allow them to frame a response. This has been satisfied here. The complaints detail the genesis and evolution of the parties’ relationship. It does not require extraordinary perception to recognize that both the contract and fiduciary duty claimed arose from the brokerage-customer relationship. The remaining state law claims are also predicated upon sufficient factual bases and shall not be dismissed.
 

 
 *1402
 
 B.
 
 Federal Securities Laws
 

 1.
 
 Section 10(b)
 

 Section 10(b)
 
 [16]
 
 of the Securities Exchange Act of 1934 and its implementing rule, 10b-5
 
 [17]
 
 broadly prohibit fraud in connection with the purchase and sale of securities. The fundamental purpose of the 1934 Act was “to substitute a philosophy of full disclosure for the philosophy of
 
 caveat
 
 emptor____”
 
 Affiliated Ute Citizens of Utah v. United States,
 
 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972) (quoting
 
 SEC v. Capital Gains Research Bureau,
 
 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963)). The Act is to be applied “not technically and restrictively, but flexibly to effectuate its remedial purposes.”
 
 Affiliated Ute,
 
 406 U.S. at 151, 92 S.Ct. at 1471 (quoting
 
 SEC v. Capital Gains Research Bureau,
 
 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963)).
 
 See also Superintendent of Insurance v. Bankers Life & Casualty Co.,
 
 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). Although drafted as an SEC enforcement provision, a private right of action “has been consistently recognized for more than 35 years. The existence of this implied remedy is beyond peradventure.”
 
 [18]
 

 Herman & Maclean v. Huddleston,
 
 459 U.S.
 

 375, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983).
 

 Judicial limitations which have been placed upon a section 10(b) claim also serve to define the elements of the cause of action. For example, in order to have standing to sue, a plaintiff must have either purchased or sold securities.
 
 See Blue Chip Stamps v. Manor Drug Stores,
 
 421 U.S. 723, 749, 95 S.Ct. 1917, 1931, 44 L.Ed.2d 539 (1975). The fraudulent conduct alleged must take the form of a misstatement, omission, manipulation or deception. The mere breach of a fiduciary duty is not actionable.
 
 See Santa Fe Ind., Inc. v. Green,
 
 430 U.S. 462, 477, 479-80, 97 S.Ct. 1292, 1303-1304, 51 L.Ed.2d 480 (1977). As the statutory language indicates, the fraud must be “in connection with” the purchase or sale. In misstatement and omission cases, the controverted fact must also be “material.” The definition of materiality in section 10(b) cases has been borrowed from the section 14(a) context. Quoting from
 
 TSC Industries, Inc. v. Northway, Inc.,
 
 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), the Third Circuit describes materiality as “a substantial likelihood that, under all circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.”
 
 [19]
 
 
 *1403
 

 Healey v. Catalyst Recovery of Pennsylvania, Inc.,
 
 616 F.2d 641, 647 (3d Cir.1980).
 

 A plaintiff must also prove that the fraudulent conduct was accompanied by “scienter.”
 
 Ernst & Ernst v. Hochfelder,
 
 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976). Although the
 
 Ernst
 
 court left the question open, this Circuit and others have held that reckless behavior is sufficient.
 
 [20]
 

 See e.g., Sirota v. Solitron Devices, Inc.,
 
 673 F.2d 566, 575 (2d Cir.),
 
 cert. denied,
 
 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982);
 
 McLean v. Alexander,
 
 599 F.2d 1190, 1197-98 (3d Cir.1979);
 
 Nelson v. Serwold,
 
 576 F.2d 1332, 1337 (9th Cir.),
 
 cert. denied,
 
 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978);
 
 Rolf v. Blyth, Eastman Dillon & Co., Inc.,
 
 570 F.2d 38, 44-47 (2d Cir.),
 
 cert. denied,
 
 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978);
 
 Coleco Industries, Inc. v. Berman,
 
 567 F.2d 569, 574 (3d Cir.1977),
 
 cert. denied,
 
 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978);
 
 First Virginia Bankshares v. Benson,
 
 559 F.2d 1307, 1314 (5th Cir.1977),
 
 cert. denied, sub nom., Heller & Co. v. First Virginia Bankshares,
 
 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978);
 
 Sunstrand Corp. v. Sun Chemical Corp.,
 
 553 F.2d 1033, 1044-45 (7th Cir.),
 
 cert. denied,
 
 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977).
 

 The final two elements of a section 10b cause of action are reliance and causation. These related concepts have generated a good deal of uncertainty,
 
 see e.g., Sharp v. Coopers & Lybrand,
 
 649 F.2d 175, 186-89 (3d Cir. 1981),
 
 cert. denied,
 
 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982) (reliance);
 
 Huddleston v. Herman & Mac-Lean,
 
 640 F.2d 534, 547-50 (5th Cir.1981),
 
 aff'd in part, rev’d in part,
 
 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (reliance and causation). In analyzing these concepts, I shall endeavor not to add to the existing confusion.
 

 Defendants’ section 10(b) arguments can be broken down into four major categories. First, defendants make a general
 
 Santa Fe v. Green
 
 argument, portraying the allegations as little more than breaches of fiduciary duties, devoid of the requisite material misstatements or omissions. The churning claims are also attacked as insufficient to state a cause of action. However, the more interesting and problematic issues presented focus upon the causation and “in connection with” elements.
 

 (a)
 
 The Scope of Prohibited Conduct
 

 When minority shareholders challenged the Delaware statutory short form merger as a “device, scheme, or artifice to defraud,” the Supreme Court decided that it was time to put a halt to the seemingly endless expansion of the scope of section 10(b). Therefore, in
 
 Santa Fe v. Green,
 
 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Court held that in the absence of some form of deception, misrepresentation or non-disclosure, a breach of a fiduciary duty is not actionable under section 10(b).
 
 Santa Fe,
 
 430 U.S. at 475-77, 97 S.Ct. at 1301-02. No longer can the catch-all anti-fraud provision be used to redress claims of corporate mismanagement.
 
 Id.
 
 at 477, 97 S.Ct. at 1302. Defendants endeavor to characterize the complaints as
 
 Santa Fe
 
 pleadings which allege little more than breach of a fiduciary duty or the failure to disclose such a breach.
 
 [21]
 
 Indeed, plaintiffs
 
 *1404
 
 are portrayed as poor losers — investors who are now crying over bad advice. After reviewing the complaints, I cannot agree.
 

 Putting aside the churning allegations, I find allegations of material misrepresentations and omissions which elevate plaintiffs’ complaints beyond the reach of
 
 Santa Fe.
 
 The complaints allege, explicitly or inferentially, knowledge or recklessness on the part of defendants — thus fulfilling the scienter requirement.
 
 [22]
 

 See e.g.,
 
 Gaugler Amended Complaint, ¶¶ 25F, 25H, 29; Taraborelli Complaint, If If
 
 25, 26, 28;
 
 Shulik Complaint 1140, 50; Singer Complaint, ¶ 39; Rastelli Complaint, 1135.
 

 The failure to disclose Catanella’s role in the
 
 Brown
 
 litigation is an omission which, if material, would fall within the scope of section 10(b). In
 
 Sutton v. Shearson Hayden Stone, Inc.,
 
 490 F.Supp. 98 (S.D.N.Y. 1980), a broker’s failure to disclose that he had been the subject of previous customer complaints survived a motion to dismiss. Although the court seemed concerned about proof of materiality, there was no suggestion that this was simply a breach of fiduciary duty barred by
 
 Santa Fe. Id.
 
 at 101. Shearson Hayden paid $34,500 to satisfy irate and potentially litigious customers. Sutton, in turn, signed a promissory note for that amount. In contrast, the
 
 Brown
 
 litigation resulted in an $813,000 verdict. The court in
 
 Sutton
 
 found that disclosure of the customer complaints would serve the purpose of protecting investors — the goal of section 10(b).
 
 Id.
 
 at 101-03. I agree. Moreover, the allegations here indicate that plaintiffs were not sophisticated and relied heavily upon Catanella. Thus, his track record of self-dealing, churning and mishandling of other portfolios would be highly material.
 
 [23]
 
 Catanella’s affirmative misrepresentation of his expertise in option trading, which induced Gaugler to purchase options, presents a similar situation. After losing all of the funds so invested, Catanella admitted that he had never before traded in options. Misrepresentation of expertise has been held actionable under section 10(b).
 
 See Marbury Management, Inc. v. Kohn,
 
 629 F.2d 705, 707-08 (2d Cir.1980),
 
 cert. denied, sub. nom., Wood Walker & Co. v. Marbury Management, Inc.,
 
 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980) (trainee represented himself as “licensed registered representative” and “portfolio management specialist”).
 

 Nor are the material omissions and misrepresentations limited to the
 
 Brown
 
 litigation. The Singer and Rastelli complaints contain detailed descriptions of all of the undisclosed risks and costs associated with margin trading. The mechanics of a margin account were not explained — plaintiffs were not told that they were actually plac
 
 *1405
 
 ing more money at risk. They were not informed about margin calls or the interest computation and were led to believe that margin trading was “prudent and cautious.” Singer Complaint, 1126; Rastelli Complaint, ¶ 26. The Shulik Complaint also contains averments of misrepresentations with respect to the risks of margin trading. Shulik Complaint, HU 23, 25, 26. Misrepresentations or omissions with respect to the risks inherent in margin trading are within the scope of section 10(b).
 
 See e.g., Arrington v. Merrill Lynch, Pierce, Fenner & Smith,
 
 651 F.2d 615, 619 (9th Cir.1981);
 
 Yancoski v. E.F. Hutton & Co., Inc.,
 
 581 F.Supp. 88 at 92 (E.D.Pa. 1983). Catanella incorrectly advised Rastelli that the high volume of trading was appropriate, when in fact his account was being churned. This allegation also states a claim under section 10(b).
 
 Accord Yancoski,
 
 at 92. In all complaints, Catanella is accused of intentionally ignoring plaintiffs’ conservative investment goals, plunging money into speculative, high risk securities. This is a material misrepresentation, rather than merely a breach of fiduciary duty.
 
 See Miley v. Oppenheimer & Co., Inc.,
 
 637 F.2d 318, 326 (5th Cir.1981);
 
 Yancoski,
 
 at 92.
 
 See also Clark v. John Lamula Inv. Inc.,
 
 583 F.2d 594, 599-601 (2d Cir.1978) (recommending unsuitable debentures violates section 10(b)). Finally, the complaints are replete with allegations of self-dealing and the general mishandling of plaintiffs’ accounts. Defendants’ goals were not to serve their customers, but rather to generate commissions and interest for themselves. Faced with a similar situation, the court in
 
 Troyer
 
 found material misrepresentations and omissions in defendant’s failure to disclose his self-dealing and mishandling of plaintiffs’ portfolio. 476 F.Supp. at 1146-47. I agree with the approach taken in
 
 Troyer.
 
 The various allegations, taken together, form a course of fraudulent and deceptive conduct, transcending
 
 Santa Fe v. Green
 
 and adequately stating a claim under section 10(b).
 
 [24]
 
 (b)
 
 Churning
 

 Churning is a term of art which is actually a “synonym for ‘overtrading.’ ”
 
 Armstrong v. McAlpin,
 
 699 F.2d 79, 90 (2d Cir.1983) (citing Hazard & Christie,
 
 The Investment Business
 
 68 (1964)). It occurs when a broker engages in excessive trading for the purpose of generating commissions, without regard to the customer’s investment objectives.
 
 See e.g., Costello v. Oppenheimer & Co., Inc.,
 
 711 F.2d 1361, 1367 (7th Cir.1983);
 
 Thompson v. Smith Barney, Harris Upham & Co., Inc.,
 
 709 F.2d 1413, 1416 (11th Cir.1983);
 
 Armstrong,
 
 699 F.2d at 90;
 
 Petrites v. J.C. Bradford,
 
 646 F.2d 1033, 1035 (5th Cir. 1981);
 
 Miley v. Oppenheimer & Co., Inc.,
 
 637 F.2d 318, 324 (5th Cir.1981);
 
 Mihara v. Dean Witter & Co., Inc.,
 
 619 F.2d 814, 820 (9th Cir.1980);
 
 Williamsport Fireman Pension Boards I and II v. E.F. Hutton & Co., Inc.,
 
 567 F.Supp. 140, 144 (M.D.Pa. 1983). Invoking the talismanic
 
 Santa Fe
 
 decision, the Gaugler defendants argue that the churning claim represents simply another chapter in state fiduciary duty law. Similarly, they argue that churning itself is insufficient to state a section 10(b) claim. Rather, churning allegations must be accompanied by averments of specific misrepresentations, omissions or acts of deception. Defendants also attack all complaints for the lack of detail with respect to the allegedly improper transactions. For the most part, these arguments were raised and rejected in the section discussing specificity.
 

 It appears undisputed that churning
 
 does
 
 state a cause of action under section 10(b).
 
 See e.g., Costello v. Oppenheimer & Co., Inc.,
 
 711 F.2d 1361, 1368 (7th Cir.1983);
 
 Thompson v. Smith Barney, Harris Upham & Co., Inc.,
 
 709 F.2d
 
 *1406
 
 1413, 1416-17 (11th Cir.1983);
 
 Follansbee v. Davis, Skaggs & Co., Inc.,
 
 681 F.2d 673, 676 (9th Cir.1982);
 
 Miley v. Oppenheimer,
 
 637 F.2d 318, 324 (5th Cir.1981);
 
 Mihara v. Dean Witter & Co., Inc.,
 
 619 F.2d 814, 820 (9th Cir.1980);
 
 Carras v. Burns,
 
 516 F.2d 251, 258 (4th Cir.1975);
 
 Landry v. Hemp-hill, Noyes & Co.,
 
 473 F.2d 365, 368 n. 1 (1st Cir.),
 
 cert. denied,
 
 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973);
 
 Hecht v. Harris Upham & Co.,
 
 430 F.2d 1202, 1206-1207 (9th Cir.1970);
 
 Mauriber v. Shear-son/American Express, Inc.,
 
 567 F.Supp. 1231, 1237-38 (S.D.N.Y.1983);
 
 Kaufman v. Magid,
 
 539 F.Supp. 1088, 1095 (D.Mass. 1982);
 
 Kaufman v. Merrill Lynch, Pierce, Fenner & Smith,
 
 464 F.Supp. 528, 534 (D.Md.1978);
 
 Dandorph v. Fahne Stock & Co.,
 
 462 F.Supp. 961, 963 (D.Conn.1979);
 
 Kravite v. Pressman, Frohlich & Frost, Inc.,
 
 447 F.Supp. 203, 211 (D.Mass.1978);
 
 Powers v. Frances I. DuPont & Co.,
 
 344 F.Supp. 429, 431-32 (E.D.Pa.1972);
 
 Lorenz y. Watson,
 
 258 F.Supp. 724, 730 (E.D.Pa. 1966). As the court stated in
 
 Follansbee:
 

 It is settled that when a broker, unfaithful to the trust of his customer, churns an account in the brokers control for the purpose of enhancing the broker’s commission income and in disregard of the client’s interest, there is a violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a
 
 et seq.,
 
 and Securities and Exchange Commission Rule 10b-5.
 

 681 F.2d at 676. In order to prove a churning claim, plaintiff must show that the broker exercised control over the account and that the trading was excessive.
 
 [25]
 

 See e.g., Costello,
 
 711 F.2d at 1368;
 
 Thompson,
 
 709 F.2d at 1416-17;
 
 Miley,
 
 637 F.2d at 324;
 
 Mihara,
 
 619 F.2d at 821;
 
 Kaufman,
 
 539 F.Supp. at 1095;
 
 Zaretsky v. E.F. Hutton & Co., Inc.,
 
 509 F.Supp. 68, 74 (S.D.N.Y. 1981). Although courts seem to be in agreement with respect to these two elements, some have added the requirement that the broker act “with the intent to defraud or with willful and reckless disregard for the investor’s interest.”
 
 Thompson,
 
 709 F.2d at 1417;
 
 Miley,
 
 637 F.2d at 324;
 
 Mihara,
 
 619 F.2d at 821.
 
 [26]
 
 However, this prong only appears to formalize the general scienter requirement necessary for all section 10(b) actions.
 

 Although the prohibition on churning can probably be traced to the fiduciary responsibility a broker owes to its customers, as the above cited eases demonstrate, churning does rise to the level of a section 10(b) violation. The act of churning itself is a deception. As the
 
 Costello
 
 court noted; “as a scheme,
 
 the essence of which is deception of a relying customer,
 
 churning, as a matter of law, is considered a violation of section 10(b) and Rule 10b-5.”
 
 Costello,
 
 711 F.2d at 1368 (citations omitted) (emphasis added). Similarly, the Ninth Circuit stated “[t]he churning of a client’s account is, in itself, a scheme or artifice to defraud within the meaning of Rule 10b-5.”
 
 *1407
 

 Mihara,
 
 619 F.2d at 821.
 
 Accord Yancoski,
 
 at 91. In
 
 Armstrong v. McAlpin,
 
 699 F.2d 79 (2d Cir.1983), the district court had dismissed the churning claim for failing to allege an accompanying misrepresentation or omission. In reversing that decision, the court stated that “churning, in and of itself, may be a deceptive and manipulative device under section 10(b), the scienter required by section 10(b) being implicit in the nature of the conduct. The district court’s reliance upon
 
 Santa Fe Industries v. Green, supra,
 
 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480, was misplaced.”
 
 Armstrong,
 
 699 F.2d at 91 (citations omitted). I agree that the utilization of a customer’s account to generate omissions, without regard to the customer’s investment objectives, is “deceptive” within the meaning of section 10(b). To require a plaintiff to prove something in addition to the elements of control and excessiveness would be redundant and would contravene the overriding purpose behind the Securities and Exchange Act of 1934 — the protection of the investing public.
 

 Defendants’ other arguments with respect to churning are made in the guise of pleading deficiencies under Rule 9(b) of the Federal Rules of Civil Procedure. I have already rejected the suggestion that a plaintiff must list all allegedly tainted transactions and calculate the turnover ratio. Although not as detailed as defendants might wish, the complaints do contain allegations of broad discretionary control and excessive trading in light of conservative investment objectives.
 
 See e.g.,
 
 Shulik Complaint, ¶¶ 19, 39, 44, 45; Singer Complaint, ¶¶ 21, 24; Rastelli Complaint, ¶¶ 21, 24. Moreover, paragraph 16 of the Gaugler Complaint sets forth in unassailable detail the names of the securities churned, the frequency of trading, the commissions paid and the estimated turnover ratio. Therefore, I conclude that churning claims are sufficient to survive a motion to dismiss.
 

 (c)
 
 In Connection With
 

 Section 10(b) and Rule 10b-5 proscribe fraud “in connection with the purchase or sale of any security.” 15 U.S.C. § 78j (1976); 17 C.F.R. § 240.10b-5 (1983). Defendants contend that many of plaintiffs’ allegations do not arise “in connection with” an actual purchase or sale. Although the failure to disclose
 
 Brown
 
 is the focal point of this argument, defendants cite the failure to disclose the risks of margin trading, churning, unsuitable purchases and other averments falling into the general category of mishandling plaintiffs’ accounts.
 
 [27]
 
 Defendants reason that these allegations reflect upon the choice of, or confidence in a broker, rather than the decision to buy or sell a particular stock. According to defendants, the latter satisfies the “connection” element, while the former does not. I do not agree.
 

 Despite voluminous caselaw in the section 10(b) area, the “in connection with” element has received little judicial attention. The concept does not lend itself to definition and its application has generated more than its share of confusion. The only Supreme Court precedent,
 
 Superintendent of Insurance of New York v. Bankers Life & Cas. Co.,
 
 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), provides little practical guidance. In
 
 Bankers Life,
 
 defendants essentially used the assets of a corporation, Manhattan Casualty Company, to acquire total ownership. Defendants purchased all of the stock of Manhattan using a check drawn at a financial institution. At the time the check was written, defendants had no funds on deposit there. After taking over Manhattan and installing a president, defendants induced the Board to sell some of its United States Treasury Bonds. The proceeds of the sale were used to cover the check with which the stock had been purchased. 404 U.S. at 7-8. Noting that “[sjection 10(b) must be read flexibly, not technically and restrictively,”
 
 id.
 
 at 12, 92 S.Ct. at 169, the Court stated that “there was a ‘sale’ of a security and since fraud was used ‘in connection with’ it, there is a
 
 *1408
 
 redress under § 10(b)----”
 
 Id.
 
 Although the Court did not explicitly define the “in connection with” element, it did explain that “Manhattan suffered an injury as a result of deceptive practices
 
 touching
 
 its sale of securities ____”
 
 Id.
 
 at 12-13, 92 S.Ct. at 169. (emphasis added). Because of this phrase,
 
 Bankers Life
 
 is universally cited for the proposition that the connection requirement will be satisfied if the alleged fraud “touches” the purchase or sale.
 
 See, e.g., Arrington v. Merrill Lynch, Pierce, Fenner & Smith,
 
 651 F.2d 615, 619 (9th Cir.1981);
 
 McGrath v. Zenith Radio Corp.,
 
 651 F.2d 458, 467 (7th Cir.),
 
 cert. denied,
 
 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981);
 
 Alley v. Miramon,
 
 614 F.2d 1372, 1378 n. 11 (5th Cir.1980);
 
 Ketchum v. Green,
 
 557 F.2d 1022, 1026 (3d Cir.)
 
 cert. denied,
 
 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977);
 
 Yancoski v. E.F. Hutton & Co., Inc.,
 
 581 F.Supp. 88 at 92 (E.D. Pa.1983);
 
 Williamsport Firemen Pension Boards I and II v. E.F. Hutton & Co., Inc.,
 
 567 F.Supp. 140, 143 (M.D.Pa.1983);
 
 Chemical Bank v. Arthur Anderson & Co.,
 
 552 F.Supp. 439, 451 (S.D.N.Y.1982);
 
 Somogyi v. Butler,
 
 518 F.Supp. 970, 985-86 (D.N.J.1981).
 

 Bankers Life
 
 raises the question what constitutes “touching” a securities transaction. Although many courts have taken a broad view of this element, there exists a paucity of viable standards. The Fifth Circuit has noted that “[t]he plaintiff ... need not establish a direct or close relationship between the fraudulent transaction and the purchase or sale____”
 
 Alley v. Miramon,
 
 614 F.2d 1372, 1378 n. 11 (5th Cir.1980).
 
 Accord Brown v. Ivie,
 
 661 F.2d 62, 65 (5th Cir.1981),
 
 cert. denied,
 
 455 U.S. 990, 102 S.Ct. 1614, 71 L.Ed.2d 850 (1982). The
 
 Alley
 
 court went on to state that the requirement is “satisfied when the proscribed conduct and the sale are part of the same fraudulent scheme.” 614 F.2d at 1378 n. 11. In
 
 Chemical Bank v. Arthur Anderson & Co.,
 
 the court explained that
 
 Bankers Life
 
 and its progeny “require a nexus, albeit not a direct or close relationship, between the allegedly fraudulent conduct and the sale of securities.” 552 F.Supp. at 451. This Circuit has “attempted to etch more-finely the contours of the ‘in connection with’ clause,” noting that other courts “[ajlmost without exception ... have found compliance ... even where fraudulent conduct is implicated only tangentially in a securities transaction.”
 
 See Ketchum v. Green,
 
 557 F.2d 1022, 1026-27 (3d Cir.),
 
 cert. denied,
 
 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977). However, rather than offering a standard, the
 
 Ketchum
 
 court observed that the ultimate determination is a factual one, best approached on a case by case basis.
 
 Id.
 
 at 1027.
 

 
 *1312
 
 Each plaintiff was completely unaware of the falsity or misleading nature of the statements or omissions as set forth above in Paragraph 18 and of the fact that each security was unregistered, until approximately 1982.
 

 
 *1408
 

 Ketchum
 
 involved a corporate power struggle. The plaintiffs were the Chairman of the Board and President of Babb, Inc., holding between them approximately forty-five percent of the stock of the company. Babb was a closely held corporation and stock could only be owned by employees. Defendants, other members of the Board, induced plaintiffs to support their slate of candidates without disclosing their plan to oust plaintiffs. After the incumbent directors were unanimously re-elected, the Board jointly proposed and elected their own candidates for the positions of chairman and president, removing plaintiffs as officers. Plaintiffs’ employment was then terminated and they were asked to surrender their stock pursuant to the corporation’s stock retirement plan. 557 F.2d at 1023-24. The court found that the fraud was not “in connection with” the forced sale of plaintiffs’ securities. Characterizing the dispute as a corporate foray, the court noted that the actual securities transaction was tangential to the relief requested. Plaintiffs apparently were more concerned with recovering their seats and invalidating the elections.
 
 [28]
 

 Id.
 
 at 1027.
 
 *1409
 
 There, the court found the proximity between the fraud and the securities transaction to be more attenuated than in
 
 Bankers Life.
 
 As the court stated; “[i]nstead of being merely one step away from a securities deal, the supposed deception here is somewhat removed from the ultimate transaction. Indeed, there are a substantial number of intermediate steps between the fraud and the accomplishment of the forced sale of plaintiffs’ shares____”
 
 Id.
 
 at 1028.
 
 [29]
 
 The court also expressed concern over the potential federalization of state law under section 10(b).
 
 [30]
 

 Id.
 
 at 1029. There is another distinction between
 
 Ketchum
 
 and
 
 Bankers Life,
 
 which was implicit in the court’s opinion. In
 
 Bankers Life,
 
 the securities transaction was an integral part of the fraudulent scheme. Yet in
 
 Ketchum,
 
 the fraud was aimed at removing plaintiffs from the corporation. The forced sale was merely an incidental result of that scheme.
 

 One year after deciding
 
 Ketchum,
 
 this Circuit once again addressed the “in connection” issue in
 
 Cramer v. General Tele. & Electronics Corp.,
 
 582 F.2d 259 (3d Cir. 1978),
 
 cert. denied,
 
 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979). The plaintiffs challenged allegedly fraudulent commission payments made to a group of foreign investors. The arrangement arose out of GTE’s sale of its controlling interest in a foreign company. The buyers did not have sufficient funds with which to purchase that interest, so GTE financed part of the price by paying the purchasers a commission on future equipment sales. Concluding that the payment of commissions was “in connection with” the sale of GTE’s ownership interest, the court stated that: “GTE’s promise to pay commissions on equipment sales was not a separate agreement. Rather, that promise was an essential part of GTE’s original agreement to sell its interest in the foreign company.” 582 F.2d at 271. Without further analysis or citation to
 
 Ketehum,
 
 the court concluded: “[sjince the commission payments were inextricably linked to GTE’s sale of its ownership interest ..., we think the district court erred in concluding that the alleged fraud was not alleged to be in connection with the sale of a security.”
 
 [31]
 

 Id.
 
 The fraud was not, as in the typical situation, the inducement for the securities transaction. Rather, the securities transaction was the inducement for the fraud. The financing problems surrounding the sale of ownership led GTE to arrange the allegedly fraudulent commission plan.
 

 Analyzing the allegations in light of the scant principles articulated above, I conclude that the connection requirement has been satisfied. Defendants’ failure to disclose
 
 Brown
 
 “touches” all of the allegedly fraudulent securities transactions. Plaintiffs here were all unsophisticated investors. They were introduced to Catanella through E.F. Hutton, a well-known and well respected brokerage house. They were told about his qualifications and expertise and subsequently opened accounts.
 
 *1410
 
 They trusted Catanella and routinely followed his advice. In some cases, discretionary accounts were opened. Therefore, Catanella was in a position to choose the securities purchased and sold for plaintiffs’ portfolios. He had
 
 de facto,
 
 if not formal control, over the accounts. It was this control which allowed him to defraud plaintiffs by churning, buying unsuitable securities, failing to disclose risks and the like. If the plaintiffs knew that Catanella had previously defrauded investors, and the extent of that fraud, it defies logic to conclude that he would have been granted the kind of control which allowed him to perpetrate the fraud. Plaintiffs may have chosen not to deal with Catanella at all. Therefore, I find a .nexus between that initial failure to disclose
 
 Brown
 
 and all subsequent fraudulent transactions performed by Catanella.
 

 I do not accept defendants’ contention that the failure to disclose
 
 Brown
 
 is too remote from the transactions. In
 
 Bankers Life,
 
 the sale of the bonds was an integral part of a complex scheme of fraud. Here, the initial fraud in failing to disclose
 
 Brown
 
 played an integral role in an ongoing scheme of fraudulent securities transactions. As the Fifth Circuit stated, the connection element is satisfied where “the proscribed conduct and the sale are part of the same fraudulent scheme.”
 
 Alley,
 
 614 F.2d at 1378 n. 11. The failure to disclose
 
 Brown
 
 was not only part of “the same fraudulent scheme,” but enabled defendants to package and sell Catanella as expert and untarnished in his brokerage experience.
 

 The failure to disclose the risks of margin trading has been deemed fraud “in connection with” the purchase and sale of securities.
 
 See Arrington v. Merrill Lynch, Pierce, Fenner & Smith,
 
 651 F.2d 615, 619 (9th Cir.1981);
 
 Yancoski v. E.F. Hutton & Co., Inc.,
 
 581 F.Supp. 88 at 92 (E.D.Pa.1983). This omission induced plaintiffs to open margin accounts and there is a nexus between that fraud and the securities purchased on margin. Defendants were informed that plaintiffs were desirous of safe investments. Although the failure to disclose did not necessarily result in the purchase of a specific security, it did cause plaintiffs to purchase more securities than they otherwise would have. Thus, plaintiffs unwittingly exposed themselves to more potential liability because of the increased trading a margin account permits. The failure to disclose certainly “touches” the securities so purchased.
 

 In
 
 Savino v. E.F. Hutton & Co., Inc.,
 
 507 F.Supp. 1225 (S.D.N.Y.1981), the court faced a similar question. Defendants there allegedly misrepresented the risks of option trading. In holding the connection element satisfied, the court explained:
 

 This alleged misrepresentation pertained directly to the underlying securities bought and sold for the Savino accounts. The Court is well aware of the recent admonition by the Court of Appeals for this Circuit that “[n]ot every ‘risky’ investment rises to the level of fraud because the risk is insufficiently disclosed.” * * * * * *
 

 On the other hand, a claim is stated where, as here, the defendants, knowing that the risk involved in an investment is unacceptable to plaintiffs, allegedly deliberately misrepresented or omitted to state their opinion of the level of risk involved.
 

 507 F.Supp. at 1241 (citations omitted). The observation applies with equal force to the allegations surrounding the purchase of unsuitable securities. When defendants knowingly ignore plaintiffs’ investment objectives and purchase speculative securities without apprising plaintiffs of the risk, a section 10(b) claim is stated. The fraud perpetrated “touches” and is “in connection with” the purchase of those unsuitable securities. Similarly, I find that churning is a fraudulent device which “touches” securities transaction. Many cases are cited in the previous section for the proposition that churning states a section 10(b) claim. While none of these cases discuss the connection element, none suggest potential problems with this requirement. The reason for this silence is fairly obvious. Churning denotes excessive trading. Thus,
 
 *1411
 
 by definition, churning is fraud “in connection with” the purchase or sale of a security.
 
 [32]
 

 Defendants contend that none of the activities discussed above are “in connection with” a securities transaction. They attempt a distinction between fraud which impacts upon the choice of a broker and that which influences the decision to buy or sell a particular security. They argue that the latter satisfies the connection requirement, the former does not. Defendants’ contention traces its roots to
 
 Troyer v. Karcagi,
 
 476 F.Supp. 1142 (S.D.N.Y.1979), a case upon which they rely heavily.
 
 [33]
 
 Although
 
 Troyer
 
 does contain some restrictive language, its application does not appear faithful to the narrow view of section 10(b) that it purports to articulate. Plainly put, the court says one thing and does another. Moreover, to the extent that
 
 Troyer
 
 does stand for the dichotomy advanced by defendants, I am unable to agree with its reasoning or result.
 

 The facts of
 
 Troyer
 
 are fairly typical. The broker, Karcagi, made various representations to the Troyers, who were unsophisticated investors. These representations induced the Troyers to open discretionary accounts with Karcagi. Through an alleged course of mishandling and self-dealing, the Troyers lost approximately seventy-five percent (75%) of their rather substantial investment. 476 F.Supp. at 1146. The court determined that the complaint survived a motion to dismiss “because it contained] allegations of a material misrepresentation or omission by Karcagi in connection with the purchase or sale of a security.”
 
 Id.
 
 The fraud revolved around the failure to disclose self-dealing and the misrepresentation of Karcagi’s intent to manage the account for his own, rather than Troyer’s benefit.
 
 Id.
 
 Applying the standard established in
 
 SEC v. W.J. Howey Co.,
 
 328 U.S. 293, 66 S.Ct. 1100,90 L.Ed. 1244 (1946), the court determined that the discretionary accounts were “investment contracts” and therefore “securities.”
 
 Id.
 
 at 1147-48. Thus, the misrepresentations which induced the Troyers to open the accounts were made “in connection” with the purchase of those accounts, which were “securities.”
 
 Id.
 
 at 1148-49. In addition, the court took a very expansive view of what constitutes “purchasing” a discretionary account. There was a “purchase” each time a new account was opened, and also each time new funds were deposited into already existing accounts.
 
 *1412
 

 Troyer,
 
 476 F.Supp. at 1148. Therefore, any misrepresentations or omissions which induced the Troyers to invest new funds constituted fraud “in connection with” the “purchase” of a “security.”
 

 In the alternative, the court explored whether the fraud was “in connection with” the purchase or sale of the underlying securities contained in the discretionary accounts. It is the resolution of this issue upon which defendants rely. At first the court suggested a negative answer, articulating the distinction drawn by defendants. The court explained:
 

 The alleged misrepresentations concerning Karcagi’s investment performance and his intentions affected the investors’ confidence in a person selected by them to be their fiduciary rather than influencing their decision to purchase or sell particular securities. The purpose of Rule 10b-5,
 
 i.
 
 e., to promote “the maintenance of free and open securities markets nurtured in a climate of fair dealing” is not therefore sufficiently served.
 

 476 F.Supp. at 1149 (citations omitted). The court then inexplicably and in contradiction to the above-quoted language concluded:
 

 Hence, under the Troyers’ alternative theory of fraud in connection with purchases or sales of the underlying securities traded by Karcagi in the discretionary accounts,
 
 a Rule 10b-5 cause of action is adequately alleged as to instances of the purchase or sale of securities under circumstances where Karcagi failed to disclose self-interest,
 
 but not as to other purchases or sales where Karcagi induced the Troyers to grant him the discretion to make the purchases or sales by generalized representations.
 

 Id.
 
 (emphasis added). If I read the second passage correctly, the
 
 Troyer
 
 court essentially held that a claim was stated with respect to the purchase or sale of the underlying securities where Karcagi failed to disclose his self-dealing. Yet, Karcagi’s failure to disclose self-dealing did not impact upon the Troyer’s decision to buy or sell a particular stock, but rather, their trust and confidence in their broker. Thus, the court stated, but apparently declined to apply, the distinction between choosing a security and a broker. Moreover, as to purchases or sales resulting from Karcagi’s control over the account, induced by “generalized representations,” many of these would be actionable under the theory that the account itself is a security. Misrepresentations or omissions which induced plaintiffs to “purchase” a discretionary account would be covered by the first prong of
 
 Troyer.
 
 Given the broad definition of “purchase,” the Troyers were fairly well protected. The motion to dismiss was ultimately denied.
 

 It is anomalous that the
 
 Troyer
 
 court suggested the distinction in light of its ultimate determination that the failure to disclose self-interest may be “in connection with” a securities transaction.
 
 [34]
 
 The instant case does not involve the mere retention of securities, although it does, to an extent, involve the retention of Catanella as broker. The fraud alleged here includes activities such as churning, margin trading without disclosing the risks and the purchase of unsuitable securities. All of these involve the purchase or sale of stocks. There is actually a supreme irony in defendants’ reliance upon
 
 Troyer.
 
 In those cases where plaintiffs opened or “purchased” discretionary accounts,
 
 Troyer
 
 ensures coverage to the allegation of most concern to defendants. The failure to disclose the
 
 Brown
 
 litigation induced plaintiffs to “purchase” their discretionary accounts and is clearly fraud “in connection with” the purchase of a security. More-
 

 
 *1413
 
 over, it is entirely possible that Troyer’s two step analysis affords more, rather than less protection under section 10(b).
 

 The distinction suggested by
 
 Troyer
 
 and championed by defendants is also at odds with precedent and the purpose behind the 1934 Act. As a practical matter, the distinction between choosing a broker and choosing securities may well be meaningless. Where a broker is given control of the client’s portfolio, the choice of a broker is tantamount to the choice of securities. Defendants’ argument would push deceptive practices, such as churning, beyond the reach of the statute, simply because they might not impact upon the decision to purchase or sell a particular stock.
 
 [35]
 
 This conflicts with controlling caselaw and common sense. Similarly, the failure to disclose risks or a prior litigation would be out of reach, despite the fact that a requirement of full disclosure is the very heart of section 10(b).
 
 [36]
 
 Finally, this distinction ignores the admonition of the Supreme Court in
 
 Bankers Life
 
 that section 10(b) “must be read flexibly, not technically and restrictively.” 404 U.S. at 12, 92 S.Ct. at 169. Although it is less exacting, I prefer the formulation of
 
 Bankers Life
 
 and progeny. Since I have concluded that the allegations “touch” and “are part of the same fraudulent scheme” as the purchase and sale of securities, the motion to dismiss on this issue shall be denied.
 

 (d)
 
 Causation
 

 Defendants’ final section 10(b) argument focuses upon the
 
 Brown
 
 litigation and the thorny issue of causation. Plaintiffs, especially the purported class representatives in Taraborelli,
 
 [37]
 
 endeavor to link all their losses to defendants’ failure to disclose
 
 Brown.
 
 They reason that had they known about Catanella’s involvement, they would not have dealt with him or given him broad discretion over their accounts. Catanella would not, therefore, have had the opportunity to churn, buy unsuitable securities or engage in the panoply of fraudulent conduct alleged. Defendants contend that this initial failure to disclose
 
 Brown
 
 did not technically “cause” plaintiff’s injuries. Rather, the losses were the result of independent intervening causes, such as fluctuations in the market, wholly unrelated to Catanella. If market forces drive the price of a stock downward,
 
 everyone
 
 who purchased would be injured. Plaintiffs would have sustained the same losses had they purchased that particular security through a different broker. Plaintiffs retort that they would not have purchased that security
 
 but for
 
 their affiliation with Catanella. These arguments underscore the complexity of, and provide
 
 *1414
 
 focus to, the issue — the meaning of “proximate causation” in a section 10(b) case.
 

 Causation actually has three facets. To analyze the arguments presented here, a clear understanding of the distinctions between them is necessary. The first is the “in connection with” requirement highlighted in the previous section. Although not typically analyzed in terms of “cause and effect,” this element requires some form of relationship between the alleged fraud and the purchase or sale of a security. The second type, referred to as “transaction causation,” asks whether “the violations in question caused the appellant to engage in the transaction in question.”
 
 Schlick v. Penn-Dixie Cement Corp.,
 
 507 F.2d 374, 380 (2d Cir.1974),
 
 cert. denied,
 
 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).
 
 See also Valente v. Pepsico, Inc.,
 
 454 F.Supp. 1228, 1246 (D.Del.1978). The final kind is “loss causation,” which requires a showing “that the misrepresentations or omissions caused the economic harm.”
 
 Schlick,
 
 507 F.2d at 380.
 
 See also Marbury Management, Inc. v. Kohn,
 
 629 F.2d 705, 720 & n. 6 (2d Cir.) (Meskill, J., dissenting), ce
 
 rt. denied sub nom. Wood Walker & Co. v. Marbury Management, Inc.,
 
 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980). Transaction causation focuses upon whether the misrepresentation induced the plaintiff to buy the security, while loss causation looks at whether the misrepresentation was responsible for plaintiffs pecuniary injury.
 

 Transaction causation is the “but for” requirement — “but for” the misrepresentation or omission, plaintiff would not have acted.
 
 [38]
 
 Stripped of fancy nomenclature, transaction causation
 
 is
 
 the reliance element in a section 10(b) case.
 
 See e.g., Wilson v. Comtech Telecommunications Corp.,
 
 648 F.2d 88, 92 n. 6 (2d Cir.1981);
 
 Huddleston v. Herman & MacLean,
 
 640 F.2d 534, 549 & n. 24 (5th Cir.1981),
 
 aff'd in part, rev’d in part on other grounds,
 
 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983);
 
 Schlick,
 
 507 F.2d at 380 and n. 11. An example will illustrate this relationship. A plaintiff contends that
 
 but for
 
 a misrepresentation in an offering circular, she would not have purchased certain securities. Not only does this satisfy the transaction causation prong, but it also inferentially shows that plaintiff read and
 
 relied
 
 upon the misrepresentation. Unfortunately, courts often use the phrases “reliance” and “causation” interchangeably, without specifying which type of causation they mean.
 
 [39]
 

 See generally Wilson,
 
 648 F.2d at 92 n. 6. As this Circuit has noted; “[rjeliance is therefore one aspect of the ubiquitous requirement that losses be causally related to the defendants’ wrongful acts.”
 
 Sharp v. Coopers & Lybrand,
 
 649 F.2d 175, 186 (3d Cir.1981),
 
 cert. denied,
 
 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982).
 
 See also T.J. Raney & Sons, Inc. v. Fort Cobb, Okl. Irr. Fuel Auth.,
 
 717 F.2d 1330, 1332 (10th Cir.1983) (reliance as causal nexus between plaintiff’s injury and defendant’s conduct);
 
 In re Ramada Inns Securities Litigation,
 
 550 F.Supp. 1127, 1130 (D.Del.1982) (same).
 

 In an omission case, a plaintiff is required to prove a negative in order to show transaction causation or reliance. That is, something material not said caused the action or inaction. Put another way, if the plaintiff had known, he would not have acted. Such a plaintiff would be unable to point to a misrepresentation in an offering circular and contend that it was read, relied and acted upon. To obviate this problem, courts have substituted materiality for reliance. In
 
 Affiliated Ute Citizens v. United States,
 
 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the Supreme Court held that proof of materiality coupled with a duty to disclose would establish reliance, or as the Court phrased it, “causation in fact.” 406 U.S. at 153-54, 92 S.Ct. at 1472.
 
 *1415
 
 Therefore, in an omission ease, transaction causation, which is actually reliance, can be inferred from materiality.
 
 See generally Madison Consultants v. Federal Deposit Ins. Corp.,
 
 710 F.2d 57, 65 n. 6 (2d Cir. 1983);
 
 Sharp,
 
 649 F.2d at 187-88;
 
 Shores v. Sklar,
 
 647 F.2d 462, 468 (5th Cir.1981) (en banc);
 
 Continental Grain, Etc. v. Pacific Oilseeds, Inc.,
 
 592 F.2d 409, 412 n. 1 (8th Cir.1979).
 
 See also Healey v. Catalyst Recovery of Pennsylvania, Inc.,
 
 616 F.2d 641, 649 (3d Cir.1980) (causation problems disposed of by applying materiality test).
 
 [40]
 
 Given the definition of materiality, something that there is “a substantial likelihood that a reasonable [investor] would consider important
 
 ...,” see TSC Industries, Inc. v. Northway, Inc.,
 
 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), this rebuttable presumption of reliance makes good legal sense.
 

 Typically, it is the transaction causation prong that is a stumbling block for plaintiffs in section 10(b) cases.
 
 See Wilson,
 
 648 F.2d at 92 n. 7. Consider for example, the plaintiff who challenges a misrepresentation in an offering circular, but admits never having read it.
 
 See e.g., Shores v. Sklar,
 
 647 F.2d 462 (5th Cir.1981) (en banc). However, the failure to disclose a previous lawsuit is factually unique and the implications for causation are similarly unique. Defendants do not, and probably could not reasonably, attack the transaction causation of the failure to disclose
 
 Brown. But for
 
 the omission, plaintiffs would not have employed Catanella as their broker in the first place. Nor would Catanella have been accorded the unbridled discretion over their accounts which permitted him to engage in the allegedly fraudulent activities. Plaintiffs relied upon Catanella’s expertise and E.F. Hutton’s good name and reputation. Treating this is an omission case, reliance or transaction causation is inferred from materiality. As I indicated above, there is a substantial likelihood that plaintiffs would have considered Catanella’s role in
 
 Brown
 
 to be important in deciding whether to give him
 
 carte blanche
 
 over their accounts. Thus, the transaction causation requirement has been satisfied, at least for purposes of surviving a motion to dismiss.
 

 However, defendants’ primary argument focuses upon loss causation — the nexus between the failure to disclose
 
 Brown
 
 and the actual monetary injury sustained. Often referred to as “proximate cause,” this concept has received far less discussion in the cases than transaction causation. In
 
 Huddleston,
 
 the Fifth Circuit explained:
 

 The plaintiff must prove not only that, had he known the truth, he would not have acted, but in addition that the untruth was in some reasonably direct, or proximate, way responsible for his loss. The causation requirement is satisfied in a Rule 10b-5 case
 
 only if the misrepresentation touches upon the reasons for the investment’s decline in value.
 
 If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted.
 

 640 F.2d at 549. (citations omitted) (emphasis added).
 
 [41]
 
 The court gave the following example of a material misrepresentation which was not the proximate cause of the injury:
 

 [A]n investor might purchase stock in a shipping venture involving a single vessel in reliance on a misrepresentation that the vessel had a certain capacity when in fact it had less capacity than was represented in the prospectus.
 
 *1416
 
 However, the prospectus does disclose truthfully that the vessel will not be insured. One week after the investment the vessel sinks as a result of a casualty and the stock becomes worthless. In such circumstances, a fact-finder might conclude that the misrepresentation was material and relied upon by the investor but that it did not cause the loss.
 

 Id.
 
 at 549 n. 25. It was the sinking of the vessel that caused the value of the stock to plummet, not the misrepresentation of its capacity. Similarly, with respect to the unauthorized and unsuitable securities purchased by Catanella, it was the intervention of market forces that caused plaintiffs’ losses. The failure to disclose
 
 Brown,
 
 like the misrepresentation of the ship’s capacity, may well have induced the purchase of the stock, but the acts of fraud were remote and wholly unrelated to the securities’ decline in value. Under the reasoning of
 
 Huddleston,
 
 therefore, an independent intervening cause, such as a fluctuation in' the stock market, will break the chain of causation.
 
 Accord Fryling v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
 
 593 F.2d 736, 743-44 (6th Cir.1979) (no causation where market conditions, rather than fraud, responsible for losses).
 

 However, there are two cases which lend support to plaintiff’s position. In
 
 Sutton v. Shearson Hayden Stone, Inc.,
 
 490 F.Supp. 98 (S.D.N.Y.1980), a brokerage firm was sued for failing to disclose that one of its brokers had been the subject of numerous customer complaints. Shearson investigated these complaints and entered into monetary settlements to placate the angry investors.
 
 Id.
 
 at 100. The customer complaints involved allegations of misconduct almost identical to those charged in the
 
 Sutton
 
 lawsuit. The court concluded without explanation that “Shearson’s failure to disclose these ... customer complaints proximately caused the damage sustained in ... [plaintiff’s] portfolio.”
 
 Id.
 
 at 101. However, the absence of any “loss causation” analysis makes
 
 Sutton
 
 less than persuasive authority.
 

 In the second case,
 
 Marbury Management, Inc. v. Kohn,
 
 629 F.2d 705 (2d Cir.),
 
 cert. denied sub nom., Wood Walker & Co. v. Marbury Management, Inc.,
 
 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), a trainee at a brokerage house misrepresented himself as a licensed, registered representative and a “portfolio management specialist.” Securities were purchased based upon the predictions of this trainee. Recognizing that the misrepresentations as to his qualifications did not cause the securities purchased to decline in value, the court nevertheless held that causation was established.
 
 Id.
 
 at 708. The basis for the court’s decision is not clear, but it apparently rested, in part, upon somewhat antiquated principles of common law “proximate causation.”
 
 See id.
 
 at 709-10. However, the court did not resolve the loss causation issue it raised, explaining in a footnote:
 

 Differentiating transaction causation from loss causation can be a helpful analytical procedure only so long as it does not become a new rule effectively limiting recovery for fraudulently induced securities transactions to instances of fraudulent representations about the value characteristics of the securities dealt in. So concise a theory of liability for fraud would be too accommodative of many common types of fraud, such as the misrepresentation of a collateral fact that induces a transaction.
 

 Id.
 
 at 710 n. 3. In avoiding the loss causation problem, the court opted for what it considered to be the “just” result. However, I am constrained to agree with the vehement dissent that the majority decision was “more righteous than right____” 629 F.2d at 717 (Meskill, J., dissenting), and that “[i]n straining to reach a sympathetic result, the majority overlooked] a fundamental principle of causation____”
 
 Id.
 
 at 716-17. In an approach strikingly similar to the one subsequently employed in
 
 Huddleston,
 
 Judge Meskill noted that “Kohn’s exaggeration of his expertise played no role in the economic collapse of the various stocks he touted.”
 
 Id.
 
 at 717. He explained further that:
 

 As applied to the sale of stock precipitated by misstatements, these principles of causation are satisfied only where the misrepresentation touches upon the rea
 
 *1417
 
 sons for the investment’s decline in value. Thus, where one is induced to purchase securities in reliance upon a claim which, however deceitful, is immaterial to the operative reason for the pecuniary loss, recovery under a theory of fraud is precluded by the inability to prove the requisite causation.
 

 Id.
 
 at 718 (citations omitted). I find the view articulated by Judge Meskill and the
 
 Huddleston
 
 court to be logical and consistent with the definition of loss causation. A contrary view would render meaningless the distinction between transaction and loss causation, thereby writing the proximate cause requirement out of a section 10(b) cause of action. To find causation despite an intervening causative factor would transform the perpetrator of the fraud into “an insurer of the investment, responsible for an indefinite period of time for any and all manner of unforeseen difficulties which may eventually beset the stock.”
 
 Mar-bury,
 
 629 F.2d at 718 (Meskill, J., dissenting). Therefore, I conclude that defendants’ failure to disclose
 
 Brown
 
 was not the proximate cause of plaintiffs’ losses where the ebbs and flows of the stock market intervened.
 
 [42]
 

 A slightly different question is presented by the other claims, such as churning and the failure to disclose the risks of margin trading. There, the injuries sustained are not determined by the external forces of the market. Nor do the losses hinge upon the decline in the value of a given security. Rather, the damages are measured by the extent of excessive commissions generated by the churning or the interest accrued on the margin accounts. To be sure, failure to disclose
 
 Brown
 
 was a substantial factor in the control Catanella gained over plaintiffs’ accounts, giving him the opportunity to churn or engage in the other alleged acts of fraud. However, that merely satisfies the cause-in-fact or transaction causation requirement. These injuries did not flow directly from the failure to disclose the prior lawsuit. The acts of churning and failing to disclose the risks of margin trading, like the fluctuation in the market or the sinking of the vessel, were the intervening factors which caused plaintiffs’ harm. Therefore, as a matter of law, the failure to disclose
 
 Brown
 
 could not have been the proximate cause of the injuries suffered by plaintiffs.
 
 [43]
 

 By so holding, defendants’ activities are not condoned, but the limits of section 10(b) are merely recognized. Plaintiffs are not bereft of a remedy. All, save the Taraborelli plaintiffs, have asserted claims based upon the more immediate acts of fraud— the churning, the failure to disclose the risks of margin trading, the unsuitable purchases and the like.
 
 [44]
 
 Moreover, the factual allegations pertaining to
 
 Brown
 
 shall not be stricken from the complaint. Although they did not state an independent section 10(b) claim, they may be relevant to issues such as scienter, Hutton’s vicarious liability or state based common law theories of liability.
 

 2.
 
 Section 12(2)
 

 Plaintiffs in the Singer and Rastelli complaints also invoke section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77/(2).
 
 [45]
 
 Defendants seek dismissal of
 
 *1418
 
 these claims, arguing that the complaints fail to establish the privity required by the statute. In their role as “broker,” defendants contend that they purchased and sold securities on behalf of plaintiffs, rather than selling securities that they owned to plaintiffs. Plaintiffs do not dispute that privity is an element of a section 12(2) cause of action,
 
 [46]
 
 but insist that the requisite buyer-seller relationship is alleged in the complaint. Indeed, each complaint avers that “[i]n connection with
 
 the offer and sale of securities to plaintiff
 
 Catanella made numerous untrue statements of material facts ____” Singer Complaint at II44; Rastelli Complaint at 1140 (emphasis added). Although this allegation may simply parrot the statutory language, on a motion to dismiss, I must draw all inferences in favor of the non-moving party. Plaintiffs argue, and I must agree, that the phrase is susceptible to the interpretation that Catanella offered and sold Hutton’s securities
 
 to
 
 plaintiffs, rather than just purchasing stock on the open market
 
 for
 
 their accounts. I am, therefore, unable to conclude “beyond doubt that the plaintiff can prove no set of facts ... which would entitle him to relief.”
 
 Conley v. Gibson,
 
 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957). Thus, the motion to dismiss must be denied. However, plaintiffs’ section 12(2) action shall be limited to those transactions where privity can be established.
 

 3.
 
 The Investment Advisers Act of 1940
 

 The Gaugler and Shulik complaints also purport to state causes of action under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-l — 80b-17 (1976). Defendants argue that these claims must be dismissed. I agree.
 

 The allegations in Gaugler are directed at defendant Granville under section 206 of the Act, 15 U.S.C. § 80b-6 (1976). Gaugler Complaint at 111153-55.
 
 *1419
 
 However, in
 
 Transamerica Mortgage Advisors, Inc. v. Lewis,
 
 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Supreme Court refused to imply a private right of action under section 206. 444 U.S. at 21-24, 100 S.Ct. at 248-249. The Shulik Complaint does not specify the section of the Act relied upon. Shulik Complaint at ¶¶ 57-59. To the extent that they endeavor to invoke section 206,
 
 Transamerica
 
 will bar their cause of action as well. Moreover, although
 
 Transamerica
 
 did hold that there is a right of action under section 215, 15 U.S.C. § 80b-15, this is a limited right, allowing a plaintiff to seek recission and restitution or an injunction to prevent the continued operation of the contract. 444 U.S. at 19, 100 S.Ct. at 247. If section 215 were applicable to plaintiffs’ claims, it would be of little aid to them in their quest for monetary damages. Furthermore, the allegations in Shulik are directed at Catanella and Hutton. As defendants correctly point out, they are not “investment advisors” under the Act. Section 202(11) defines an investment Adviser as:
 

 any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include ...
 

 (C) any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor;
 

 15 U.S.C. § 80b-2(ll) (1976). There is no allegation that Catanella’s advice was anything other than incidental to his brokerage functions or that he received special compensation for that advice.
 
 See generally Kaufman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
 
 464 F.Supp. 528, 537-38 (D.Md.1978). The same is true for Hutton. Thus, plaintiffs have failed to state a cause of action for monetary damages and have failed to sue appropriate defendants under the Investment Advisers Act. The counts under the Act shall be dismissed.
 

 4.
 
 Section 17(a) of the Securities Act of 1933
 

 The Gaugler complaint contains a count brought pursuant to section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (1976). Defendants have not moved to dismiss this claim. However, in light of my decision in
 
 Kimmel v. Peterson,
 
 565 F.Supp. 476 (E.D.Pa.1983), I raise the issue
 
 sua sponte.
 
 In
 
 Kimmel,
 
 I held that there is no implied private right of action under section 17(a).
 
 See Kimmel,
 
 565 F.Supp. at 482-88. In this, the court does not stand alone.
 
 See e.g., Alloy v. Miller,
 
 No. 83-4780 slip op. at 14 (E.D.Pa. February 8, 1984);
 
 Hudson v. Capital Management Intern., Inc.,
 
 565 F.Supp. 615, 625-27 (N.D.Cal.1983);
 
 Massaro v. Vernitron Corp.,
 
 559 F.Supp. 1068, 1078 (D.Mass.1983);
 
 Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
 
 551 F.Supp. 580, 585-87 (S.D.Ohio 1982);
 
 Keys v. Wolfe,
 
 540 F.Supp. 1054, 1060 (N.D.Tex.1982),
 
 aff'd in relevant part, rev’d on other grounds,
 
 709 F.2d 413 (5th Cir.1983);
 
 Kaufman v. Magid,
 
 539 F.Supp. 1088, 1097-98 (D.Mass.1982).
 
 See also Kimmel,
 
 565 F.Supp. at 482-83 and n. 6.
 

 5.
 
 Vicarious Liability
 

 Catanella and Hutton seek to dismiss claims asserted against them under the “controlling persons” provisions — section 15 of the Securities Act of 1933, 15 U.S.C.
 
 % 11 o
 
 (1976) and section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) (1976). Defendants contend that since plaintiffs have failed to state a cause of action under section 10(b), secondary or vicarious liability cannot attach.
 
 [47]
 
 However, the assumption upon which this argument is premised is faulty, as I have determined that there are section 10(b) claims sufficient to survive a motion to dismiss in
 
 *1420
 
 all cases except Taraborelli. Since a claim for primary liability has been adequately stated, the assertion of derivative liability cannot be dismissed on this basis.
 
 [48]
 

 In a separate motion, defendant Gran-ville moves to dismiss the claims against him, all of which are based upon theories of vicarious liability. Specifically, the Gaugler complaint labels him a “controlling person” under section 20(a) and an aider and abettor. Liability against Granville is also asserted under the doctrine of
 
 respondeat superior.
 

 In essence, the complaint accuses Gran-ville of bolstering Catanella’s reputation and then reassuring Gaugler of the wisdom of Catanella’s investments. His behaviour is characterized as “hand-holding.” It is claimed that Granville knew or was reckless in failing to learn about the fraud being perpetrated. Gaugler Complaint at
 
 n
 
 19, 29. The following specific activities are alleged in the complaint. Granville was present at the Hutton seminar attended by Gaugler in Atlantic City. He joined Catanella in representing the latter as the “Granville Oriented Broker in the Tri State Area.” He stated that Hutton “fully endorsed the Granville Market Theory.”
 
 Id.
 
 at 11 9. During the course of their association, Catanella frequently telephoned Gran-ville in Gaugler's presence. Granville spoke directly to Gaugler, allaying any fears he might entertain.
 
 Id.
 
 at 12. In addition, Granville called during Catanella’s radio show to endorse Catanella publicly and lead the listeners to believe that he approved Catanella’s trading decisions.
 
 Id.
 
 at H 13. A tape recorded conversation between Granville and former Treasury Secretary William Simon was played to impress Gaugler and other investors. This discussion focused upon Simon’s interest in the Granville strategy.
 
 Id.
 
 at 1115.
 
 [49]
 

 There is also a general allegation that Granville and Hutton failed to supervise Catanella adequately “contrary to their duties as controlling persons.”
 
 Id.
 
 at H 20. Finally, it is averred that Granville knew or was reckless in failing to learn about the facts surrounding the
 
 Brown
 
 litigation.
 
 Id.
 
 at 1125H. Granville argues that those allegations do not state a claim.
 
 [50]
 

 Respondeat superior
 
 is not applicable to this case, factually or legally. This Circuit has held that, as a matter of law, the doctrine should not be used to impose vicarious liability under the securities laws.
 
 Rochez Brothers, Inc. v. Rhoades,
 
 527 F.2d 880, 885-86 (3d Cir.1975)
 
 (Rochez
 
 II).
 
 See also Sharp v. Coopers & Lybrand,
 
 649 F.2d 175, 183 (3d Cir.1981). The
 
 Rochez
 
 court reasoned that applying
 
 respondeat superior
 
 would circumvent the good faith defense contained in section 20(a). As the court explained, “imposing secondary liability would not advance the legislative purpose of the 1934 Act and in fact would also undermine the Congressional intent by emasculating section 20(a).”
 
 Rochez
 
 II, 527 F.2d at 885. The court envisioned exceptions to this rule, such as in the case of broker-dealers, where “a stringent duty to supervise employees does exist.”
 
 Id.
 
 at 886. Thus, Hutton could be held liable for Catanella’s acts under
 
 respondeat superior.
 
 However, Granville was not Catanella’s employer and no “stringent duty to supervise” existed. Thus, the broker-dealer exception is inapposite. This also underscores the factual problem with applying
 
 respondeat superior
 
 even in the absence of
 
 Rochez.
 
 The doctrine is based upon the agency concept that the principal or master will be responsible for the acts of the agent or servant. Granville was neither a principal nor agent vis-a-vis Catanella or Hutton. At
 
 *1421
 
 best, he was an independent participant. He appeared at the Hutton seminars only to gain followers and subscriptions to his market newsletter. Even assuming that an exception from
 
 Rochez
 
 could be carved out to cover this situation, common law principles of
 
 respondeat superior
 
 simply do not apply in this factual setting. Therefore, the claim shall be dismissed.
 

 Section 20(a) of the Securities Exchange Act of 1934 is the vehicle through which secondary liability can be imposed upon those who “control” a primary violat- or. That section provides:
 

 Every person who, directly or indirectly,
 
 controls any person liable under any provision of this chapter or of any
 
 rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the
 
 controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
 

 15 U.S.C. § 78t(a) (1976) (emphasis added). A definition of “control” is conspicuously absent from the statute. In
 
 Rochez,
 
 the court opined that “Congress deliberately did not define ‘control’ thus indicating its desire to have the courts construe the applicable provisions of the statute along with the evidence adduced at trial.” 527 F.2d at 890. The court recognized that the SEC defines control as “the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person____”
 
 Id.
 
 (quoting 17 C.F.R. § 240.12(b)-2(f)).
 

 While the Gaugler complaint states that Granville was a controlling person vis-a-vis Catanella and Hutton,
 
 see
 
 Gaugler Complaint at ¶ 7, it does not contain any factual averments which would support that assertion. The factual allegations in the complaint demonstrate indisputably that Gran-ville could not be a controlling person as a matter of law. With respect to Hutton, he was not a high ranking employee or officer with the power to direct its policies or management. Indeed, Granville was not an officer, director or employee of Hutton in any respect. His appearances at the seminars were his only connections with Hutton and those were motivated by his own self-interest — the profit gained from increased newsletter subscriptions. There is no basis in the complaint from which it can be adduced that Granville controlled Hutton.
 

 Nor do the facts in the complaint give rise to the inference that Granville “controlled” Catanella. No relationship existed, employment or otherwise, that would allow Granville to exert influence over Catanella. The only link between the two was Catanella’s purported adherence to the Granville market method. The complaint plainly states that Catanella did not always follow Granville’s advice, despite representations to the contrary to Gaugler. Gaugler Complaint at ¶ 8. Thus, the plaintiff concedes that Catanella exercised independent judgment.
 
 [51]
 
 The claims against Granville based upon section 20(a) shall be dismissed.
 

 The final issue, Granville’s liability as an aider and abettor, warrants a different result. Liability as an aider-abettor is not dependent upon the individual’s status or relationship with the primary violator. This theory imposes liability upon one who knowingly participates or aids in a securities violation.
 
 See generally Rochez
 
 II,
 
 *1422
 
 527 F.2d at 886, Three elements must be present before liability can attach. There must be an underlying securities violation, the aider-abettor must have knowledge of the violation and must substantially assist or participate in the wrongdoing.
 
 See Monsen v. Consolidated Dress Beef Co., Inc.,
 
 579 F.2d 793, 799 (3d Cir.1978),
 
 cert. denied,
 
 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1979);
 
 Gould v. American-Hawaiian Steamship Co.,
 
 535 F.2d 761, 779 (3d Cir.1976);
 
 Rochez,
 
 527 F.2d at 886;
 
 Landy v. FDIC,
 
 486 F.2d 139, 162-63 (3d Cir.1973),
 
 cert. denied,
 
 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).
 
 Accord Armstrong v. McAlpin,
 
 699 F.2d 79, 91 (2d Cir.1983);
 
 SEC v. Seaboard Corp.,
 
 677 F.2d 1289, 1296 (9th Cir.1982);
 
 Herm v. Stafford,
 
 663 F.2d 669, 684 (6th Cir.1981);
 
 ITT, An International Investment Trust v. Cornfeld,
 
 619 F.2d 909, 922 (2d Cir.1980);
 
 Rolf v. Blyth, Eastman Dillion & Co., Inc.,
 
 570 F.2d 38, 47-48 (2d Cir.1978).
 

 For purposes of this motion, I shall assume that an underlying securities violation has been established. With respect to the second element, the complaint alleges that Granville acted intentionally or recklessly. Gaugler Complaint at ¶ 29. Although recklessness will satisfy the general scienter requirement under section 10(b), it is unlikely that it is sufficient in the aiding and abetting context. In
 
 Monsen,
 
 the Third Circuit stated that “[kjnowledge of the underlying violation is a critical element in proof of aiding-abetting liability, for without this requirement financial institutions, brokerage houses, and other such organizations would be virtual insurers of their customers against security law violations.” 579 F.2d at 799.
 
 Cf: Armstrong v. McAlpin,
 
 699 F.2d 79, 91 (2d Cir.1983) (recklessness enough only if aider-abettor owes fiduciary duty to plaintiff; otherwise knowledge needed). However, since the complaint also pled knowledge, by way of intentional conduct, I must assume, for purposes of a motion to dismiss, that the second prong has also been satisfied. The issue remaining is whether Granville “substantially assisted” or “participated” in the fraudulent conduct. The complaint does not allege that Granville actually aided in the churning or the various omissions and misrepresentations. However, construing all reasonable inferences in favor of plaintiff, the complaint is susceptible to an interpretation of substantial assistance on the part of Granville. Knowing about Catanella’s escapades, Granville nevertheless continued to placate and reassure Gaugler, thus allaying potential fears or suspicions. This allowed Catanella to continue, undisturbed, in his course of fraudulent conduct. It is not clear at this early stage whether plaintiff can prove this scenario or a similar one — more factual development is needed. I am, however, unable to conclude, as a matter of law, that the complaint fails to state a claim against Granville on a theory of aiding and abetting.
 

 C.
 
 The RICO Claims
 

 Defendants advocate dismissal of the claims brought pursuant to the civil remedy provision of the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. §§ 1961-1968 (1976) (“RICO”). Four arguments are advanced — two of which actually depend upon how I resolved the underlying securities issues. Defendants contend that since the federal securities claims are legally deficient, no “pattern” of “racketeering activity” has been alleged. It is also asserted that the lack of “loss causation” in the securities sense precludes a finding that the injuries occurred “by reason of” a RICO violation. The other two arguments have become rather standard civil RICO defenses': the missing link to organized crime and the failure to allege an injury “by reason of” a violation of section 1962.
 

 1.
 
 The Statute
 

 Title IX of the Organized Crime Control Act of October 15,1970, Pub.L. No. 91-452, 84 Stat. 941, better known as RICO, was enacted in an effort to quell the potence and persistence of organized crime.
 
 [52]
 
 As illustrated by its findings, Congress was
 
 *1423
 
 particularly concerned with organized crime’s steady infiltration into legitimate business:
 

 The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America’s economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Nation’s economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; and (5) organized crime continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact. It is the purpose of this Act to seek the
 

 eradication of organized crime in the United States by strenthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.
 

 Pub.L. No. 91-452, 84 Stat. 922, title IX § 1 (1970). True to its word, Congress formulated a broad statute, giving law enforcement officials new tools with which to continue the battle. RICO created an entirely new category of offenses. The statute makes collective, ongoing activity, of the sort commonly engaged in by “organized crime,” an offense separate from the underlying violation. For example, it is illegal to participate in the affairs of an “enterprise” through a “pattern” of “racketeering activity.”
 
 See
 
 18 U.S.C. § 1962(c). “Racketeering activity” is the actual criminal offense, for which the violator may be separately punished. Its definition includes a variety of state law offenses punishable by imprisonment for more than one year, as well as a long list of federal statutes.
 
 See
 
 18 U.S.C. § 1961(1).
 
 [53]
 
 A “pat
 
 *1424
 
 tern of racketeering activity” is defined as the commission of at least two acts of racketeering within ten years. 18 U.S.C. § 1961(5). The statutory definition of “enterprise” includes any individual, group or entity. 18 U.S.C. § 1961(4).
 
 [54]
 
 However, the statute does not simply prohibit engaging in a “pattern of racketeering activity.” Rather, it prohibits an individual from using income derived from a pattern of racketeering to acquire an interest in, or establish the operation of, an enterprise. 18 U.S.C. § 1962(a). It proscribes acquiring or maintaining an interest in, or control of, an enterprise through a pattern of racketeering. 18 U.S.C. § 1962(b). It also prohibits an individual employed or associated with an enterprise from conducting or participating in its affairs through a pattern of racketeering. 18 U.S.C. § 1962(c). Finally, it is unlawful to conspire to do any of the above. 18 U.S.C. § 1962(d).
 

 In addition to criminal sanctions, RICO provides a civil remedy for “[a]ny person injured in his business or property by reason of a violation of section 1962 ____” 18 U.S.C. § 1964(c). The statute provides for treble damages and attorney’s fees.
 
 Id.
 
 Largely ignored for nearly a decade, this civil remedy provision has now been “found.” Its recent leap from obscurity to notoriety has generated a tremendous volume of litigation. Although the statute is facially clear and unambiguous, its sheer breadth seems to have created problems in the civil context. Courts are reluctant to turn every multiple statutory violation into an action for treble damages and loath to label each multiple violator a “racketeer.” This is especially true in the securities fraud area, where federal statutory remedies already exist.
 
 See e.g., Divco Const. & Realty Corp., Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
 
 575 F.Supp. 712, 714-15 (S.D.Fla.1983);
 
 Hokama v. E. F. Hutton & Co., Inc.,
 
 566 F.Supp. 636, 643-44 (C.D.Cal.1983);
 
 Noland v. Gurley,
 
 566 F.Supp. 210, 218 (D.Col.1983);
 
 Harper v. New Japan Securities Intern., Inc.,
 
 545 F. Supp. 1002, 1007-08 (C.D.Cal.1982).
 
 [55]
 
 Therefore, despite the Congressional admonition that the statute be “liberally construed to effectuate its remedial purposes,” Pub.L. No. 91-452, 84 Stat. 922, title IX § 904(a) (1970), some courts have endeavored to narrow the concededly expansive scope of the statute by judicial fiat.
 

 2.
 
 Securities Related Issues
 

 Defendants argue that the legal deficiency of the underlying securities claims prevents the complaints from alleging the required “pattern” of “racketeering activity.” This challenge is analogous to the one made with respect to vicarious liability — if there is no valid claim for a primary violation, derivative liability cannot
 
 *1425
 
 attach. In the RICO context, defendants argue that if the allegations are insufficient to state a section 10(b) claim, there could be no “fraud in the sale of securities” sufficient to qualify as a predicate act under section 1961(1)(D). Defendants rely upon their earlier assertion that the misrepresentations and omissions were not made “in connection with” the purchase or sale of securities. Since I have decided otherwise, this argument must be rejected. The complaints allege various instances of fraud “in connection with” the purchase or sale of securities, sufficient to state a section 10(b) claim and establish a “pattern” of “racketeering activity.”
 
 [56]
 

 Reaching back to the securities issues once again, defendants reassert that there is no “loss causation” between the alleged fraud and injury. Defendants reason that without loss causation, plaintiffs injuries cannot be “by reason of” a violation of section 1962. However, defendants do not explain or elaborate upon this theory. They may be intimating that “loss causation” in a securities sense is also a requirement under section 1964(c). However, I shall not decide this issue, especially considering defendant’s non-existent analysis.
 
 But see Seawell v. Miller Brewing Co.,
 
 576 F.Supp. 424, 430 (M.D.N.Car.1983) (independent, intervening act will break chain of causation required by section 1964(e)). If defendants are making the derivative liability argument discussed above, they may have a valid challenge. Causation is an element of a section 10(b) cause of action. If there is no loss causation, plaintiffs will not have stated a securities fraud claim. Without a valid securities fraud cause of action, that claim cannot serve as a predicate offense under RICO.
 
 See Moss v. Morgan Stanley, Inc.,
 
 719 F.2d 5, 18-19 (2d Cir.1983).
 
 See also Tenaglia v. Cohen,
 
 No. 83-1814 slip op. at 15-16 (E.D.Pa. March 8, 1984) (failure to state securities claim will defeat RICO claim based upon “fraud in the sale of securities”);
 
 Somerville v. Major Exploration, Inc.,
 
 576 F.Supp. 902, 913-14 (S.D.N.Y.1983) (same);
 
 Mauriber v. Shearson/American Express, Inc.,
 
 546 F.Supp. 391, 397 (S.D.N.Y.1982) (same). I have concluded that defendant’s failure to disclose
 
 Brown
 
 did not cause plaintiff’s injuries in the loss causation sense. Thus, with respect to that claim only, recovery would be barred under section 10(b) and under RICO.
 
 [57]
 

 
 *1426
 
 The RICO counts in Gaugler, Singer, Rastelli and Shulik embrace all the alleged acts of fraud. As I have concluded earlier, there are allegations of omissions and misrepresentations other than
 
 Brown,
 
 which state valid claims under section 10(b). Therefore, the RICO counts can stand without
 
 Brown.
 
 As noted earlier, the purported class representatives in Taraborelli rely exclusively upon the failure to disclose
 
 Brown.
 
 Since that does not satisfy the dictates of section 10(b), there is a failure to state a claim under RICO as well.
 

 I am compelled to raise,
 
 sua sponte,
 
 a flaw in the Gaugler RICO count. Plaintiff alleges that the “enterprises” in which Catanella gained an interest were plaintiffs securities accounts. Gaugler Amended Complaint at ¶71. While it is true that the complaint does not state or reasonably infer that Catanella gained an interest in plaintiffs portfolio, this issue is immaterial. No conceivable reading of the statutory definition would support a conclusion that securities accounts qualify as “enterprises.”
 
 See
 
 18 U.S.C. § 1961(4). Thus, the RICO count shall be dismissed without prejudice for failure to allege the existence of a legally appropriate “enterprise” under the statute. Plaintiff shall have twenty days within which to amend the RICO count. Earlier, I declined to dismiss Count Eleven on technical pleading grounds, reasoning that the prolix allegations with respect to
 
 Brown
 
 might have relevance to the RICO claim. Given my rulings, the only possible relevance these allegations could have would be to show a “pattern” of prohibited activity. The remaining multiple allegations of fraud cast doubt upon the necessity of
 
 Brown
 
 for this purpose. Even assuming its probity on the issue of “pattern” over one hundred paragraphs detailing the facts and holdings of
 
 Brown ad nauseaum
 
 seems unwarranted. This is especially true since the pertinent allegations are summarized elsewhere in the complaint.
 
 See
 
 Amended Complaint at HU 25A-251. Therefore, should plaintiff choose to amend the RICO claim, he would be well advised to ponder the evils of redundancy and the virtues of brevity.
 

 3.
 
 Organized Crime
 

 Expressing concern over the broad sweep of RICO, defendants assert that it was “the clear intention of Congress ... to eradicate
 
 organized crime,
 
 not to turn all civil disputes into RICO claims.”
 
 See e.g.,
 
 Defendants’ Reply Memorandum in Support of the Motion to Dismiss in Gaugler at 23. Defendants then proceed to quote the court in
 
 Waterman Steamship Corp. v. Avondale Shipyards, Inc.,
 
 527 F.Supp. 256, 260 (E.D.La.1981), holding that RICO applies only to the activities of “organized crime.” Defendants appear to be suggesting that a link to organized crime is necessary to state a civil RICO claim. In
 
 Kimmel,
 
 I refused to impose such a requirement,
 
 see Kimmel v. Peterson,
 
 565 F.Supp. at 490-93, and will not deviate from that holding. However, I feel compelled by the ever increasing caselaw, to update that pri- or discussion.
 

 Given defendants’ argument, it is noteworthy that the so-called organized crime requirement has not found acceptance in the criminal RICO context.
 
 See e.g., United States v. Gottesman,
 
 724 F.2d 1517, 1521 (11th Cir.1984);
 
 United States v. Cauble,
 
 706 F.2d 1322, 1330 (5th Cir.1983);
 
 petition for cert. filed,
 
 — U.S. -, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984);
 
 United States v. Martino,
 
 648 F.2d 367, 380 (5th Cir.1981),
 
 cert. denied,
 
 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982),
 
 aff'd, reh’ng en banc,
 
 681 F.2d 952 (5th Cir.1982);
 
 aff'd sub. nom, Russello v. United States,
 
 — U.S.-, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983);
 
 United States v. Uni Oil, Inc.,
 
 646
 
 *1427
 
 F.2d 946, 953 (5th Cir.1981);
 
 cert. denied sub. nom., Corbitt v. United States,
 
 455 U.S. 908, 102 S.Ct. 1254, 71 L.Ed.2d 446 (1982).
 
 United States v. Thordarson,
 
 646 F.2d 1323, 1328-29 n. 10 (9th Cir.),
 
 cert. denied,
 
 454 U.S. 1055, 102 S.Ct. 601, 70 L.Ed.2d 591 (1981);
 
 United States v. Aleman,
 
 609 F.2d 298, 303 (7th Cir.1979),
 
 cert. denied,
 
 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980);
 
 United States v. Forsythe,
 
 560 F.2d 1127, 1136 (3d Cir.1977);
 
 United States v. Campanale,
 
 518 F.2d 352, 363 (9th Cir.1975),
 
 cert. denied sub nom., Grancich v. United States,
 
 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976);
 
 United States v. Vignola,
 
 464 F.Supp. 1091, 1095-96 (E.D.Pa.)
 
 aff'd mem.
 
 605 F.2d 1199 (3d Cir.1979),
 
 cert. denied,
 
 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980). In
 
 Forsythe,
 
 this Circuit remarked that “the legislative intent was to make RICO violations dependent
 
 upon behavior, not status.” Forsythe,
 
 560 F.2d at 1136 (emphasis added). Yet, on the civil side, where the stakes are presumably not as high, some courts have been willing to restrict a civil RICO claim by requiring a link or nexus with organized crime.
 
 See e.g., Gilbert v. Prudential-Bache Securities, Inc.,
 
 No. 83-1513, slip op. at 4 (E.D.Pa. January 10, 1984);
 
 Divco Const. & Realty Corp., Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
 
 575 F.Supp. 712, 714-15 (S.D.Fla. 1983);
 
 Hokama v. E.F. Hutton & Co., Inc.,
 
 566 F.Supp. 636, 643 (C.D.Cal.1983);
 
 Wagner, et al. v. Bear, Stearns & Co., et al,
 
 [1982-1983 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 99,032 at 94,913 (N.D.Ill. 1982);
 
 Noonan v. Granville-Smith,
 
 537 F.Supp. 23, 29 (S.D.N.Y.1981);
 
 Waterman Steamship Corp. v. Avondale Shipyards, Inc.,
 
 527 F.Supp. 256, 260 (E.D.La.1981);
 
 Adair v. Hunt International Resources Corp.,
 
 526 F.Supp. 736, 747-48 (N.D.Ill. 1981) ;
 
 Kleiner v. First National Bank of Atlanta,
 
 526 F.Supp. 1019, 1021-22 (N.D. Ga.1981);
 
 Barr v. WUI/TAS, Inc.,
 
 66 F.R.D. 109, 112-13 (S.D.N.Y.1975).
 
 [58]
 
 However, the continued vitality of
 
 Wagner, Noonan, Adair
 
 and
 
 Barr
 
 is dubious in light of the recent decisions in
 
 Moss v. Morgan Stanley, Inc.,
 
 719 F.2d 5 (2d Cir. 1983) and
 
 Schacht v. Brown,
 
 711 F.2d 1343 (7th Cir.1983),
 
 cert. denied,
 
 — U.S.-, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983). Indeed, the overwhelming majority of cases have rejected the organized crime limitation.
 
 See e.g., Sutliff Inc. v. Donovan Cos., Inc.,
 
 727 F.2d 648 at 654 (7th Cir. 1984) ;
 
 Moss v. Morgan Stanley, Inc.,
 
 719 F.2d 5, 21 (2d Cir.1983);
 
 Bunker Ramo Corp. v. United Business Forms, Inc.,
 
 713 F.2d 1272, 1287-88 n. 6 (7th Cir.1983);
 
 Schacht v. Brown,
 
 711 F.2d 1343, 1353 (7th Cir.1983),
 
 cert. denied,
 
 — U.S.-, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983);
 
 Cenco, Inc. v. Seidman & Seidman,
 
 686 F.2d 449, 457 (7th Cir.),
 
 cert. denied,
 
 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982);
 
 Bennett v. Berg,
 
 685 F.2d 1053, 1063 (8th Cir. 1982) ,
 
 aff'd en banc,
 
 710 F.2d 1361, 1364 (8th Cir.1983),
 
 cert. denied sub nom., Prudential Ins. Co. v. Bennett,
 
 — U.S.-, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983);
 
 Jensen v. E.F. Hutton & Co., Inc.,
 
 [Current] Fed.Sec.L.Rep. (CCH) 1199,674 at 97,713 (C.D.Cal.1984);
 
 Willamette Savings & Loan v. Blake & Neal Finance Co.,
 
 577 F.Supp. 1415, 1425-26 (D.Ore.1984);
 
 Fur-man v. Cirrito,
 
 578 F.Supp. 1535 at 1538-1539 (S.D.N.Y.1984);
 
 B.F. Hirsch, Inc. v. Enright Refining Co., 511
 
 F.Supp. 339, 348 (D.N.J.1983);
 
 Yancoski v. E.F. Hutton & Co., Inc.,
 
 581 F.Supp. 88 at 96 n. 18 (E.D. Pa.1983);
 
 Slattery v. Costello,
 
 586 F.Supp. 162 at 164-65 (D.C.D.C.1983);
 
 Mooney v. Fi
 
 
 *1428
 

 delity Union Bank, et al.,
 
 Nos. 82-3192, 82-3193 slip op. at 5 (D.N.J. March 22, 1983);
 
 In re Longhorn Securities Litigation,
 
 573 F.Supp. 255, 269 (W.D.Okl.1983);
 
 King v. Lasher,
 
 572 F.Supp. 1377, 1382-83 (S.D.N.Y.1983);
 
 Taylor v. Bear & Stearns & Co.,
 
 572 F.Supp. 667, 681-82 (N.D.Ga. 1983);
 
 In re Action Industries Tender Offer,
 
 572 F.Supp. 846, 850-51 (E.D.Va.1983);.
 
 Guerrero v. Katzen,
 
 571 F.Supp. 714, 719-20 (D.C.D.C.1983);
 
 Durante Bros, and Sons, Inc. v. Flushing Nat’l Bank,
 
 571 F.Supp. 489, 495 (E.D.N.Y.1983);
 
 Austin v. Merrill Lynch, Pierce, Fenner & Smith,
 
 570 F.Supp. 667, 669 (W.D.Mich.1983);
 
 Ralston v. Capper,
 
 569 F.Supp. 1575, 1578-79 (E.D.Mich.1983);
 
 Mauriber v. Shear-son/American Express, Inc.,
 
 567 F.Supp. 1231, 1239-40 (S.D.N.Y.1983);
 
 Bankers Trust Co. v. Feldesman,
 
 566 F.Supp. 1235, 1239-40 (S.D.N.Y.1983);
 
 Eisenberg v. Gag-non,
 
 564 F.Supp. 1347, 1351 (E.D.Pa.1983);
 
 Windsor Assoc., Inc. v. Greenfeld, et al.,
 
 564 F.Supp. 273, 278-79 (D.Md.1983);
 
 Hunt Int’l Resources Corp. v. Binstein,
 
 559 F.Supp. 601, 602 (N.D.Tex.1982);
 
 Lode v. Leonardo,
 
 557 F.Supp. 675, 680 (N.D.Ill. 1982);
 
 Kaushal v. State Bank of India,
 
 556 F.Supp. 576, 578 (N.D.Ill.1983);
 
 Crocker Nat’l Bank v. Rockwell Int’l Corp., 555
 
 F.Supp. 47, 49 (N.D.Cal.1982);
 
 D’lorio v. Adonizio,
 
 554 F.Supp. 222, 230-31 (M.D. Pa.1982);
 
 Meineke Discount Muffler Shops, Inc. v. Noto,
 
 548 F.Supp. 352, 354 (E.D.N.Y.1982);
 
 Hanna Mining Co. v. Norcen Energy Resources, Ltd.,
 
 574 F.Supp. 1172 [1982 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 98,742 at 93,737 (N.D. Ohio 1982);
 
 Harper v. New Japan Securities, Int’l, Inc.,
 
 545 F.Supp. 1002, 1006 n. 7 (C.D.Cal.1982);
 
 Maryville Academy v. Loeb Rhoades & Co., Inc.,
 
 530 F.Supp. 1061, 1069 (N.D.Ill.1981);
 
 Hellenic Lines, Ltd. v. O’Hearn,
 
 523 F.Supp. 244, 247-48 (S.D.N.Y.1981);
 
 Spencer Companies, Inc. v. Agency Rent-a-Car, Inc.,
 
 1981-82 Fed. Sec.L.Rep. (CCH) ¶ 98,361 at 92,214 (D.Mass.1981);
 
 Engl v. Berg,
 
 511 F.Supp. 1146, 1155 (E.D.Pa.1981);
 
 Heinold Commodities, Inc. v. McCarty,
 
 513 F.Supp. 311, 313 (N.D.Ill.1979);
 
 Farmers Bank v. Bell Mortgage Corp.,
 
 452 F.Supp. 1278, 1280 (D.Del.1978).
 
 Accord, Blakey, supra
 
 note 43 at 284-85; Note
 
 Application of the Racketeer Influenced and Corrupt Organizations Act (RICO) to Securities Violations,
 
 8 J.Corp.L. 411, 429 (1983).
 

 Those courts requiring a link to organized crime appear to be searching for a way to restrict the seemingly endless scope of RICO in accordance with their perception of the statutory goals. However, “[t]he short answer is that Congress did not write the statute that way.”
 
 Russello,
 
 104 S.Ct. at 300 (quoting
 
 United States v. Naftalin,
 
 441 U.S. 768, 773, 99 S.Ct. 2077, 2081, 60 L.Ed.2d 624 (1979)). A fundamental tenent of statutory construction teaches that “[i]n determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.’ ”
 
 Russello,
 
 104 S.Ct. at 299 (quoting
 
 United States v. Turkette,
 
 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981)). By its terms, RICO does not require any connection with organized crime — the statute neither mentions nor purports to define that concept. Each subsection of section 1962 begins, “[i]t shall be unlawful for
 
 any person
 
 ____” 18 U.S.C. § 1962 (emphasis supplied),
 
 [59]
 
 indicating an intent not to restrict the class of possible defendants. The legislative history of the statute supports this reading of the plain language. Congress recognized the difficulties inherent in endeavoring to first define and then apply the concept of “organized crime.” For example, an amendment was proposed that would have made membership in the “Mafia” or “La Cosa Nostra” an offense.
 
 See
 
 116 Cong.Rec. 35, 343 (Oct. 7, 1970) (Rep. Biaggi). It was rejected as underinclusive and potentially unconstitutional.
 
 Id.
 
 at 35, 344-346. Representative Poff remarked that “the concept of organized criminal ac
 
 *1429
 
 tivity is broader in scope than the concept of organized crime; it is meant to include any criminal activity collectively undertaken ____”
 
 Id.
 
 at 35,293. Put another way, RICO is not aimed at organized crime, but rather, at organized criminal behavior. As Senator McClellan observed:
 

 the curious objection has been raised to S.30 as a whole, and to several of its provisions in particular, that they are not somehow limited to organized crime itself ... as if organized crime were a precise and operative legal concept like murder, rape or robbery. Actually, of course, it is a functional concept like white collar crime, serving simply as a shorthand method of referring to a large and varying group of criminal offenses committed in diverse circumstances.
 

 116. Cong.Ree. 18,913 (June 9, 1970).
 

 In addition to the potential constitutional problems, the act of defining “organized crime” would, by necessity, limit RICO’s application.
 
 [60]
 
 Rather than endeavoring to target the actors, Congress chose instead to focus upon the acts often committed. Therefore, RICO is not status oriented.
 
 See e.g., Forsythe,
 
 560 F.2d at 1136;
 
 Guerrero,
 
 571 F.Supp. at 719;
 
 Ralston,
 
 569 F.Supp. at 1578-79. Senator McClellan explained that:
 

 [t]he Senate report does not claim, however, that the listed offenses are committed primarily by members of organized crime, only that those offenses are characteristic of organized crime. The listed offenses lend themselves to organized commercial exploration ... and experience has shown they are commonly committed by participants in organized crime.
 

 :¡s s}: :js if: s{: sf:
 

 It is impossible to draw an effective statute which reaches most of the commercial activities of organized crime, yet does not include offenses commonly committed by persons outside organized crime as well.
 

 116 Cong.Ree. 18,940 (June 9, 1970). Thus, Congress was well aware that in order to reach “organized crime” effectively, the statute would, by necessity, ensnare those outside of that nebulous category.
 
 [61]
 

 In addition, as noted by Professor Blakey, various groups voiced their objections to the sweep of the bill during the House Hearings in 1970.
 
 See generally Blakey, supra
 
 note 43 at 272-79. For example, the New York City Bar Association specifically criticized the inclusion of securities fraud in the definition of “racketeering activity.”
 
 See
 
 Relating to the Control of Organized Crime in the United States: Hearings on S.30 and Related Proposals Before Sub-comm. No. 5 of the Comm, on the Judiciary, 91st Cong., 2d Sess. at 329 (1970).
 
 [62]
 
 However, “fraud in the sale of securities” was not omitted from section 1961(1). Indeed, as Professor Blakey commented:
 

 Despite this testimony, Title IX was not only reported out, but the treble damage
 
 *1430
 
 clause was
 
 added.
 
 Accordingly, those who seek to have the courts restrict the scope of the statute to curtail its application to fraud are refighting in the judicial forum a battle they lost in the legislative arena____
 

 Blakey, supra,
 
 note 43 at 273 n. 112.
 

 The fear of opening the floodgates notwithstanding, neither the language nor legislative history of RICO support an organized crime requirement. I agree with the eloquent conclusion reached by the Seventh Circuit:
 

 Congress, by granting both plaintiff and defendant status to “any person” who possesses the rudimentary connection with the operation of an enterprise through predicate offenses or who suffers injury therefrom, may well have created a runaway treble damage bonanza for the already excessively litigious. The statute, however, does not speak ambiguously, and Congress, as RICO’s legislative history indicates, was alerted to the far-reaching implications of its enactment.
 
 The legislature having spoken, it is not our role to reassess the costs and benefits associated with the creation of a dramatically expansive, and perhaps insufficiently discriminate, tool for combating organized crime.
 

 Schacht,
 
 711 F.2d at 1361 (emphasis added).
 

 4.
 
 Injury “By Reason of’ a Violation of Section 1962
 

 Defendants argue that the complaints do not allege injury “by reason of a violation of section 1962,” pointing out that the damages sustained flow only from the commission of the predicate acts. It is not as if plaintiffs claim only two acts of securities fraud with ten years. Rather, it is alleged that Catanella participated in the affairs of an enterprise, Hutton, through a pattern of racketeering, multiple acts of securities fraud. It would appear that the statutory requirements have been met. Yet the only injuries suffered by plaintiffs were the losses incurred in the fraudulent securities transactions. Suggesting that some additional injury is required, defendants advocate the necessity of a “competitive” or “racketeer enterprise” injury.
 

 Although this issue is often characterized as one of “standing” or “causation,” in essence, defendants question whether the complaints allege the
 
 appropriate kind
 
 of injury. See
 
 Kimmel,
 
 565 F.Supp. at 493. What constitutes an appropriate RICO injury has become one of the most popular judicial tools for limiting the scope of the statute and has generated its share of imaginative approaches.
 
 See e.g., Dakis on Behalf of Dakis Pension Fund v. Chapman,
 
 574 F.Supp. 757, 761 (N.D.Cal. 1983) (loss of control due to infiltration or competitive injury);
 
 Noland v. Gurley,
 
 566 F.Supp. 210, 218 (D.Col.1983) (infiltration or commercial injury);
 
 Van Schaick v. Church of Scientology of Cal., Inc.,
 
 535 F.Supp. 1125, 1136-37 (D.Mass.1982) (commercial injury);
 
 Erlbaum v. Erlbaum,
 
 [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,772 at 93,923 (E.D.Pa.1982) (infiltration)
 
 Landmark Savings & Loan v. Rhoades,
 
 527 F.Supp. 206, 208-09 (E.D. Mich.1981) (racketeer enterprise injury);
 
 Spencer Cos., Inc. v. Agency Rent-A-Car, Inc.,
 
 1981 Fed.Sec.L.Rep. (CCH) ¶98,361 at 92,216 (D.Mass.1981) (infiltration)
 
 North Barrington Development, Inc. v. Fan-slow,
 
 547 F.Supp. 207, 211 (N.D.Ill.1980) (competitive injury). All these approaches share a common thread — the injury alleged must be something other than that arising out of the commission of the predicate offenses.
 
 [63]
 
 However, despite the various
 
 *1431
 
 terms employed, none of these courts have been terribly clear on exactly what that “something else” is. This is especially true of the so-called “racketeering enterprise injury,” a “catch-all” concept which appears to defy definition. Although bright line distinctions do not always exist, to the extent possible, I shall analyze separately the “competitive injury” and “racketeer en-. terprise injury” requirements.
 

 (a)
 
 Competitive Injury
 

 Borrowing from the field of antitrust, some courts have transplanted the “competitive injury” requirement to the civil RICO context.
 
 See e.g., Bankers Trust Co. v. Feldesman,
 
 566 F.Supp. 1235, 1241 (S.D.N.Y.1983);
 
 North Barrington v. Fanslow,
 
 547 F.Supp. 207, 210-11 (N.D.Ill. 1980). Essentially a standing requirement, this concept would not grant a remedy “to those who have suffered
 
 directly
 
 through the operation of a business through a pattern of racketeering, but only to those injured as competitors.”
 
 Schacht,
 
 711 F.2d at 1357 (emphasis in original). One of the first cases that required a competitive injury,
 
 North Barrington,
 
 relied upon RICO’s stated purpose to prevent the infiltration of legitimate business and the interference with free competition. 547 F.Supp. at 210-11. However,
 
 North Barrington
 
 has been discredited by the Seventh Circuit’s decision to the contrary in
 
 Schacht,
 
 711 F.2d at 1358. Moreover, the holdings in two of the cases universally cited as following
 
 North Barrington
 
 actually appear to rest on a different ground. In
 
 Harper v. New Japan Securities Intern., Inc.,
 
 545 F.Supp. 1002 (C.D.Cal.1982), while noting twice that an antitrust analogy provides the most logical construction of section 1964(c),
 
 id.
 
 at 1007, 1008, the court concluded that its requirement of a causal connection between the injury and the violation of section 1962 “avoid[s] the imposition of the antitrust requirement of a ‘competitive injury,’ [yet] recognizes the similarities between the RICO treble damages provision and § 4 of the Clayton Act.”
 
 Id.
 
 at 1008. The
 
 Harper
 
 court endeavors to have it both ways — claiming allegience to antitrust law, yet repudiating the competitive injury requirement. Harper’s “causal connection” actually sounds closer to the “racketeer enterprise injury,” discussed
 
 infra. Van Schaick v. Church of Scientology of Cal., Inc.,
 
 535 F.Supp. 1125 (D.Mass.1982) is also often cited in connection with the competitive injury requirement. However, a careful reading of that case shows that the court explicitly rejected the competitive injury in favor of a “commercial” “racketeer enterprise injury.”
 
 Id.
 
 at 1134 n. II.
 
 [64]
 
 The court did not define that concept. There does not, therefore, appear to be a clear consensus on what constitutes a “competitive injury,” even among those courts ostensibly requiring it. The majority of courts have either rejected the requirement,
 
 see e.g., Bunker Ramo Corp. v. United Business Forms, Inc.,
 
 713 F.2d 1272, 1288 (7th Cir.1983);
 
 Schacht,
 
 711 F.2d at 1358;
 
 Bennett,
 
 685 F.2d 1053, 1059 (8th Cir.1982),
 
 aff'd en banc,
 
 710 F.2d 1361 (8th Cir.1983);
 
 Yancoski,
 
 at 95;
 
 Slattery v. Costello,
 
 586 F.Supp. 162 at 165-66 (D.C.D.C. July 28, 1983);
 
 Municipality of Anchorage v. Hitachi Cable Ltd.,
 
 No. 81-347 slip op. at 3-4 (March 18, 1983);
 
 In re Longhorn Securities Litigation,
 
 573 F.Supp. 255, 270 (W.D. Okl.1983);
 
 Ralston v. Capper,
 
 569 F.Supp. 1575, 1580 (E.D.Mich.1983);
 
 Wilkinson v. Paine, Webber, Jackson & Curtis, Inc.,
 
 585 F.Supp. 23 [1982-83 Transfer Binder], Fed.Sec.L.Rep. (CCH) 1199,198 at 95,-797 (N.D.Ga.1983);
 
 Mauriber v. Shear-son/American Express, Inc.,
 
 567 F.Supp. 1231, 1240-41 (S.D.N.Y.1983);
 
 Eisenberg v. Gagnon,
 
 564 F.Supp. 1347, 1352-53 (E.D). Pa.1983);
 
 Gitterman v. Vitoulis,
 
 564 F.Supp. 46, 48 (S.D.N.Y.1982);
 
 Crocker Nat’l Bank v. Rockwell Intern. Corp.,
 
 555 F.Supp. 47, 49 (N.D.Cal.1982);
 
 D’lorio v. Adonizio,
 
 554 F.Supp. 222, 230 n. 5 (M.D. Pa.1982);
 
 Hanna Mining Co. v. Noreen
 
 
 *1432
 

 Energy Resources, Ltd..,
 
 574 F.Supp. 1172 [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,742 at 93,737 (N.D.Ohio 1982);
 
 State Farm Fire and Cas. Co. v. Estate of Caton,
 
 540 F.Supp. 673, 680 (D.Del.1982);
 
 Hellenic Lines, Ltd. v. O’Hern,
 
 523 F.Supp. 244, 248 (S.D.N.Y.1981), or abandoned it in favor of another approach.
 
 See e.g., In re Action Industries Tender Offer,
 
 572 F.Supp. 846, 851-52 (E.D.Va.1983) (racketeering injury);
 
 Guerrero v. Katzen,
 
 571 F.Supp. 714, 720 n. 6 (RICO injury);
 
 Barker v. Underwriters at Lloyd’s, London,
 
 564 F.Supp. 352, 358 (E.D.Mich.1983) (racketeer enterprise injury);
 
 Landmark,
 
 527 F.Supp. at 208-09 (racketeer enterprise injury).
 
 See also Blakey, supra
 
 note 43 at 253-54 and n. 52; 326-28 (rejecting competitive injury requirement).
 

 I have previously cast my lot with those courts which have concluded that restrictive antitrust standing principles are not applicable to civil RICO,
 
 see Kimmel,
 
 565 F.Supp. at 493-95, and continue to be of that view. To be sure, the Sherman and Clayton Acts served as models for section 1964(c).
 
 [65]
 
 The “by reason of” language appears in both section 1964(c) and section 4 of the Clayton Act, 15 U.S.C. § 15 (1976). Moreover, the Congressional findings expressed concern that organized crime “would weaken the stability of the nation’s economic system” and “interfere with free competition.” Pub.L. No. 91-452, 84 Stat. 922, title IX § 1(4) (1970). These similarities notwithstanding, there is abundant evidence that Congress did not intend to incorporate a competitive injury requirement into RICO.
 

 As Professor Blakey chronicles, earlier proposed bills, S.2048 and S.2049, suggested amending the Sherman Act to create a weapon against organized crime.
 
 See Blakey, supra
 
 note 43, at 253-56. After studying the proposal, the Antitrust Division of the American Bar Association issued a report advocating separate legislation. The report stated, in pertinent part:
 

 the use of antitrust laws themselves as a vehicle for combating organized crime could create inappropriate and unnecessary obstacles in the way of persons injured by organized crime who might seek treble damage recovery. Such a private litigant would have to contend with a body of precedent — appropriate in a purely antitrust context — setting strict requirements on questions such as “standing to sue” and “proximate cause.”
 

 115 Cong.Rec. 6995 (March 20, 1969).
 
 See also
 
 115 Cong.Rec. 9567 (April 18, 1969) (Sen. McClellan) (no intent to incorporate complexity of antitrust principles). The ABA recommendation was followed — separate legislation was enacted. As the court in
 
 State Farm
 
 appropriately observed, section 1964(c) was “cast as a separate statute intentionally to avoid the restrictive precedent of antitrust jurisprudence.” 540 F.Supp. at 680.
 
 Accord Schacht,
 
 711 F.2d at 1358;
 
 Yancoski,
 
 at 95;
 
 Slattery,
 
 at 165. Similarly, Professor Blakey concluded “any suggestion that RICO actions be limited by antitrust type limitations — “competitive,” “commercial,” or “direct/indirect” injuries — flies in the face of the very consideration that led to the drafting of RICO as a separate statute from the antitrust statutes that are so limited.”
 
 Blakey, supra
 
 note 43 at 255 n. 52.
 

 Another factor militating against the application of the antitrust standing requirement is the differing goals behind the two statutes. As the
 
 Bennett
 
 court observed; “although RICO borrowed the tools of antitrust law to combat organized criminal activity ____Congress did not see the objectives of RICO and the antitrust laws as
 
 *1433
 
 coterminous.”
 
 Bennett,
 
 685 F.2d at 1059 (citing S.Rep. No. 617 at 81-82; 115 Cong. Rec. 6993 (Sen. Hruska);
 
 id.
 
 at 9567 (Sen. McClellan); 116 Cong.Rec. at 607 (Sen. Byrd);
 
 id.
 
 at 35, 193 (Sen. Poff)). On a very simplistic level, fostering free competition is
 
 the
 
 purpose of the antitrust laws, while only an ancillary purpose of RICO. RICO “was broadly aimed at ‘striking ... a mortal blow against the property interests of organized crime.’ ”
 
 Schacht,
 
 711 F.2d at 1357-58 (quoting 116 Cong.Rec. 602 (1970) (Sen. Hruska)). Thus, the very reason for the antitrust standing requirement is inapposite in the RICO context. As the
 
 Bennett
 
 court recognized “to ruin an antitrust defendant, usually a legitimate businessman, would generally lessen competition and increase concentration in a particular industry.”
 
 Bennett,
 
 685 F.2d at 1059. Thus, the competitive injury requirement actually prevents frivolous suits from undermining the purpose behind the antitrust laws — the promotion of competition. This safeguard is unnecessary in the RICO situation — the economic ruin of an enterprise which operates through a pattern of racketeering is
 
 the
 
 purpose behind section 1964(a).
 

 More fundamentally, a competitive injury requirement would be underinclusive when applied to RICO. Organized crime will not always affect competition.
 
 [66]
 
 Not all of the victims will be either “competitors” or harmed in their ability to compete. Consider as an example, threats made to induce a small grocer to pay a certain amount of money per month for “protection services.” The grocer is not in competition with the vendors of this service, who, for purposes of this hypothetical, are members of “organized crime.” No attempt is made to infiltrate or take over the grocer’s business. Nor is the grocer hampered in his ability to compete. Imposition of the competitive injury requirement would prevent the grocer from suing under section 1964(c). This result would frustrate the purpose of RICO in two major respects. First, targeted behavior would go unpunished and the protection ring would not be divested of its “ill-gotten gains,”
 
 Turkette,
 
 452 U.S. at 585,101 S.Ct. at 2529.
 
 See also Hellenic Lines,
 
 523 F.Supp. at 248 (can sue to recover bribes or kickbacks). In addition, the Congressional findings preceding the statute express a desire to protect “innocent investors” as well as “competing organizations.” Pub.L. No. 91-452, 84 Stat. 922, title IX § 1(4) (1970). The grocer in the example is a direct victim of racketeering activity. Preventing suit by those
 
 directly,
 
 as opposed to
 
 competitively
 
 injured, would circumvent one of Congress’ stated objectives. In rejecting the need to show a competitive injury, the court in
 
 Hanna Mining
 
 observed:
 

 To conclude otherwise and restrict the right of action under 18 U.S.C. § 1964(c) only to those who or which are indirect victims of racketeering activity would leave undisturbed racketeers whose activity does not infringe upon their competitor’s markets. It is untenable to suggest that Congress intended such a result.
 

 
 *1434
 

 Hanna Mining,
 
 574 F.Supp. 1172 [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,742 at 93,737.
 
 Accord In re Longhorn Securities Litigation,
 
 573 F.Supp. at 270;
 
 Hellenic Lines,
 
 523 F.Supp. at 248.
 
 See also
 
 Note,
 
 Application of the Racketeer Influenced and Corrupt Organizations Act (RICO) to Securities Violations,
 
 8 J.Corp.L. 411, 435-36 (1983).
 

 The legislative history of RICO evidences an intent to escape the restrictive antitrust standing principles. Section 1964(c) was added to battle organized criminal activity on a new front — its pocketbook. Since a competitive injury requirement would interfere with that goal and create cracks through which targeted behavior will slip, it must be rejected.
 

 (b)
 
 Racketeer Enterprise Injury
 

 Some courts, perhaps recognizing the limitations of the antitrust analogy, but still desirous of narrowing the statute’s sweep, have reached the same result by requiring a “racketeer enterprise injury.”
 
 See Haroco, Inc. v. American National Bank and Trust Co. of Chicago,
 
 577 F.Supp. 111, 114-15 (N.D.Ill.1983);
 
 Fur-man v. Cirrito,
 
 578 F.Supp. 1535 at 1540-1541 (S.D.N.Y.1984);
 
 Willamette Savings & Loan v. Blake & Neal Finance Co.,
 
 577 F.Supp. 1415, 1429-30 (D.Or.1984);
 
 Hudson v. Larouche,
 
 579 F.Supp. 623 at 630 (S.D.N.Y.1983);
 
 Richardson v. Shear-son/American Express Co., Inc.,
 
 573 F.Supp. 133, 137 (S.D.N.Y.1983);
 
 King v. Lasher,
 
 572 F.Supp. 1377, 1382 (S.D.N.Y. 1983);
 
 In re Action Industries Tender Offer,
 
 572 F.Supp. 846, 851-52 (E.D.Va.1983);
 
 Barker v. Underwriters at Lloyd’s, London,
 
 564 F.Supp. 352, 358 (E.D.Mich.1983);
 
 Moss v. Morgan Stanley, Inc.,
 
 553 F.Supp. 1347, 1361 (S.D.N.Y.),
 
 rev’d on other grounds,
 
 719 F.2d 5 (2d Cir.1983);
 
 Johnsen v. Rogers,
 
 551 F.Supp. 281, 285 (C.D.Cal. 1982);
 
 Van Schaick,
 
 535 F.Supp. at 1137 & n. 11;
 
 Landmark,
 
 527 F.Supp. at 208-09. Underlying this requirement is the familiar judicial discomfort with the potential breadth of RICO’s civil component. As the
 
 Johnsen
 
 court noted: “Congress ... did not intend to provide an additional remedy for an already compensable injury.”
 
 John-sen,
 
 551 F.Supp. at 285.
 
 See also In re Actions Industries,
 
 572 F.Supp. at 852;
 
 Harper,
 
 545 F.Supp. at 1007-008, discussed
 
 supra
 
 at note 55.
 

 It is far from clear what constitutes a “racketeering enterprise injury” and how it differs from a “competitive injury.” Those courts requiring a racketeer enterprise injury purport to do so out of strict adherence to RICO’s terms. Parrotting the statutory language, they simply state that the injury must result from a violation of section 1962.
 
 See e.g., Haroco,
 
 at 114-115;
 
 Richardson,
 
 573 F.Supp. at 137;
 
 King,
 
 572 F.Supp. at 1382;
 
 Moss,
 
 553 F.Supp. at 1361. The
 
 Johnsen
 
 court described the appropriate damage as “a commercial injury, caused by the conducting of an ‘enterprise’s affairs through a pattern of racketeering activity.’ ”
 
 Johnsen,
 
 551 F.Supp. at 285. At first blush, it appears that these courts may actually be applying RICO’s internal standing requirement. RICO does not punish the commission of two or more predicate acts within ten years. Rather, the statute proscribes,
 
 inter alia,
 
 the operation of, or participation in, the affairs of an enterprise through a pattern of racketeering.
 
 See
 
 18 U.S.C. § 1962(c). Viewed in that light, the racketeering enterprise injury requirement becomes redundant.
 
 See Slattery,
 
 at 166. However, the courts’ insistence that the resulting injury be something “more or different than injury from predicate acts,”
 
 see Landmark,
 
 527 F.Supp. at 208, belies this conclusion.
 

 Individuals may operate the affairs of an enterprise through a pattern of racketeering, yet a potential plaintiff may suffer injuries resulting only from the underlying predicate acts. Recall the small grocer discussed
 
 supra.
 
 The members of the protection ring operated the affairs of their criminal enterprise through repeated acts of extortion. The only injuries suffered by the grocer were those flowing from the predicate acts — the money extracted via threats. Although the actions of the enterprise fall squarely under RICO’s requirements, those courts requiring a racketeer enterprise injury would bar the grocer from recovery. To hold that the injuries must be something more or different from those flowing from the predicate acts, is to imply that the
 
 *1435
 
 damages must be
 
 indirect.
 
 This direct versus indirect distinction harkens back to the antitrust analogy. There is much to
 

 suggest that this racketeer enterprise injury concept is similar or at least related to the competitive injury concept. The only court to venture a definition of a racketeer enterprise injury, did so by way of example. The court in
 
 Landmark
 
 opined that such an injury might be found where “a civil RICO defendant’s ability to harm the plaintiff is enhanced by the infusion of money from a pattern of racketeering activity into the enterprise.”
 
 Landmark,
 
 527 F.Supp. at 209. Although noting that they are not identical, the court in
 
 Landmark
 
 also conceded the existence of an overlap between the competitive and racketeer enterprise injuries.
 
 Id.
 
 at 208-09. Further narrowing the gap between these two allegedly distinct concepts, the court noted:
 

 [T]he number of potential plaintiffs who are not the
 
 direct
 
 victims of predicate crimes but who have treble damage claims because they have suffered racketeering enterprise injury to their business or property are limited only by their imagination and the burden of proof. Does, for example, the State of Michigan have a treble damage action against an illegal gambling enterprise because of injury to its lottery business? Does a legitimate business which loses a public
 

 bid because of a series of bribes by a competitor have a treble damage action under RICO?
 

 Id.
 
 at 209 (emphasis added).
 
 [67]
 
 These examples appear to be competitive injuries, despite the court’s explicit rejection of the antitrust standing requirement.
 
 See Landmark, id.
 
 at 208. Whatever else
 
 Landmark
 
 teaches, it appears to give the “indirect injury” concept a new name.
 

 Other cases also call into doubt the existence of a tangible distinction between the two concepts. In
 
 Harper,
 
 discussed,
 
 supra,
 
 the court seemed unable to choose between the racketeer enterprise and competitive injury requirements.
 
 See Harper,
 
 545 F.Supp. 1007-08. In
 
 Barker v. Underwriters at Lloyd’s, London,
 
 the court, after explicitly rejecting the need for a competitive injury, noted that “[ojther cases, however,
 
 have used the same analogy to the antitrust laws to interpret section 1964(c) as requiring that plaintiff suffer ‘racketeering enterprise injury.’” Barker,
 
 564 F.Supp. at 358. (emphasis added). Similarly, the court in
 
 Schacht
 
 rejected the argument that RICO required a competitive or “indirect injury.” The court treated the approaches utilized in
 
 North Barring-ton, Van Schaick
 
 and
 
 Landmark
 
 together, implicitly suggesting that they all represented facets of the same concept.
 
 See Schacht,
 
 711 F.2d at 1356-58.
 
 [68]
 

 See also
 
 
 *1436
 

 Hanna Mining,
 
 574 F.Supp. 1172, 1982 Fed.Sec.L.Rep. (CCH) 1198,742 at 93,737. To the extent that a racketeer enterprise injury is identical or related to the antitrust competitive injury concept, it must be rejected for the reasons articulated in the previous section.
 

 However, it may be that a racketeer enterprise injury is not synonymous with a competitive injury. The former may actually be broader than the latter. All that can be gleaned from the cases is that the injury must be something more or different from that flowing from the predicate acts. Perhaps this amorphous requirement is a proxy for any form of indirect injury. In other words, a racketeer enterprise injury may be an umbrella concept, encompassing not only competitive and commercial injuries, but also damages flowing from infiltration or complete takeover of a plaintiffs business.
 
 [69]
 

 See Dakis,
 
 574 F.Supp. at 761 (racketeer enterprise injury is
 
 either
 
 infiltration or competitive injury). Viewing this requirement as a “catch-all” does not redeem its basic flaw — any limitation along the direct/indirect dichotomy is untenable in light of RICO’s language and purpose. The
 
 Mauriber
 
 court suggested the following “infiltration” hypothetical:
 

 A brokerage enterprise infiltrated by organized crime and engaged in defrauding its customers through acts like those alleged here might injure no one but the customers of the enterprise. There would be no injury above and beyond that caused by the predicate acts of fraud forming the “pattern of racketeering activity.”
 

 Mauriber,
 
 567 F.Supp. at 1240. The advocates of a racketeering enterprise injury would allow the infiltrated brokerage house to recover, assuming it could first oust the unwanted intruders. Surely a competing brokerage house somehow hampered in its ability to compete would have standing. However, the defrauded customer would have no redress. I must agree with the
 
 Mauriber
 
 court that “[sjuch conduct, however, would violate RICO and would lie near the center of Congress’ concern.”
 
 Id.
 
 The reasoning that compelled rejection of the competitive injury requirement applies with equal force here. RICO’s purpose would be frustrated if targeted behavior went unpunished and innocent investors were not compensated. As the court in
 
 Crocker
 
 eloquently concluded:
 

 The key purpose of RICO’s civil remedy is to “divest the association of the fruits of its ill-gotten gains.” This purpose would be severely undermined if persons who suffered direct harm from racketeering activity as defined by the statute could not recover in the absence of showing some “special” harm or some overall anti-competitive effect. Such a rule would leave money derived from actions prohibited by RICO precisely where Congress did not intend it to remain, in the hands of RICO violators.
 

 
 *1437
 

 Crocker,
 
 555 F.Supp. at 49-50. omitted). (citations
 

 It is possible that those courts requiring a racketeer enterprise injury have envisioned something other than the indirect injuries discussed above. However, they have not defined the parameters of this concept and it borders on impossible to apply that which defies definition.
 
 See Municipality of Anchorage v. Hitachi Cable Ltd..,
 
 No. 81-347 slip op. at 4 (D.Alaska March 18, 1983). Perhaps the most telling fact is that none of the courts requiring this special injury have found it to exist in the cases before them.
 
 70.
 
 Ultimately, this requirement may be seen as nothing more than a convenient way to exclude from coverage actions which do not seem like they ought to fall within RICO’s grasp— especially where other remedies exist for the commission of the predicate acts. In order to give the statute its plain meaning and intended effect, I shall not engraft vague and artificial requirements to a civil cause of action. Curtailing RICO’s breadth is a task reserved to Congress. Therefore, I follow the better reasoned path of those who have declined to require a “racketeer enterprise injury.”
 
 See e.g., Jensen,
 
 [Current] Fed.Sec.L.Rep. (CCH) ¶ 99,674 at 97,-713;
 
 Yancoski,
 
 at 96-97;
 
 Slattery,
 
 at 166-67;
 
 Municipality of Anchorage
 
 slip op. at 4;
 
 Kirschner v. Cable/Tel Corp,
 
 576 F. Supp. 234, 244 (E.D.Pa.1983).
 
 In re Longhorn Securities Litigation,
 
 573 F.Supp. at 270;
 
 Ralston v. Capper,
 
 569 F.Supp. 1575, 1580 (E.D.Mich.1983);
 
 Seville Industrial Machinery Corp. v. Southmost Mach. Corp.,
 
 567 F.Supp. 1146, 1157 (D.N.J.1983);
 
 Mauriber,
 
 567 F.Supp. at 1240-41;
 
 Eisenberg v. Gagnon,
 
 564 F.Supp. 1347, 1352-53 (E.D.Pa.1983);
 
 Windsor Associates, Inc. v. Greenfeld,
 
 564 F.Supp. 273, 278-79 (D.Md. 1983);
 
 Crocker,
 
 555 F.Supp. at 49 — 50;
 
 Hanna Mining,
 
 574 F.Supp. 1172 [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,742 at 93,737.
 

 D.
 
 State Law Claims
 

 Defendants challenge the legal sufficiency of the state law claims, arguing .that a remedy is unavailable to plaintiffs under the Pennsylvania Securities Act of 1972, Pa.Stat.Ann. tit. 70 § 1-101 — 1-704 (Purdon’s Supp. 1983-1984) the New Jersey Uniform Securities Law, N.J.Stat.Ann. tit. 49 § 3-47 — 3-76 (West 1970) or the New Jersey Consumer Fraud Act, N.J.Stat.Ann. tit. 56 § 8-1 — 8-20 (West Supp.1983-1984). With respect to the theories of common law fraud and negligence, defendants contend that the requisite causation is missing. As a threshold matter, however, defendants question this court’s jurisdiction over all state created causes of action.
 

 1.
 
 Pendent
 
 Jurisdiction'
 

 Defendants’ jurisdictional attack is premised upon their earlier arguments that the complaints fail to state valid securities or RICO causes of action. Without a surviving federal claim, exercise of pendent jurisdiction would be clearly unjustified.
 
 See United Mine Workers of America v.
 
 
 *1438
 

 Gibbs,
 
 383 U.S. 715, 726-27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). However, I have determined that the Gaugler, Shulik, Singer and Rastelli complaints do contain legally sufficient federal causes. Since the state and federal claims arise from the same “common nucleus of operative fact[s],”
 
 Gibbs,
 
 383 U.S. at 725, 86 S.Ct. at 1138, an exercise of pendent jurisdiction is appropriate. Taraborelli presents a different question. In light of plaintiffs limitation of the issues, a section 10(b) claim has not been pled. Much like dominoes, the section 20(a) and RICO claims must also fall, leaving the complaint devoid of a federal cause of action. As such, I shall decline to exercise pendent jurisdiction,
 
 see Gibbs,
 
 383 U.S. at 726-27, 86 S.Ct. at 1139, and the complaint shall be dismissed in its entirety.
 

 2.
 
 Causation
 

 In the section 10(b) context, defendants have contended that there is no causal link between the failure to disclose the
 
 Brown
 
 litigation and plaintiffs’ subsequent losses, placing the blame instead on fluctuations in the stock market. Defendants maintain that this reasoning applies with equal force to the common law fraud and negligence counts. However, as a factual matter, it is not clear whether the
 
 Brown
 
 litigation is the subject of either of these state claims.
 

 The negligence counts, although incorporating by reference the previous factual allegations, focus upon how defendants handled plaintiffs’ portfolios. More specifically, defendants are accused of negligently and recklessly handling the accounts, Shulik Complaint at ¶ 71, and breaching their duty of care by purchasing speculative securities, trading on margin and engaging in excessive trading. Singer Complaint at Mi 68-69; Rastelli Complaint at MI 64-65.
 
 See also
 
 Gaugler Complaint at 11 50.
 
 [71]
 
 The failure to disclose
 
 Brown
 
 is not specifically mentioned, nor would it seem to be actionable in negligence. If anything, plaintiffs allege an
 
 intentional
 
 act of fraud on defendants’ part. Negligence principles might be relevant if Hutton had not had actual knowledge of the
 
 Brown
 
 litigation. Then it could be argued that Hutton was negligent in failing to learn of Catanella’s role in that suit. Alternately, Hutton may have been negligent if it knew and hired Catanella anyway. However, the failure to disclose
 
 Brown
 
 to plaintiffs sounds in fraud rather than negligence.
 

 The common law fraud counts aver that defendants churned the accounts, Shulik Complaint at MI 61-62, misrepresented the nature of the securities purchased and generally breached the duty of care owed to plaintiffs. Rastelli Complaint at MI 64-65; Singer Complaint at MI 68-69. Once again,
 
 Brown
 
 is not explicitly mentioned, however, it may be incorporated by reference to the prior factual allegations. Assuming this to be so, I must agree with defendants that there is a break in the chain of causation. As I concluded earlier, independent intervening factors were the actual cause of plaintiffs’ losses.
 
 See
 
 section 1(d)
 
 supra.
 
 It was not the failure to disclose
 
 Brown,
 
 but rather fluctuations in the market, Catanella’s churning, purchase of unsuitable securities and failure to disclose the risks inherent in certain transactions which caused plaintiffs to lose money. Therefore, plaintiffs cannot predicate their common law fraud claim upon the failure to disclose Catanella’s complicity in
 
 Brown.
 

 3.
 
 State Securities Statutes
 

 Two basic problems arise under both the Pennsylvania Securities Act of 1972 and the New Jersey Uniform Securities Law— specifically, which sections apply and what are their requirements? Defendants contend that private civil actions under each statute are limited to those sections expressly providing for such a remedy. The plaintiff in Gaugler argues that this court should imply a private right of action under a statutory provision which happens to track the language of section 10(b). Defendants note that the express remedy sections of both statutes contain a privity re
 
 *1439
 
 quirement similar to that found in section 12(2). Therefore, they maintain that plaintiffs can only sue persons from whom they purchased or to whom they sold. Plaintiffs contend that they did purchase from defendants, thereby satisfying the privity requirement.
 

 Both statutes contain a general anti-fraud provision virtually identical to section 101 of the Uniform Securities Act, which was patterned after Rule 10b-5.
 
 See
 
 Pa.Stat.Ann. tit. 70 § 1-401 (Purdon’s Supp.1983-1984); N.J.Stat.Ann. tit. 49 § 3-52 (West 1970).
 
 [72]
 
 Like section 10(b), these provisions do not expressly grant a private remedy. Analogizing to section 10(b) jurisprudence, plaintiff insists that a private right of action should be implied under sections 3-52 and 1-401. Notwithstanding the similarity of language, implication of a private remedy under the state statutory provisions is clearly inappropriate. Unlike the federal statute, both the Pennsylvania and New Jersey blue sky laws have explicitly limited causes of action to those expressly provided in the statute. The New Jersey statute states; “this law
 
 does not create any cause of action not specified in this section
 
 or section 10, paragraph (e).” N.J.Stat.Ann. tit. 49 § 3-71(h) (emphasis added). The Pennsylvania limitation mandates that
 
 “[e]xcept as explicitly provided in this act, no civil liability
 
 in favor of any private party
 
 shall arise against any person by implication
 
 from or as a result of the violation of any provision of this act or any rule or order hereunder.” Pa.Stat.Ann. tit. 70 § 1-506. Therefore, plaintiff’s suggestion that a private remedy be implied flies in the face of the plain language of both statutes and must be rejected.
 
 See also Biggans v. Bache Halsey Stuart Shields, Inc.,
 
 638 F.2d 605, 609 (3d Cir.1980) (under Pennsylvania statute, section 1-501 is sole source of civil liability);
 
 Roberts v. Magnetic Metals Co.,
 
 611 F.2d 450, 453 (3d Cir.1979) (section 3-71 of New Jersey Statute does not contemplate implication of additional remedies.
 

 Having decided that plaintiffs are limited to the express remedies granted in each statute, I turn now to the privity requirements of those provisions. The Pennsylvania statute is the more generous of the two, affording a cause of action to a defrauded buyer or seller.
 
 See
 
 Pa.Stat.Ann. tit. 70 § l-501(a), (b). The New Jersey statute only allows a defrauded buyer to sue.
 
 See
 
 NJ.Stat.Ann. tit. 49 § 3-71. However, both share the same express limitations on who may be sued. For example, section 3-71(a)(2) provides that one who fraudulently offers or sells a security “is liable to the person buying the security from him____”
 
 [73]
 
 Similarly, the Pennsyl
 
 *1440
 
 vania statute states that a seller “shall be liable to the person purchasing the security from him,” Pa.Stat.Ann. tit. 70 § l-501(a), and a buyer “shall be liable to the person selling the security to him ____”
 
 Id.
 
 at § l-501(b).
 
 [74]
 
 Thus, sections 3-71 and 1-501 contain privity requirements likened to that found in section 12(2). Plaintiffs can recover under these sections only if they purchased from, or, under the Pennsylvania statute, sold to, defendants.
 
 See e.g., Biggans,
 
 638 F.2d at 610 (Pennsylvania statute);
 
 Ging v. Parker-Hunter, Inc.,
 
 544 F.Supp. 49, 52 (W.D.Pa.1982) (Pennsylvania statute);
 
 Hoover v. E.F. Hutton & Co.,
 
 1980 Fed.Sec.L.Rep. (CCH) ¶ 97,654 at 98,-486 (E.D.Pa.1980) (Pennsylvania statute);
 
 Salb v. Lemoine Ave. Assoc.,
 
 178 N.J.Super. 36, 40-41, 427 A.2d 1129, 1132 (1981) (New Jersey statute).
 

 Claims for churning, failure to disclose risks, engaging in unsuitable transactions and generally mishandling plaintiffs’ portfolios are.not compensable under sections 3-71 or 1-501. Such claims necessarily involve the relationship between a customer and broker. Although arguably, defendants were acting for their own benefit, technically, they were plaintiff’s agents. The broker would have purchased and sold securities
 
 for
 
 the customer’s accounts, rather than
 
 to
 
 the customer. Put another way, there would not be the required buyer-seller relationship.
 
 [75]
 

 This precise issue was treated in the prior discussion of section 12(2),
 
 supra.
 
 I did not dismiss those claims because defendants may have actually sold securities to plaintiffs, thus satisfying the privity requirement. Plaintiffs again make that argument
 
 [76]
 
 As in the section 12(2) area, if defendants did sell securities to plaintiffs, a cause of action would also lie under the state statutes. Since the Singer and Rastelli complaints explicitly allege that defendants sold securities to the plaintiffs in violation of the substantive provisions of both statutes,
 
 see
 
 Rastelli Complaint at 111173, 78; Singer Complaint at Ulf 77, 82, the allegations of privity are sufficient to survive a motion to dismiss. On the other hand, the Shulik complaint does not allege that defendants sold securities to plaintiffs. It is merely averred that defendants gained exorbitant profits and commissions by defrauding plaintiffs.
 
 See
 
 Shulik Complaint
 
 *1441
 
 at ¶¶ 53-56. This is not compensable under the statutes. Similarly, the Gaugler complaint incorporates the previous allegations by reference and simply concludes that the New Jersey statute has been violated. After carefully examining both complaints, I find no allegation that even intimates that defendants sold securities to plaintiffs.
 
 [77]
 
 Therefore, these claims shall be dismissed for failing to allege privity which is essential under both the Pennsylvania and New Jersey securities statutes.
 

 4.
 
 New Jersey Consumer Fraud Act
 

 The Gaugler complaint includes a count under the New Jersey Consumer Fraud Act, N.J.Stat.Ann. tit. 56 § 8-1 — 8-20 (West Supp.1983-1984). Noting that it is unclear whether the statute applies to securities transactions at all, defendants nevertheless argue that the act would be inapplicable here, since they did not
 
 sell
 
 anything to Gaugler. Instead, they acted as his agent, buying and selling for his portfolio. Gaugler responds that the language of the Act is sufficiently broad to encompass securities transactions. He asserts that defendants’ distinction between “selling to” and “buying for” his account is not relevant.
 

 The New Jersey Consumer Fraud Act is, as its name implies, designed to protect consumers from deceptive sales or advertising practices. Its broad language evidences “legislative concern over sharp practices and dealings in the marketing of merchandise and real estate whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive or other similar kind of selling or advertising practice.”
 
 Daaleman v. Elizabethtown Gas Co.,
 
 77 N.J. 267, 271, 390 A.2d 566, 568-69 (1978). Its general anti-fraud section provides in pertinent part:
 

 The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate ... is declared to be an unlawful practice ____
 

 N.J.Stat.Ann. tit. 56 § 8-2 (West Supp. 1983-1984). Merchandise is broadly defined as “any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale;” N.J.Stat.Ann. tit. 56 § 8-l(e). A private remedy is available to anyone suffering “any ascertainable loss of moneys or property, real or personal,” as a result of any of the practices prohibited by the Act. N.J. Stat.Ann. tit. 56 § 8-19. Section 8-19 also provides for treble damages, costs and attorneys fees.
 

 Defendants’ position boils down to the contention that there was no privity because there was no sale of securities
 
 to
 
 plaintiff as opposed to buying or selling
 
 for
 
 plaintiff. This dichotomy was effective in the context of section 12(2) and the state securities acts, because these all require privity. However, the Consumer Fraud Act has no privity requirement.
 
 See Neveroski v. Blair,
 
 141 N.J.Super. 365, 376, 358 A.2d 473, 479 (1976). In
 
 Neveroski,
 
 plaintiffs purchased a house with the representation that it was free from termites. The house had suffered extensive termite damage and was so infested that plaintiffs were forced to vacate four months after moving in. Plaintiffs sued the real estate broker for concealing the presence of termites. The broker raised the lack of privity as a bar to liability. In rejecting the need to show privity, the court stated:
 

 Section 19 clearly grants a remedy to “any person who suffers any ascertainable loss ... as a result of the use” of any practice declared unlawful. There
 
 is no provision that the claimant thereunder must have direct contractual relationship with the seller of the product or service.
 

 Neveroski,
 
 141 N.J.Super. at 376, 358 A.2d at 479. Although the broker was not the seller of the house, the court determined
 
 *1442
 
 that the concealment of the termites arose “in connection with” the sale of real estate sufficient to invoke section 8-19.
 
 Id.
 
 While defendants here might not have sold their securities to Gaugler, a claim is stated under the Act so long as there was a sale of securities and fraud “in connection with” the sale. Securities were sold to Gaugler, probably by a large number of unknown investors. The complaint sufficiently alleges that defendants committed various acts of fraud “in connection with” these sales.
 

 Although conceding that the issue is not free from doubt, defendants have suggested that the Act does not cover securities transactions. Relying upon the definition of “merchandise,” plaintiff responds that fraud in the sale of securities falls within the expansive sweep of the statute. There is no New Jersey Supreme Court caselaw on this issue. Moreover, there is virtually no legislative history accompanying the Act. Therefore, in predicting how the highest state court would rule, I look to the language of the statute and the decision in Neveroski.
 
 [78]
 

 At first blush, it would appear that the definition of merchandise found in section 8-l(c) is facially broad enough to cover securities. By including the phrase “anything offered, directly or indirectly to the public for sale,” the reach of the Act might seem limitless. In
 
 Neveroski,
 
 the New Jersey Superior Court determined otherwise. It had to decide whether real estate brokerage services fall within the scope of the Act. In determining that they did not, the court distinguished between the kind of item sold, real estate, and the kind of services performed, brokerage services. Tracing the history of the statute, the court noted that the original definition of merchandise included “any objects, wares, goods, commodities or services.”
 
 Neveroski,
 
 141 N.J.Super. at 377, 358 A.2d at 479. An amendment was proposed which would have expanded the definition to “any objects, wares, goods, commodities,
 
 real estate, securities,
 
 services or
 
 anything offered directly or indirectly to the public for sale.” Id.
 
 (quoting Assembly Bill 715, introduced March 13, 1967) (emphasis in original). When the amendment was enacted, the terms real estate and securities were deleted.
 
 See
 
 N.J.Stat.Ann. tit. 56 § 8-l(c). After the
 
 Neveroski
 
 suit was instituted, section 8-2 was amended to its present form, prohibiting fraud “in connection with the sale or advertisement of any
 
 merchandise or real estate.” Id.
 
 at n. 3. Securities, though proposed for inclusion, never found its way into the statute, either in the definition of merchandise or the prohibitions listed in section 8-2. The
 
 Neveroski
 
 court observed:
 

 We would consider such a deletion as a meaningful act on the part of the Legislature eliminating these two areas of commercial activity from the purview of the statute.
 

 We recognize a possible alternative construction to the effect that the deletion was made because of an assumption that the express words were unnecessary in view of the catch-all phrase “or anything offered, directly or indirectly, to the public for sale.”
 

 Id.
 
 at 378, 358 A.2d at 480. Although the court did not explicitly claim allegiance to either interpretation, the “alternative construction” makes little sense in light of the addition of “real estate” to section 8-2. It is illogical to conclude that the express words were unnecessary when real estate was ultimately added and securities left out.
 

 The
 
 Neveroski
 
 court then shifted focus from what was being sold to what services were being rendered. The court opined that “the entire thrust of the Consumer Fraud Act is pointed to products and services sold to consumers in the popular
 
 *1443
 
 sense.”
 
 Id.
 
 at 378, 358 A.2d at 480. Distinguishing between consumerism and professional services, the court explained:
 

 A real estate broker is in a far different category from the purveyors of products or services or other activities. He is in a semi-professional status subject to testing, licensing, regulations and penalties through other legislative provisions ... Although not on the same plane as other professionals such as lawyers, physicians, dentists, accountants or engineers, the nature of his activity is recognized as something beyond the ordinary commercial seller of goods or services — an activity beyond the pale of the act under consideration.
 

 Certainly no one would argue that a member of any of the learned professions is subject to the provisions of the Consumer Fraud Act despite the fact that he renders “services” to the public. And although the literal language may be construed to include professional services, it would be ludicrous to construe the legislation with that broad a sweep in view of the fact that the nature of the services does not fall into the category of consumerism.
 

 Id.
 
 at 379, 358 A.2d at 480-81 (citations omitted). The court then concluded that the services of a real estate broker are outside the scope of the Consumer Fraud Act.
 
 Id.
 
 at 380, 358 A.2d at 381.
 

 The proposal to add securities to the definition of merchandise and its subsequent deletion suggests that the legislature affirmatively decided to exclude the sale of securities from the scope of the Act. The addition of real estate to section 8-2 belies the conclusion that the general catch-all phrase was of sufficient breadth to encompass both real estate and securities. Moreover, when real estate was ultimately added, it
 
 was not placed in the definition of merchandise,
 
 as originally proposed. Rather, it was placed in section 8-2, which prohibits fraud “in connection with the sale
 
 ... of any merchandise or real estate.’’
 
 N.J.Stat.Ann. tit. 56 § 8-2. This phraseology implies that real estate is different from “merchandise,” despite the apparent breadth of the definition of the latter concept. Since both real estate and securities were deleted from the definition of merchandise, it appears that the legislature also perceived securities to be conceptually different from merchandise. Unlike real estate, the sale of securities was never added to any section of the Consumer Fraud Act. The logical inference to be drawn is that despite the statutory definition, securities are not merchandise and their sale does not fall within the statute.
 

 The second prong of
 
 Neveroski,
 
 differentiating between professional or semi-professional services and “consumer” services, is a separate ground for dismissing the Consumer Fraud Act claim. A securities broker is a professional, subject to registration, regulation and penalties under the New Jersey Uniform Securities Law. Moreover, the very existence of a carefully drawn state securities statute militates against the application of the Consumer Fraud Act to securities transactions. As was noted in the previous section, the New Jersey securities statute has a privity requirement. In addition, private causes of action are strictly limited to those expressly granted. Therefore, it is very clear that the legislature desired private damage actions to be restricted to those individuals in a privity relationship. The Consumer Fraud Act has no privity requirement. To allow a plaintiff to recover under the Consumer Fraud’ Act in the absence of privity would emasculate the internal restrictions embodied in the Uniform Securities Act.
 

 Finally, there is a distinction, though subtle, between the policies underlying the protection of consumers in general and the protection of investors in particular. As the allegations in this case amply illustrate, not all investors are savvy, sophisticated financial moguls. Nor are they the poor, uneducated, naive consumers that the Consumer Fraud Act was designed to protect.
 
 See e.g., Kugler v. Romain,
 
 58 N.J. 522, 537-38, 279 A.2d 640, 648-49 (1971). Securities fraud is qualitatively different from the archetypal installment credit sale scam where the uneducated are duped into buying inferior consumer goods at exorbitant prices. The rationale behind the Consumer
 
 *1444
 
 Fraud Act is inapposite in the securities fraud area.
 

 Therefore, given the history of the definition of “merchandise,” the fact that securities never found its way into the statute, the requirements of the Uniform Securities Law and the policies underlying each statute, I predict that the New Jersey Supreme Court, if faced with the issue, would hold that securities fraud is not actionable under the Consumer Fraud Act.
 

 An appropriate order follows.
 

 ORDER
 

 AND NOW, this 9th day of April, 1984, for the reasons stated in the foregoing memorandum, it is hereby ORDERED that Defendants’ Motions to Dismiss are GRANTED in part and DENIED in part. It is further ORDERED that:
 

 1. The Taraborelli complaint is DISMISSED without prejudice. Plaintiff shall have twenty (20) days from the date of this order in which to amend the complaint in accordance with this memorandum.
 

 2. Count Eleven of the Gaugler complaint is DISMISSED without prejudice. Plaintiff shall have twenty (20) days from the date of this order in which to amend the complaint in accordance with this memorandum.
 

 3. The counts in the Gaugler and Shulik complaints brought pursuant to the Investment Advisers Act of 1940 are DISMISSED with prejudice.
 

 4. Counts Three, Nine and Ten of the Gaugler complaint are DISMISSED with prejudice.
 

 5. The claims asserted by Gaugler against Granville based upon
 
 respondeat superior
 
 and section 20(a) of the Securities Exchange Act of 1934 are DISMISSED with prejudice.
 

 6. The count in the Shulik complaint brought pursuant to the New Jersey Uniform Securities Law and the Pennsylvania Securities Act of 1972 is DISMISSED with prejudice.
 

 7. A record conference shall be held in this case on May 17, 1984, at 9:00 a.m., in Courtroom 8B.
 

 [1]
 

 . Subsequent to the order of the panel, two “tag along” cases were filed and assigned as related pursuant to E.D.Pa. Local Rule 3(c)(2),
 
 Margaret Cole v. Catanella and E.F. Hutton & Co., Inc.,
 
 No. 83-3750;
 
 Charles Hohns and Marjorie Hohns v. Catanella, et al.,
 
 No. 83-3865.
 

 [2]
 

 . Dismissal on a Rule 12(b)(6) motion is appropriate only when “it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.”
 
 Conley v. Gibson,
 
 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957).
 

 [3]
 

 . Although many of the factual allegations are replicated in each complaint, I shall cite to only one.
 

 [4]
 

 . Suit was filed by Robert Kendell Brown, Gloria Elaine Brown and Elaine V. Aikman in the United States District Court for the Southern District of Indiana. The case shall hereinafter be referred to as the
 
 Brown
 
 litigation.
 

 [5]
 

 . The Taraborelli complaint contains the general class allegations required under Fed.R.Civ.P. 23. The decision whether to certify this class and what effect, if any, a class will have on the remaining suits, must await another day.
 

 [6]
 

 . Granville’s involvement is limited to Gaugler. He is not a named defendant in the Taraborelli, Shulik, Singer or Rastelli actions.
 

 [7]
 

 . The rule provides that: “In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b).
 

 [8]
 

 . In
 
 Adair v. Hunt Intern. Resources Corp.,
 
 526 F.Supp. 736 (N.D.Ill.1981) the court stated; “Rule 9 lists the actions in which
 
 slightly
 
 more is needed for notice.” 526 F.Supp. at 744 (quoting T
 
 omera v. Galt,
 
 511 F.2d 504, 508 (7th Cir. 1975) (emphasis in original). Similarly, the court in
 
 Beascoechea v. Sverdrup & Parcel Assoc., Inc.,
 
 486 F.Supp. 169 (E.D.Pa.1980) noted that Rule 9(b) "must be read in conjunction with the liberal pleading rules, which eschew obsolete technicalities." 486 F.Supp. at 174 (citations omitted).
 
 See also Schacht v. Brown,
 
 711 F.2d 1343, 1352 (7th Cir.1983),
 
 cert. denied,
 
 — U.S. -, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983) (liberal pleading policy of Federal Rules prevents dismissal of meritorious claims on technical grounds).
 

 [9]
 

 . The turnover ratio has been defined as the "ratio of the total cost of the purchases made for the account during a given period of time to the amount invested.”
 
 Baselski v. Paine, Webber, Jackson & Curtis, Inc.,
 
 514 F.Supp. 535, 541 n. 4 (N.D.Ill.1981). Churning will be discussed in more detail
 
 infra.
 

 [10]
 

 . Defendants fear that they shall be required to go through each and every transaction consummated during the relevant period in order to answer the complaints. I have previously rejected an identical argument.
 
 See Kimmel,
 
 565 F.Supp. at 481.
 

 [11]
 

 . Paragraph 25, which contains the substantive allegations, provides:
 

 Showing himself to be a recidivist, defendant Catanella took on more customers than he could possibly handle on a responsible basis; directed that unauthorized transactions be made for his customers, frequently on a mass basis, without regard to the suitability of the transaction to the particular customer; repeatedly churned accounts so as to generate commissions to himself and Hutton; engaged in margin and options trading without disclosing the risks or costs inherent in such practices and otherwise conducted himself in a manner designed to improperly regard the defendants at the expense of plaintiff and the Class.
 

 [12]
 

 . I am mindful that the requirements of Rule 9(b) must be relaxed in the class action context. As this court has noted:
 

 A strict application of Rule 9(b) in class action securities fraud cases could result in substantial unfairness to persons who are the victims of fraudulent conduct. This is especially true where many matters are peculiarly within the knowledge of the defendants. Certainly in such cases, once plaintiff has satisfied the minimum burden of Rule 9(b), plaintiff should be allowed to flesh out the allegations in the complaint through discovery. This is in keeping with the liberal view espoused by the Federal Rules.
 

 Denny v. Carey,
 
 72 F.R.D. 574, 578 (E.D.Pa.1976) (citations omitted).
 

 [13]
 

 . Defendants argue that the RICO counts also violate Rule 9(b) as they incorporate by reference, rather than alleging the relevant facts. This contention defies logic. The RICO claims are predicated upon the acts of securities fraud. If the underlying securities fraud satisfies the rule, by necessity, so must the RICO allegations. Incorporation by reference is perfectly appropriate — indeed setting out the facts a second time would be an exercise in redundancy.
 

 Along similar lines, defendants in Gaugler and Shulik assail the particularity of various state law claims sounding in fraud. They argue that they are unable to discern from the complaint what conduct is alleged to be fraudulent or constitute a breach of fiduciary duty. Plaintiffs have incorporated the earlier factual allegations by reference, rather than restating the facts giving rise to each theory of liability. I find this method of pleading appropriate. After reviewing these complaints, I find that the allegations giving rise to the various theories of '■ability are sufficiently specific to satisfy Rule '(b).
 

 [14]
 

 . In addition, defendants challenge the use of certain words and phrases, including the characterization of Catanella as a "recidivist.” Although this court does not sanction "name-calling" and “mud-slinging,” assuming the truth of the allegations contained in the complaints, this word is merely descriptive. I do not find the language at issue “impertinent or scandalous.”
 

 [15]
 

 . Given the allegations of multiple violations within each complaint, the
 
 Brown
 
 case is not technically necessary to a finding of a "pattern,” but is supportive nevertheless. Should plaintiffs fail to prove more than one violation, however, it could become critical to the viability of the RICO claim.
 

 [16]
 

 . Section 10(b) provides:
 

 It shall be unlawful for any person....
 

 ******
 

 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 

 15 U.S.C. § 78j(b) (1976). '
 

 [17]
 

 . Rule 10b-5 reads:
 

 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 

 (a) To employ any device, scheme, or artifice to defraud,
 

 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 

 17 C.F.R. § 240.10b-5 (1983).
 

 [18]
 

 . A private right of action was first implied under section 10(b) in this district.
 
 See Kardon v. National Gypsum Co.,
 
 69 F.Supp. 512, 513-14 (E.D.Pa.1946). Most lower federal courts followed this lead. The Supreme Court, with virtually no discussion, finally gave its imprimatur to this private remedy in
 
 Superintendent of Insurance v. Bankers Life & Casualty Co.,
 
 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971).
 

 [19]
 

 . The original definition in
 
 TSC
 
 also noted that in order to fund materiality, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the
 
 *1403
 
 reasonable investor as having significantly altered the 'total mix’ of information made available." 426 U.S. at 44S>, 96 S.Ct. at 2132.
 

 [20]
 

 .
 
 Ernst
 
 resolved the question of whether negligence was sufficient for the imposition of liability under section 10(b). In a footnote the Court stated:
 

 In this opinion the term "scienter" refers to a mental state embracing intent to deceive, manipulate or defraud. In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b-5.
 

 425 U.S. at 194 n. 12, 96 S.Ct. at 1381 n. 12.
 

 [21]
 

 . Defendants accuse plaintiffs - of “bootstrapping" — interpreting many of the allegations as failures to disclose breaches of fiduciary duties. In support of their proposition, they cite
 
 Biesenbach v. Guenther,
 
 588 F.2d 400 (3d Cir.1978). In
 
 Biesenbach,
 
 the court did reject the concept that "the failure to disclose the breach of a fiduciary duty is sufficient to constitute a violation of the Act.”
 
 Id.
 
 at 402. In the first in
 
 *1404
 
 stance,
 
 Biesenbach
 
 is factually inapposite here. Plaintiffs were minority shareholders challenging the terms of loans made to the corporation by individual directors. It was a pure state law claim for the breach of a fiduciary duty. In fact, plaintiffs lacked standing to sue under section 10(b), as they had not purchased or sold securities.
 
 Id.
 
 at 401 n. 1. Contrary to defendants' argument, it appears that this Circuit has accorded
 
 Santa Fe
 
 a very narrow construction. In
 
 Santa Fe,
 
 the plaintiffs did allege that the failure to disclose the merger before the fact was a material omission. However, under Delaware law, appraisal was the only remedy — the knowledge of the merger would not have aided them in stopping it. Consequently, the Court held the failure to disclose to be non-material.
 
 Santa Fe,
 
 430 U.S. at 474 n. 14, 97 S.Ct. at 1301 n. 14. Following the Second Circuit in the controversial
 
 Goldberg v. Meridor,
 
 567 F.2d 209 (2d Cir.1977),
 
 cert. denied,
 
 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978), this Circuit held the failure to disclose merger information actionable where the plaintiff had the right to seek a state law injunction.
 
 See Healey v. Catalyst Recovery of Pennsylvania, Inc.,
 
 616 F.2d 641, 646-47 (3d Cir.1980). Therefore, it would seem that in this Circuit, where there has been a material omission or misrepresentation, there is a remedy under section 10(b).
 
 See also Dower v. Mosser Ind. Inc.,
 
 488 F.Supp. 1328, 1333 (E.D. Pa.1980),
 
 aff’d.
 
 648 F.2d 183 (3d Cir.1981) (failure to disclose information about merger more than breach of duty under
 
 Santa Fe ).
 

 [22]
 

 . I will not, at this point, discuss the thorny problems arising from the causation and "in connection with” elements. These will be discussed in separate sections
 
 infra.
 

 [23]
 

 .
 
 See also Troyer v. Karcagi,
 
 476 F.Supp. 1142, 1146 n. 2 (S.D.N.Y. 1979) (failure to disclose employers role as “market maker” material omission).
 

 [24]
 

 . In their motions to dismiss, defendants dissect each paragraph of the complaints, a method of analysis which might lose sight of the larger picture. They assume that each paragraph, standing alone, must state a separate cause of action. There may well be paragraphs which do not. I could proceed through each complaint, paragraph by paragraph, highlighting the alleged fraud which rises to the level of a section 10(b) violation. However, that would serve no useful purpose.
 

 [25]
 

 . Various factors aid in the determination of excessiveness, including the turnover ratio and the investment objectives.
 
 See e.g., Costello,
 
 711 F.2d at 1368;
 
 Mihara,
 
 619 F.2d at 821. The
 
 Costello
 
 court explained:
 

 The essential issue of fact is whether the volume of transactions, considered in light of the nature and objectives of the account, was so excessive as to indicate a purpose on the part of the broker to derive a profit for himself at the expense of his customer.
 

 Costello,
 
 711 F.2d at 1368. Similarly, the inquiry into the level of control exercised by the broker focuses upon various factors. If the account is discretionary, such that the broker need not gain the customer's consent, the requisite control is obvious.
 
 Mihara,
 
 619 F.2d at 821. However, where the account is not discretionary, factors such as the sophistication and intelligence of the customer will become critical. The
 
 Follansbee
 
 court asked “whether or not the customer has sufficient intelligence and understanding to evaluate the broker’s recommendations and to reject one when he thinks it unsuitable."
 
 Follansbee,
 
 681 F.2d at 677. In contrast, the
 
 Mihara
 
 court noted that the “requisite degree of control is met when the client routinely follows the recommendations of the broker."
 
 Mihara,
 
 619 F.2d at 821. However, whether plaintiffs can prove the requisite degree of control and excessiveness must await later proceedings in this litigation.
 

 [26]
 

 . In
 
 Costello,
 
 the court rejected a third prong requiring proof that the customer was unsophisticated about the market. 711 F.2d at 1368 n. 8. The court properly concluded that the relative sophistication of the customer is better viewed as another indicia of control.
 
 Id.
 

 [27]
 

 . In Shulik and Gaugler, defendants argue that misrepresentations as to the use of Hutton’s research facilities do not arise "in connection with” a transaction. In Gaugler, the hiding of excess cash in plaintiff's account and Granville’s "hand-holding” are also challenged on this basis.
 

 [28]
 

 . The court concluded:
 

 It would appear, then, that the present case does not constitute an instance in which misrepresentations were tendered “in connection with” a securities transaction. To the contrary, the purportedly deceptive practices occurred, if at all, in connection with the struggle for control of the corporation. Unlike
 
 Bankers Life,
 
 where the fraudulent conduct of the defendants undergirded the securities transaction, it cannot be said here that the
 
 *1409
 
 misrepresentations bear a similar relationship to the forced sale of plaintiffs’ stock.
 
 Ketchum,
 
 557 F.2d at 1027-28.
 

 [29]
 

 . In
 
 Ketchum,
 
 the court suggested that "connection” and “causation” are related inquiries. However, the court also recognized that they are not identical.
 
 Ketchum,
 
 557 F.2d at 1028-29.
 
 Accord Coons v. Kidder, Peabody & Co., Inc.,
 
 539 F.Supp. 1145, 1146-47 (S.D.N.Y.1982). In
 
 Bankers Life,
 
 for example, the sale of Treasury Bonds "only
 
 made possible
 
 the accomplishment of the fraud as opposed to having
 
 caused
 
 it.”
 
 Ketchum,
 
 557 F.2d at 1029 (emphasis in original). Yet the court also noted that both concepts “speak to the proximity required between a misrepresentation and a securities transaction.”
 
 Id.
 

 [30]
 

 .
 
 Ketehum
 
 was decided three months after
 
 Santa Fe
 
 was handed down. The court, without citing to
 
 Santa Fe,
 
 opined that "to reinstate the present lawsuit, might tend to promote further incursions by federal courts into areas and activities now regulated by state corporation laws. 557 F.2d at 1029. Coming so close on the heels of
 
 Santa Fe, Ketehum
 
 may reflect the court’s use of the connection element to limit section 10(b)'s application to the corporate battlefield.
 

 [31]
 

 . The district court’s dismissal of the section 10(b) claim was ultimately affirmed in
 
 Cramer
 
 on grounds unrelated to the connection issue.
 
 Cramer
 
 was a derivative suit and the shareholders failed to make a demand on the Board under Rule 23.1 of the Federal Rules of Civil Procedure or prove that such a demand would be futile.
 
 Cramer,
 
 582 F.2d at 276-77.
 

 [32]
 

 . With respect to the misrepresentation of the intent to use research facilities, defendants cite
 
 Wilson v. First Houston Inv. Corp.,
 
 566 F.2d 1235 (5th Cir.1978),
 
 vacated and remanded on other grounds,
 
 444 U.S. 959, 100 S.Ct. 442, 62 L.Ed.2d 371 (1979), for the proposition that this is not “in connection with” a securities transaction. In
 
 Wilson,
 
 the alleged failure to use the promised computer analysis was apparently the only claim advanced. Without analysis, the court simply declared the fraud too remote from the transactions. 566 F.2d at 1243. Thus,
 
 Wilson
 
 lends little guidance. Unlike
 
 Wilson,
 
 this case involves a multifaceted scheme to induce investors to trust defendants for the purpose of defrauding them. If defendants found this representation important in their decision to employ defendants' services and if it was an inducement to give Catanella
 
 carte blanche,
 
 it may be "in connection with" future transactions. It is not the connection that I question so much as the materiality of this representation, given everything else plaintiffs were told. To the extent that this hinges upon a factual determination, it is not proper for resolution at this time.
 

 Granville’s alleged "hand holding” does not appear to be a substantive allegation, but rather sets the stage for his potential liability upon the various theories of vicarious responsibility advanced by plaintiffs. It shows knowledge of and participation in, the scheme to defraud. As such, it shall not be dismissed.
 

 With respect to the averment that defendants were "hiding” Gauguler’s cash position from him, that is simply one more instance of failing to disclose an intent to self-deal. Although I could probably imagine a way to link that to a transaction, it would be strained at best. Nor is it clear that this allegation was intended to state a separate section 10(b) claim,
 
 see
 
 note 24,
 
 supra.
 
 However, this claim will not be dismissed from the complaint, as it may satisfy a requirement under a state law theory of liability.
 

 [33]
 

 . Defendants also cite
 
 Kung v. Catanella,
 
 No. 82-1350 (D.N.J. October 7, 1982), a case somewhat similar to these complaints. In
 
 Kung,
 
 it appears that many of the misrepresentations did not concern an actual purchase or sale.
 
 Kung,
 
 bench op. at 5. However, to the extent that
 
 Kung
 
 follows
 
 Troyer,
 
 the following discussion expresses my disagreement with both.
 

 [34]
 

 . In
 
 Savino v. E.F. Hutton & Co., Inc.,
 
 507 F.Supp. 1225 (S.D.N.Y.1981), the court followed
 
 Troyer,
 
 but made no mention of the dichotomy relied upon by defendants. The
 
 Savino
 
 court proceeded through the same two step analysis, first analyzing the misrepresentations made in connection with the discretionary accounts.
 
 Id.
 
 at 1239-40. The court also adopted the
 
 Troyer
 
 formulation of "purchasing,” concluding that a purchase was accomplished when additional funds were injected into an existing account.
 
 Id.
 
 at 1240. The court then proceeded to look at transactions involving the underlying securities, concluding that the misrepresentation of the risks of option trading was “in connection with” the securities so traded.
 
 Id.
 
 at 1240-41.
 

 [35]
 

 . Defendants' distinction might "overrule"
 
 Bankers Life
 
 and
 
 Cramer.
 
 In
 
 Cramer,
 
 the alleged fraud did not induce the sale of the ownership interest — indeed the reverse was true. In
 
 Bankers Life,
 
 there was some element of fraud involved in persuading the Board of Manhattan to sell the Treasury Bonds. However, the fraud did not relate to the sale of the bonds themselves, but rather, the purpose behind that sale. The real deception in
 
 Bankers Life
 
 surrounded how Manhattan had been acquired and how the proceeds of the sale would be used.
 

 [36]
 

 . In
 
 Sutton,
 
 490 F.Supp. 98 (N.D.Ill.1980), a brokerage firm was sued for failing to disclose that one of its brokers had been the subject of customer complaints. The court found disclosure would probably serve the policies underlying section 10(b) and denied a motion to dismiss. Factually,
 
 Sutton
 
 is roughly equivalent to the failure to disclose the
 
 Brown
 
 litigation, although the latter is arguably worse. In discussing the disclosure requirements, the court stated:
 

 It is true that full disclosure is at the very heart of § 10(b) and Rule 10b-5 and that they were intended to protect the investor from the harsh common law rule of
 
 caveat emptor.
 
 And, while it may be too burdensome to impose a duty upon a brokerage firm to disclose each customer complaint registered against one of its representatives, this is hardly the situation at bar. On the contrary, here we are dealing with a brokerage firm which after investigation entered into monetary settlements with its customers for the alleged wrong-doings of one of its brokers and required the broker to execute a promissory note in its favor for the amounts paid in settlement.
 

 490 F.Supp. at 101-102.
 

 [37]
 

 . For purposes of this motion, the Taraborelli plaintiffs rely upon the failure to disclose
 
 Brown
 
 as the exclusive basis for their section 10(b) claim.
 

 [38]
 

 . Borrowing from common law tort principles, transaction causation is roughly equivalent to “cause-in-fact."
 
 See e.g., Wilson v. Comtech Telecommunications Corp.,
 
 648 F.2d 88, 92 n. 6 (2d Cir.1981). Loss causation would be the securities analogue for "proximate cause.”
 

 [39]
 

 . In their motions, defendants accuse plaintiffs of confusing the reliance and causation requirements. Perhaps plaintiffs were not careful to indicate which type of causation they had in mind, however, defendants’ accusation is not well taken.
 

 [40]
 

 . Some courts still struggle with the allocation of the burden of proof and the characterization of the fraud as an omission, misrepresentation or both.
 
 See generally Sharp,
 
 649 F.2d at 188-189. The
 
 Sharp
 
 court concluded that “the proper approach to the problem of reliance is to analyze the plaintiff's allegations, in light of the likely proof at trial, and determine the most reasonable placement of the burden of proof of reliance.”
 
 Id.
 
 at 188.
 
 Accord Frankel v. Wyllie & Thornhill, Inc.,
 
 537 F.Supp. 730, 738-40 (W.D. Va.1982).
 

 [41]
 

 . Contrary to the suggestion in the responses to motions to dismiss, the Supreme Court did not review this portion of the
 
 Huddleston
 
 holding. Nor did the decision in
 
 Shores,
 
 647 F.2d 462 (5th Cir.1981) (en banc) signal a retrenchment from this position. Thus,
 
 Huddleston’s
 
 discussion on loss causation remains good law.
 

 [42]
 

 . This holding does not affect plaintiffs’ rights to recover based upon the underlying fraud. That is, plaintiffs continue to have a claim for Catanella’s misrepresentation or failure to disclose the suitability of a given security.
 

 [43]
 

 . Plaintiffs point out that a motion to dismiss tests the legal sufficiency of the complaint. They argue that causation is a factual issue that should be resolved by a jury. However, on a motion to dismiss, the court accepts as true all of plaintiffs’ allegations. I have assumed that plaintiffs have sustained injuries. However, given the facts in the complaints, these injuries cannot be causally linked to the previous litigation, as a matter of law.
 

 [44]
 

 . Since the Taraborelli plaintiffs rely only upon the failure to disclose
 
 Brown,
 
 their section 10(b) claim must be dismissed. However, they shall have twenty days from the date of this Memorandum and Order in which to amend their complaint, should they choose to alter their theory in light of the resolution of this issue.
 

 [45]
 

 . Section 12(2) provides:
 

 Any person who—
 

 (2) offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue
 
 *1418
 
 statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
 

 15 U.S.C. § 77/(2) (1976).
 

 [46]
 

 . Plaintiffs contend that section 12(2) actions may be brought against a seller or "those whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place.” Singer Memorandum in Opposition to Defendants’ Motion to Dismiss at 19; Rastelli Memorandum in Opposition to Defendants’ Motion to Dismiss at 19 (both quoting
 
 Pharo v. Smith,
 
 621 F.2d 656, 667 (5th Cir.1980)). Since the Third Circuit has limited the class to those who sold or who occupied a special relationship vis-a-vis the seller,
 
 see Collins v. Signetics Corp.,
 
 605 F.2d 110, 113 (3d Cir.1979), it is not at all clear that the court would follow the
 
 Pharo
 
 approach. The
 
 Collins
 
 court did not define the concept of “special relationship,” but used a control relation as an example. Whatever else this relationship is, it does not exist between an issuer and its underwriters. The plaintiffs in
 
 Collins
 
 attempted to sue the issuer, even though they had purchased from the underwriters handling the offering. The court determined that they had no section 12(2) cause against the issuer, as it did not control or otherwise have a special relationship with the members of the underwriting syndicate.
 
 Collins,
 
 605 F.2d at 113. Moreover, the language employed by the
 
 Collins
 
 court is suggestive of a restrictive interpretation of section 12(2). The court stated that the provision “is designed as a vehicle for a purchaser to claim against his immediate seller. Any broader interpretation would ... only torture the plain meaning of the statutory language ....’’
 
 Id.
 

 Other circuit courts have taken a slightly more expansive view of the privity requirement, using the substantial factor test articulated by plaintiff.
 
 See e.g., Admiralty Fund v. Jones,
 
 677 F.2d 1289, 1294 (9th Cir.1982);
 
 Junker v. Crory,
 
 650 F.2d 1349, 1360 (5th Cir.1981);
 
 Stokes v. Lokken,
 
 644 F.2d 779, 785 (8th Cir.1981);
 
 Pharo v. Smith,
 
 621 F.2d 656, 667 (5th Cir.),
 
 aff'd in part, remanded in part on other grounds,
 
 625 F.2d 1226 (5th Cir.1980). Given the more restrictive view espoused in
 
 Collins,
 
 it is not clear whether the Third Circuit would follow these other courts. However, in light of my resolution of the issue, I need not decide how the Third Circuit would rule and whether defendants "substantially participated” under
 
 Pharo
 
 and progeny.
 

 [47]
 

 . This is the only basis upon which Catanella and Hutton challenge the claims of secondary liability.
 

 [48]
 

 . This same reasoning dictates that the claims for vicarious liability asserted in Taraborelli must be dismissed.
 

 [49]
 

 . The complaint does not indicate whether Granville was present during its playing or knew of its use. Gaugler states that Granville was present in his Memorandum in Opposition to Granville’s Motion to Dismiss at 8. However, that is not a pleading and as such, cannot be considered. However, it is permissible to infer that, at the very least, Granville knew about the tape and its intended use.
 

 [50]
 

 . Granville does not specifically argue the
 
 respondeat superior
 
 issue, but rather makes references to it discussing the other theories of vicarious liability. To the extent that it has not been raised, I will address it
 
 sua sponte.
 

 [51]
 

 . Plaintiff asserts that the complaint does not concede control. He interprets paragraph 18, in conjunction with paragraphs 20 and 27, to mean that Granville assisted Catanella in the fraud. Granville advised his subscribers to "get out of the market,” or "sell short,” while helping Catanella to keep Gaugler "long.” This was accomplished, Gaugler contends, by Granville’s representations that he agreed with Catanella’s "long” strategy.
 
 See
 
 Plaintiff’s Memorandum in Opposition to Defendant Granville's Motion to Dismiss at 9. Although this may be relevant to Granville’s liability as an aider and abettor, it does not rebut defendant’s control argument. The fact that Granville knew that Catanella was not following his strategy does not change the fact Catanella did not always do as Granville suggested. Put another way, Granville did not have any power over Catanella to bend his will or even influence his decisions. If anything, this argument places Granville in a secondary role. Catanella was "calling the shots” and Granville was following along and lending assistance.
 

 [52]
 

 .
 
 See e.g., Russello v. United States,
 
 - U.S. -. 104 S.Ct. 296. 302-03. 78 L.Ed.2d 17 (1983);
 
 United States v. Turkette,
 
 452 U.S. 576, 589-91. 101 S.Ct. 2524, 2531-33. 69 L.Ed.2d 246
 
 *1423
 
 (1981). For an excellent and exhaustive analysis of the legislative history of RICO,
 
 see
 
 Blakey, The RICO Civil Fraud Action in Context: Reflections On
 
 Bennett v. Berg,
 
 58 Notre Dame L.Rev. 237, 249-80 (1982) [hereinafter cited as
 
 Blakey
 
 ].
 
 See also
 
 Blakey & Gettings, Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts — Criminal and Civil Remedies, 53 Temp.L.Q. 1009, 1014-21 (1980).
 

 [53]
 

 . Section 1961(1) provides:
 

 (1) "Racketeering activity” means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year: (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen
 
 *1424
 
 property), sections 2341-2346 (relating to trafficking in contraband cigarettes), sections 2421-24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States____
 

 18 U.S.C. § 1961(1). Subsection (D) includes "fraud in the sale of securities" as a predicate offense.
 

 [54]
 

 . An enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.” 18 U.S.C. § 1961(4).
 

 [55]
 

 . As the court stated in
 
 Harper:
 

 It is simply incomprehensible that a plaintiff suing under the securities laws would receive one-third the damages of a plaintiff suing under RICO for the same injury. While RICO utilizes and sometimes expands upon the offenses designed as racketeering activities, there is no evidence that it was meant to pre-empt or supplement the remedies already provided by those statutes which define a predicate RICO offense.
 

 Harper,
 
 545 F.Supp. at 1007-08 (citations omitted). Quoting from the now overruled district court opinion in
 
 Moss v. Morgan Stanley,
 
 the court in
 
 Hokama
 
 agreed that “there is nothing in the legislative history to suggest that Congress intended to create a private right of action for treble damages for violations of substantive statutes by ordinary business or parties.”
 
 Hokama,
 
 566 F.Supp. at 643.
 
 See also Sedima S.P.R.L. v. Imrex Co., Inc.,
 
 574 F.Supp. 963, 965 (S.D.N.Y. 1983) (RICO not intended to grant windfall where injuries otherwise compensable).
 

 [56]
 

 . Fraud in the sale of securities is listed as a form of "racketeering activity.”
 
 See
 
 18 U.S.C. § 1961(1)(D), quoted at note 43,
 
 supra. At
 
 least two courts have explicitly held that fraud in the
 
 purchase
 
 of securities is also a predicate offense.
 
 See Hanna Mining Co. v. Norden Energy Resources, Ltd.,
 
 574 F.Supp. 1172, 1982 Fed.Sec. L.Rep. (CCH) ¶ 98,742 at 93, 738 (N.D.Ohio 1982);
 
 Spencer Cos. v. Agency Rent-A-Car, Inc.,
 
 1981 Fed.Sec.L.Rep. (CCH) ¶ 98,361 at 92,215 (D.Mass.1981). As the
 
 Spencer
 
 court aptly noted "[t]he remedial purpose of the statute would appear to encompass fraud committed by the purchaser of securities, as well as the seller."
 
 Spencer,
 
 1981 Fed.Sec.L.Rep. (CCH) ¶ 98,361 at 92,215. I agree that the reach of RICO should extend to both purchases and sales.
 

 The complaints allege more than two instances of fraud within ten years, thus satisfying the "pattern” element. Defendants do not question the "enterprise" prong, nor do they challenge whether Catanella as an employee of the “enterprise,” has conducted the affairs of that enterprise through a pattern of racketeering activity.
 
 See
 
 18 U.S.C. § 1962(c).
 

 Defendants do argue that the inclusion of allegations of mail and wire fraud cannot rise to the level of a pattern of racketeering, since there is no private right of action under those criminal statutes. Because I have found a sufficient pattern of racketeering vis-a-vis the securities claims, I need not resolve this issue. However, by enacting section 1964(c), Congress has granted a civil remedy not for the mere violation of a criminal statute, but rather for violations of section 1962. A violation of section 1962 may well be grounded upon violations of criminal statutes, but the other RICO elements,
 
 e.g.,
 
 a "pattern” and an “enterprise" are also required. RICO does not grant a private right of action for an instance of isolated criminal conduct.
 

 [57]
 

 . Plaintiffs have not raised the argument that the common law fraud claim would serve as "fraud in the sale of securities” under section 1961(1)(D). This rather vague phrase is not defined in the statute and its parameters have yet to be explored. It is not clear whether it embraces
 
 any fraud
 
 in the sale of securities or only violations of the federal antifraud provisions.
 
 See generally
 
 Bridges, Private RICO Litigation Based Upon "Fraud in the Sale of Securities,” 18 Ga.L.Rev. 43, 58-63 (1983). For example, "fraud in the sale of securities” appears in section 1961(1)(D), which list other
 
 federal
 
 offenses. The state offenses are found in section 1961(1)(A). This placement may indicate that the phrase “fraud in the sale of securities” was
 
 *1426
 
 not intended to reference state common law fraud. However, I need not resolve this largely ignored issue. Assuming that common law fraud would serve as a predicate act, the claim based upon
 
 Brown
 
 is plagued by causation deficiencies in both the section 10(b) and common law fraud area. Thus, neither section 10(b) or common law fraud would afford a remedy for the failure to disclose
 
 Brown.
 
 As such,
 
 Brown
 
 cannot serve as a predicate offense under either theory.
 
 See Moss,
 
 719 F.2d at 18-19 n. 14 (did not define scope of "fraud in the sale of securities,” as both federal and common law fraud claims were dismissed).
 

 [58]
 

 . No court of appeals has required a link to organized crime. However, in
 
 dicta
 
 in
 
 Dan River, Inc. v. Icahn,
 
 701 F.2d 278 (4th Cir.1983), the Fourth Circuit hinted that it might be disposed to do so. The court explicitly refused to decide the issue, which arose in the context of a preliminary injunction. The court did express the universal concern over RICO’s breadth, observing:
 

 Finally, we meet the mounting controversy with federal courts over the proper limits, if
 
 nny,
 
 upon the use of RICO on cases far removed from the context which Congress had in mind when it enacted the statute. Congress was out to attack the problem of organized crime, not the problems of corporate control and risk arbitrage. We of course make no attempt to resolve the dispute here and now. We do not propose to enter the fray.
 

 Dan River,
 
 701 F.2d at 291.
 

 [59]
 

 . Similarly, section 1964(c) grants a remedy to
 
 “[a]ny person
 
 injured in his business or property ____” 18 U.S.C. § 1964(c) (emphasis added). There are no restrictions on the status of plaintiff or defendant in a RICO action.
 

 [60]
 

 . In addition to the definitional problems, imagine the obstacle confronting a plaintiff who must prove affiliation with organized crime. As I noted in
 
 Kimmel,
 
 "[i]f it were easy enough for a private plaintiff to prove, then RICO would probably not have been necessary in the first instance."
 
 Kimmel,
 
 565 F.Supp. at 492.
 

 [61]
 

 . As Judge Posner recently noted:
 

 Congress deliberately cast the net of liability wide, being more concerned to avoid opening loopholes through which the minions of organized crime might crawl to freedom than to avoid making garden-variety frauds actionable in federal treble damage proceedings — the price of eliminating all possible loopholes.
 

 Sutliff, Inc. v. Donovan Cos., Inc., 121
 
 F.2d 648 at 654 (7th Cir.1984).
 

 [62]
 

 . A report issued by that body feared that RICO could be utilized in virtually any securities fraud case. The report stated in part:
 

 [W]ithin the definition of 'racketeering activity’ is ‘fraud in the sale of securities.’ Against the background of expanding securities regulation, this definition could include the various officers, directors, and employees of corporations and underwriters of securities who have been found guilty of fraud in the sale of securities in some of the recent Rule 10(b)5 cases. Fraud in the sale of securities is simply not synonymous with racketeering activity-
 

 Relating to the Control of Organized Crime in the United States: Hearings on S.30 and Related Proposals Before Subcomm. No. 5 of the Comm, on the Judiciary, 91st Cong., 2d Sess. at 401 (1970).
 

 [63]
 

 .
 
 Accord Sedima S.P.R.L. v. Imrex Co., Inc.,
 
 574 F.Supp. 963, 965 (S.D.N.Y.1983).
 
 Sedima
 
 was decided after the Second Circuit rejected the organized crime limitation in
 
 Moss.
 
 The court noted the split between the competitive injury and racketeer enterprise injury requirements. However, it did not find it necessary to choose between the two, as neither requirement was satisfied. Implying that one of the two would be required, the court remarked:
 

 I find no allegation here of any injury apart from that which would result directly from the alleged predicate acts of mail fraud and wire fraud. To permit the RICO claim to stand under such circumstances would represent an unwarranted extension of the statute’s coverage that is not supported by the caselaw.
 

 Sedima,
 
 574 F.Supp. at 965. RICO counts were therefore dismissed.
 
 Id.
 

 [64]
 

 . In footnote 11, the court stated that "a RICO violation does not depend upon the existence of a competitive injury.”
 
 Van Schaick,
 
 535 F.Supp. at 1137 n. 11. Instead, the court followed
 
 Landmark's
 
 racketeer enterprise injury, adding the twist that the injury must be commercial in nature.
 
 Id.
 

 [65]
 

 . Senator Hruska, when introducing an earlier version of the statute, explained:
 

 Patterned closely after the Sherman Act, it provides for private treble damage suits, prospective injunctive relief, unlimited discovery procedures and all the other devices which bring to bear the full panoply of our antitrust machinery in aid of the businessman competing with organized crime.
 

 The bill is innovative in the sense that it vitalizes procedures which have been tried and proven in the antitrust field and applies them where they have been seldom used before.
 

 115 Cong.Ree. 6993 (March 20, 1969).
 

 [66]
 

 . This point was recognized in the ABA report on the proposed S.2048 and S.2049:
 

 Some of the conduct of organized crime in legitimate business can be ... reached by the existing antitrust laws____ Other activities of organized crime in legitimate business may or may not be subject to antitrust laws. Thus some extortion tactics and business take-overs by organized crime might not be reached under the antitrust laws,
 
 particularly if they affected only the victimized business rather than resulting in a lessening of competition in an entire line of
 
 commerce____
 

 ******
 

 By placing the antitrust-type enforcement and discovery procedures in a separate statute, a commingling of criminal enforcement goals with the goals of regulating competition is avoided.
 

 [O]n the other hand, by inserting in the Sherman Act a provision
 
 which does not have as its primary objective the establishment or maintenance of free competition,
 
 may result in an undesirable blending of otherwise laudatory statutory objectives. Criminal conduct which violates existing antitrust laws can be proceeded against under those laws. Additional conduct sought to be reached should be attacked under separate legislation.
 

 115 Cong.Rec. 6995 (emphasis added).
 

 [67]
 

 . It was this language in
 
 Landmark
 
 which led me to conclude in
 
 Kimmel
 
 that a “racketeering injury is indistinguishable from a competitive or commercial injury.”
 
 See Kimmel,
 
 565 F.Supp. at 494. Upon further reflection, it seems that a competitive injury is one
 
 type
 
 of racketeer enterprise injury.
 

 [68]
 

 . The defendants in
 
 Schacht
 
 apparently raised an argument similar to the racketeer enterprise injury, reasoning that the injuries did not stem from the operation of the enterprise through a pattern of racketeering, but rather, only from the commission of the predicate acts. The
 
 Schacht
 
 court found to the contrary and did not specifically resolve whether a valid RICO claim could be stated where the only actual injuries resulted from the underlying acts of fraud. 711 F.2d at 1358-59. However, the court reiterated that "RICO was designed to protect,
 
 direct,
 
 and not just second order victims of organized crime infiltration____"
 
 Schacht, id.
 
 at 1358. (emphasis in original). In light of this statement and given the court's general rejection of both "competitive” and "indirect” injury requirements, the court would almost have to veto the racketeer enterprise injury requirement.
 
 See also Bunker Ramo v. United Business Forms, Inc.,
 
 713 F.2d 1272, 1288 (7th Cir.1983) (adopting approach taken in
 
 Hellenic Lines
 
 allowing recovery for direct injuries). The requirement that the injuries be something more than that flowing from the predicate acts, forecloses most, if not all, actions for
 
 direct
 
 injuries. Interestingly, of the five courts to interpret
 
 Schacht
 
 on this point, three different results were reached.
 
 See e.g., County of Cook v. Midcon Corp.,
 
 574 F.Supp. 902 at 919 (N.D.Ill.1983)
 
 (Schacht
 
 does not foreclose interpretation that plaintiff must suffer racketeering injury apart from commission of predicate acts);
 
 Haroco, Inc. v. American National Bank and. Trust Co. of Chicago,
 
 577 F.Supp. 111, 114-15 (N.D.Ill.1983) (same);
 
 Jensen v. E.F. Hutton & Co., Inc.,
 
 [Current] Fed.Sec.L.Rep. (CCH) ¶ 99,674 at 97,713 (C.D.Cal.1984)
 
 (Schacht
 
 rejected racketeer enterprise injury);
 
 Windsor Assoc., Inc. v. Greenfeld,
 
 564 F.Supp. 273, 278-79 (D.Md.1983)
 
 (Schacht
 
 rejected notion that inju
 
 *1436
 
 ry something more than commission of two predicate offenses within two years through an enterprise);
 
 Austin v. Merrill Lynch, Pierce, Fenner & Smith,
 
 570 F.Supp. 667, 669 (W.D.Mich. 1983) (following
 
 Schacht
 
 — does not decide the issue). Assuming, without deciding, that a racketeer enterprise injury was required, the
 
 Austin
 
 court formulated a novel way to
 
 uphold
 
 the RICO claim. The predicate acts relied upon in this securities fraud case were mail and wire fraud. The criminal mail and wire fraud statutes do not require misrepresentations, reliance or injury — all of which were pled by plaintiff. The court concluded that "[ijnsofar as these allegations raise matters not contained in criminal mail and wire fraud charges, they allege injury arising out of the pattern of racketeering and not the commission of predicate offenses."
 
 Austin,
 
 570 F.Supp. at 669. This analysis suggests that as long as there is some factor involved in addition to the elements of the predicate offense, an appropriate RICO injury is alleged. However, the court does not explain how the existence of misrepresentations or reliance adds to the injury suffered. This result was probably possible only because the plaintiffs in
 
 Austin
 
 did not rely upon the securities fraud as a predicate offense.
 

 [69]
 

 . Other explanations of this concept have been offered. The
 
 Bennett
 
 court suggested that the racketeer enterprise injury requirement may actually test the sufficiency of the enterprise element.
 
 Bennett,
 
 685 F.2d at 1059 n. 5. In a similar vein, the court in
 
 Slattery
 
 queried whether it represents the largely discredited requirement that the enterprise be separate and distinct from the acts of racketeering.
 
 Slattery,
 
 at 166-67.
 

 70.
 

 The one arguable exception to this rule is
 
 Gitterman v. Vitoulis,
 
 564 F.Supp. 46 (S.D.N.Y. 1982), where the court appeared to find the racketeering enterprise injury element satisfied. However, the injury in that case was nothing more or different than that arising from the commission of the predicate acts. Defendants in
 
 Gitterman
 
 represented themselves as members of a carpet cleaning service, using their access to plaintiffs’ apartments as an opportunity to appropriate diamonds. Although the court mentioned the need to show a racketeering enterprise injury, there was virtually no analysis of the actual injury sustained. The court simply noted that the "thefts ... were part of a pattern of criminal activity and systematic fraud ..." and concluded that “the type of scheme to combat, i.e., the infiltration of legitimate businesses by organized crime.”
 
 Gitterman,
 
 564 F.Supp. at 49. The injury in
 
 Gitterman
 
 was the loss of the stones, which arose from the predicate acts of theft. The decision may be reflective of the fact that criminal conduct, rather than "garden variety” commercial fraud, was involved. Indeed, many courts appear to treat RICO in general and the racketeer enterprise injury in particular, with the same analysis employed in the obscenity area — they know it when they see it!
 
 See Jacobellis v. Ohio,
 
 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring). At least two courts have actually cited to Justice Stewart’s famous phrase in order to explain their view of RICO.
 
 See Willamette Savings & Loan v. Blake & Neal Finance Co.,
 
 577 F.Supp. 1415, 1430 (D.Ore.1984);
 
 Waste Recovery Corp. v. Mahler,
 
 566 F.Supp. 1466, 1468 (S.D.N.Y. 1983).
 

 [71]
 

 . Defendants in Gaugler have not raised this as a ground for dismissal and the Taraborelli complaint has been dismissed. Thus, only the allegations in Singer, Rastelli and Shulik remain in issue.
 

 [72]
 

 . The Pennsylvania statute provides:
 

 It is unlawful for any person, in connection with the offer, sale or purchase of any security in the State, directly or indirectly:
 

 (a) To employ any device, scheme or artifice to defraud;
 

 (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
 

 (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.
 

 Pa.Stat.Ann. tit. 70 § 1-401. The New Jersey statute differs only in its prefatory language, which states: "[I]t shall be unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly ____” N.J.Stat.Ann. tit. 49 § 3-52.
 

 [73]
 

 . The section states:
 

 (a) Any person who
 

 ******
 

 (2) offers or sells a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission),
 
 is liable to the person buying the security from him, who may sue to recover the consideration paid for the security,
 
 together with interest at 6% per year from the date of payment and costs, less the amount of any income received on the security, upon the tender of the security and any income received on it, or for damages if he no longer owns the security; provided, however, that the person buying the security must sustain the burden of proof that the seller knew of the untruth or omission and intended to deceive the buyer, and provided further that the buyer has suffered a financial detriment. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and
 
 *1440
 
 interest at 6% per year from the date of disposition ____
 

 NJ.Stat.Ann. tit. 49 § 3 — 71(a)(2) (emphasis added).
 

 [74]
 

 . Section 1-501 provides in part:
 

 (a) Any person who:
 

 * * * * iV *
 

 (ii) offers or sells a security in violation of section 401, 403, 404 or otherwise by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, the purchaser not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known the untruth or omission, shall be liable to the person purchasing the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income or distributions, in cash or in kind, received on the security, upon the tender of the security, or for damages if he no longer owns the security.
 

 Pa.Stat.Ann. tit. 70 § l-501(a). Section 1-501(b), which holds a buyer liable to his seller, is virtually identical in language to section 1-501(a).
 

 [75]
 

 . The
 
 Biggans
 
 court pointed out that in a churning case, the measure of damages would be worthless to a potential plaintiff, who seeks to recover the excess commissions paid to a broker.
 
 See Biggans,
 
 638 F.2d at 610.
 

 [76]
 

 . In the section 12(2) area, plaintiffs also argued that they were a "substantial factor in causing the transaction to take place."
 
 See
 
 note 46,
 
 supra.
 
 I did not find it necessary to decide whether this Circuit would follow the “substantial factor” test. By implication, plaintiffs raise the same argument again in this context. Both the Pennsylvania and New Jersey statutes resolve this issue by creating aider-abettor type liability for a broker-dealer who "materially aids" in the sale.
 
 See
 
 Pa.Stat.Ann. tit. 70 § l-503(a); NJ.Stat.Ann. tit. 49 § 3-71(b). Section 3-71(b) holds that individual liable "jointly and severally with and
 
 to the same extent as the seller ____" Id.
 
 The factual allegations here simply do not support imposition of liability under these sections.
 

 [77]
 

 . Neither the Gaugler or Shulik complaints contain section 12(2) claims. Thus, the required privity cannot be inferred from those claims.
 

 [78]
 

 . The Third Circuit, in discussing the duty of a federal court applying state law explained:
 

 In the absence of an authoritative pronouncement from the state’s highest court, the task of a federal tribunal is to predict how that court would rule. To make this prognostication, we are not inflexibly confined by dicta or lower state court decisions, although we should look to such statements as indicia of how the state’s highest court might decide.
 

 Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,
 
 652 F.2d 1165, 1167 (3d Cir.1981).